IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

| | | |
|---|---|---|
| KIMBERLY ANN POLK, | ) | |
| | ) | |
| | ) | No. 8:24-cv-1487-DLB |
| Plaintiff, | ) | |
| v. | ) | **Hearing Requested** |
| | ) | |
| MONTGOMERY COUNTY PUBLIC SCHOOLS, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____


<u>MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>

Frederick W. Claybrook, Jr., Bar No. 21604
  (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(301) 622-0360
Rick@claybrooklaw.com

<u>Of Counsel</u>

Robert Flores
Gammon & Grange, P.C.
1945 Old Gallows Rd., Ste. 650
Vienna, Va. 22181
jrf@gg-law.com

Steven W. Fitschen, Bar No. 31117
James A. Davids, Bar No. 31107
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Attorneys for Plaintiff

May 29, 2024

## Table of Contents

Statement of Facts ................................................................................................................. 1

Argument ............................................................................................................................... 2

  I. Ms. Polk Is Likely to Succeed on the Merits ................................................................. 2

    A. MCPS Violated Title VII by Refusing a Religious Accommodation ................................. 3

      1. MCPS's Proffered Justifications Are Insufficient as a Matter of Law .......................... 3

      2. Ms. Polk's Suggested Accommodation Is Feasible ........................................................ 5

      3. MCPS Has Not Carried Its Burden to Show Other Accommodations
      Are Infeasible ................................................................................................................. 6

    B. MCPS Also Violated Ms. Polk's Constitutional Rights ................................................. 7

      1. Ms. Polk's Free Speech Rights Are Violated by MCPS's Gender Identity Policy ......... 8

        a. The MCPS Gender Identity Policy Compels Speech ................................................. 8

        b. Ms. Polk Retains Her Free Speech Rights in Her Teaching Role ............................ 10

          i. Garcetti's "Government Speech" Exception Does Not Apply in an
          Academic Setting ................................................................................................ 11

          ii. The Supreme Court Has Expressed Serious Reservations About the
          Applicability of the *Pickering* Balancing Test in Situations Such as This ........... 11

        c. MCPS Can Satisfy Neither Strict nor Exacting Scrutiny nor *Pickering*
        Balancing ............................................................................................................. 13

          i.  MCPS Cannot Satisfy Either Prong of Strict Scrutiny ........................................ 14

            (a) MCPS Has No Legitimate Interest in the Parts of the Policy Offensive
            to Ms. Polk ...................................................................................................... 14

            (b) MCPS Cannot Meet the Least Restrictive Means Requirement .................... 19

          ii. MCPS Cannot Satisfy Exacting Scrutiny ........................................................... 20

          iii. MCPS Cannot Prevail Under the Pickering Balancing Test ............................... 20

      2. MCPS's Policy Also Violates Ms. Polk's Free Exercise Rights .................................. 21

i

II. Ms. Polk Will Suffer Irreparable Harm Without the Requested Injunctive
  Relief, MCPS Will Not Be Harmed by It, and the Public Interest Supports It ................... 25

Conclusion ............................................................................................................... 26

## Table of Authorities

Cases

*303 Creative, LLC v. Elenis*, 600 U.S. 570 (2023)....................................................................... 10

*Adams v. Trustees of the Univ. of N.C.-Wilmington*,
    640 F.3d 550 (4th Cir. 2011) ......................................................................................................11

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)...................................................................................................................... 9

*Brokaw v. Mercer Cnty.*, 235 F.3d 1000 (7th Cir. 2000) ................................................................ 19

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019) ...................................................................11

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) .................................................... 16, 25

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
    508 U.S. 520 (1993).................................................................................................................... 23

*Connick v. Myers*, 461 U.S. 138 (1983) ............................................................................8, 11, 21

*Cramp* v. *Bd. of Pub. Instruction*, 368 U.S. 278 (1961) .............................................................. 13

*Croft v. Westmoreland Cnty. Children and Youth Servs.*,
    103 F.3d 1123 (3d Cir. 1997) ................................................................................................... 19

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)............................................................................11

*Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003)................................................................................... 19

*Elrod v. Burns*, 427 U.S. 347 (1976)............................................................................................ 25

*Employment Division v. Smith*, 494 U.S. 872 (1990)................................................................... 22

*Fulton v. Phila.*, 593 U.S. 522 (2021) .............................................................................. 22, 23, 24

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ......................................................................10, 11, 13

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002)........................................... 25, 26

*Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410 (1979)................................................. 8

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006) .................. 16

*Greater Balto. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balto.,*
879 F. 3d 101 (4th Cir. 2018) ........................................................................ 9

*Groff v. DeJoy*, 600 U.S. 447 (2023) .......................................................... 3-7

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, Inc.,*
515 U.S. 557 (1995) ................................................................................ 8, 18

*Janus v. American Fed'n of State, Cnty., and Mun. Employees,*
585 U.S. 878 (2018) .................................................... 8, 9, 12-13, 20, 21

*Keene v. City & Cnty. of San Francisco,*
U.S. App. LEXIS 11807 (9th Cir. May 15, 2023) .................................... 22

*Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022) .............................. 15, 22, 23

*Keyishian* v. *Bd. of Regents,* 385 U.S. 589 (1967) .......................................... 8, 13

*Knox v. Serv. Employees Int'l,* 567 U.S. 298 (2012) ...................................... 20

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't,*
2 F.4th 330 (4th Cir. 2021) ...................................................................... 25

*Lee v. Weisman*, 505 U.S. 577 (1992) ........................................................ 15

*Lee v. York Cnty. Sch. Div.*, 484 F.3d 687 (4th Cir. 2007) ............................ 11

*Masterpiece Cakeshop, Inc. v. Colo. Civ. Rights Comm'n,*
584 U.S. 617 (2018) .......................................................................... 15, 23

*Matal v. Tam*, 582 U.S. 218 (2017) .......................................................... 15, 18

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ................................ 11, 20, 21

*Meyer v. Neb.*, 262 U.S. 390 (1923) ........................................................ 15

*Mirabelli v. Olson*, 2023 WL 5976992 (S.D. Cal. Sept. 14, 2023) ................ 16, 17, 22

*Moore v. E. Cleveland*, 431 U.S. 494 (1977) .............................................. 15

iv

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    585 U.S 755 (2018) ............................................................................................ 9

*Nat'l Socialist Party of Am. v. Village of Skokie,*
    432 U.S. 43 (1977) ............................................................................................ 15

*Newsom ex re. Newsom v. Albemarle Cnty. Sch. Bd.,* 354 F.3d 249 (4th Cir. 2003) ................... 26

*Parham v. J.R.*, 442 U.S. 584 (1979) ................................................................ 13, 17-18

*Perry* v. *Sindermann,* 408 U. S. 593 (1972) ....................................................................... 7-8

*Pickering v. Bd. of Educ. of Twnshp. High Sch. Dist.,*
    391 U.S. 563 (1968) .................................................................................. 10, 12, 21

*Ramirez v. Collier,* 595 U.S. 411 (2022) ......................................................................... 2

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ............................................................... 14

*Renken v. Gregory*, 541 F.3d 769 (7th Cir. 2008) .........................................................11

*Ricard v. USD 475 Geary County, KS School Board,*
    2022 WL 1471372 (D. Kan., May 9, 2022) ........................................... 16, 17, 18-19

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) .............................. 8

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) ......................... 25

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) .................... 10

*Santosky v. Kramer*, 455 U.S. 745 (1982) ..................................................................... 13

*Shelton* v. *Tucker,* 364 U.S. 479 (1958) ................................................................... 8, 13

*Sherbert* v. *Verner,* 374 U. S. 398 (1963) ..................................................................... 8

*Snyder v. Phelps,* 562 U.S. 443 (2011) .................................................................. 15, 21

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
    600 U.S. 181 (2023) ...................................................................................... 16

*Tex. v. Johnson*, 491 U.S. 397 (1989) ......................................................................... 15

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969) ........................................................................................ 10

*Torcaso* v. *Watkins,* 367 U.S. 488 (1961) ................................................................ 13

*Troxel v. Granville*, 530 U.S. 57 (2000) ................................................... 13, 17, 18

*Turner Broad., Inc. v. FCC*, 512 U.S. 622 (1994) ................................................ 9, 14

*United States v. Treas. Employees,* 513 U.S. 454 (1995) ...................................... 12

*Wash. v. Glucksberg*, 521 U.S. 702 (1997) ............................................................ 15

*Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007) .................................... 13

*Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7 (2008) ...................................... 2

*Wooley v. Maynard*, 430 U.S. 705 (1977) .............................................................. 8, 9

*Wyatt v. Fletcher*, 718 F.3d 496 (5th Cir. 2013) .................................................... 19

<u>Statutes</u>

42 U.S.C. § 1983 ...................................................................................................... 25

42 U.S.C. § 2000e(j) .............................................................................................. 3, 25

Without preliminary injunctive relief, the Defendants will continue to violate Ms. Polk's constitutional rights—a per se irreparable harm—and she will likely lose yet another year's employment by the Montgomery County Public Schools ("MCPS") as a substitute teacher, to her great financial hardship.  The relief she seeks is in the public interest, and it will not harm MCPS or students in any way.  The Court should grant her motion for a preliminary injunction.

<u>Statement of Facts</u>[1]

MCPS approved Ms. Polk as a substitute teacher in 2021, and she taught in preschool special education, kindergarten, and Grades 2 and 4 during the 2021-2022 school year.  She received positive reviews and qualified to continue substitute teaching during the 2022-2023 school year.

However, MCPS required Ms. Polk in the summer of 2022 to do on-line training that included instruction on MCPS's gender identity policy.  That policy, which remains in effect, requires Ms. Polk to pretend that students who are transitioning genders really are other than their God-given sex by letting them use the other-sex restroom of their choice, by using mismatched pronouns when addressing them, and by lying to parents about these at-school behaviors when MCPS has decided that parents may not be supportive of their child's transition.  While Ms. Polk would never bully or harass a transitioning student and would stop any such behavior, and while she would use whatever first name is selected by the student, Ms. Polk has religious objections to these other parts of the policy.  As a result, she could not in good conscience affirm that she would abide by MCPS's gender identity policy in full.  Because she

---

[1] These facts are summarized from Ms. Polk's Verified Complaint ("V.C.") and her declaration filed in support of her motion for preliminary injunction ("Polk Decl.").

did not "check the box" that she would, MCPS locked her out of the substitute teacher portal in which she signs up for substitute positions.

Ms. Polk in her prior substitute teaching never had interaction with transitioning students, and, in her experience, there are many classes, especially in the lower grades, that have no transitioning students.  Thus, she requested a religious accommodation from MCPS.  During her initial conversation with a MCPS official, she said she was willing to compromise by substituting only in elementary and lower classes and by calling on other MCPS personnel if she ever were confronted with a situation in which she could not follow the MCPS gender policy without violating her religious beliefs.  After that conversation, the official reported back to her that MCPS had categorically refused any accommodation for her.

Ms. Polk filed an EEOC charge and, after more than six months, requested and received a "right to sue" notice.  During the EEOC process, the only "accommodation" MCPS suggested was that it would not require Ms. Polk to "check the box" to affirm that she would follow the policy, but that she would still have to follow the gender policy when working.  This is not a real accommodation, as it would compel her either to violate her religious beliefs or to lose her job.

<u>Argument</u>

The preliminary injunction factors are well established. The movant must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Ramirez v. Collier,* 595 U.S. 411, 421 (2022) (quoting *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)).  Ms. Polk meets each of these requirements for relief.

I.    <u>Ms. Polk Is Likely to Succeed on the Merits</u>

Ms. Polk is likely to succeed on all three counts of her Verified Complaint.  MCPS violated Title VII by failing to provide her an accommodation to allow her to continue to work as

a substitute teacher.  Moreover, by conditioning her employment on compelling her to treat gender dysphoric youth as transgender and to conspire with it to violate the constitutional rights of parents by misleading them about how the school is treating their children, MCPS violated her free speech and free exercise rights.

      A.  <u>MCPS Violated Title VII by Refusing a Religious Accommodation</u>

When defining *religion* for purposes of unlawful discrimination, Congress in Title VII explains as follows:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).  While the courts had reached somewhat conflicting opinions on what constitutes an "undue hardship," the Supreme Court in *Groff v. DeJoy*, 600 U.S. 447 (2023), clarified the standard.  *Groff*'s lessons are these for present purposes:

- Only a *de minimis* burden on the employer does not suffice.  *Id.* at 468-69.

- Consistent with the plain language of Title VII and common sense, the burden is on the employer to defend a denial of a religious accommodation by showing that the denial would result in substantial increased costs in relation to the overall context of the conduct of its particular business.  *Id.* at 469-70 (holding that employer "must show" sufficient burden).

- Bias or hostility to a religious practice or a religious accommodation does not provide a valid defense to an employer.  *Id.* at 472.

- An employer may not only consider particular accommodations requested by an employee, but must affirmatively consider all possible accommodations.  *Id.* at 473.

      1.  <u>MCPS's Proffered Justifications Are Insufficient as a Matter of Law</u>

MCPS in its Statement of Position ("SOP") submitted to the EEOC sought to avoid its Title VII responsibilities in two ways:  (a) by repeating at length how important it believes it to be to hold affirming view of homosexuality and transgenderism (*see, e.g.*, SOP (Attach. 9 to the

Polk Decl.) at 4-5), and (b) by claiming that it provided Ms. Polk an acceptable accommodation by saying she would have to comply fully with the gender identity policies in practice but would just not have to affirm that she agreed to do so in writing (i.e., by "checking the box" electronically) (*see* SOP at 5).  This approach fails as a matter of law.

What MCPS is basically arguing is that it disagrees with Ms. Polk's religiously informed views.  As a result, MCPS will require her to dishonor her beliefs in practice, even if MCPS does not make her affirm expressly MCPS's contrary vision of reality and morality.  All MCPS accomplishes by putting this forward as a purported "accommodation" is show its own anti-religion bias.  It does no more good for MCPS to say it disagrees with Ms. Polk's religious beliefs and considers them "biased" and "discriminatory" than it would have for USPS to have defended its firing of Mr. Groff by saying that it felt strongly that his beliefs about the Sunday being a Sabbath day of rest were mistaken.  Title VII requires *accommodation* of an employee's religious view, even when they might come into conflict in some ways with the employer's beliefs and business practices.

The Supreme Court emphasized in *Groff* that an anti-religious bias like MCPS shows— i.e., a disagreement with the complaining employee's religious beliefs and practices—is irrelevant in the Title VII accommodation enquiry:  "If bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself."  600 U.S. at 472.  That is true whether the hostility is expressed by other employees or by the employer itself.

Of course, MCPS's suggested "accommodation" that Ms. Polk act inconsistently with her religious beliefs is also "at war with itself."  It is no accommodation at all, but a mandated capitulation.  Viewed more cynically, MCPS was trying to create the type of Catch-22 trap that

Title VII prohibits:  Had Ms. Polk taken MCPS up on its disingenuous offer and altered her behavior, it would have undermined her credibility of sincerely holding orthodox Christian beliefs about gender; if she acted consistently with her beliefs after taking the "accommodation," she would be guilty of violating MCPS's rules and subject to dismissal.

2.   <u>Ms. Polk's Suggested Accommodation Is Feasible</u>

This discussion could end here.  Both Title VII and the Supreme Court in *Groff* make clear that it is the *employer's* burden to prove that no accommodation is feasible without involving an undue hardship to the overall business.  *Id.* at 470.  MCPS has done nothing except posit excuses that are unavailing as a matter of law.

But Ms. Polk and MCPS's Mr. Walker did broker an accommodation, and it shows that one is available here.  Their accommodation was that Ms. Polk would be assigned to classes that did not have a "transitioning" student and, if any problem situation presented itself, she would get assistance from other MCPS employees and remove herself from the situation.  (V.C. ¶ 33.) Obviously, Ms. Polk is not asking for an accommodation to ridicule or discriminate against children exhibiting as transgender (Polk Decl. ¶ 23) and her suggested accommodation would not undercut the school's professed mission to support its transitioning students in the least, as it would keep her out of such situations.

This suggested accommodation is obviously one that is reasonable, practical, and eminently feasible.  MCPS has hundreds of preschool and elementary classrooms, it has thousands of employees, it knows which classes have transitioning students due to its recordkeeping of such children (*see* V.C. ¶¶ 8, 13, 15; Polk Decl. ¶ 22 & Attachs. 3, 4), and the likelihood of transitioning students among the preschool through elementary classes (the classes for which Ms. Polk seeks injunctive relief) is minimal.  (Polk Decl.  ¶ 19.)  Despite being aware

of this suggested accommodation, MCPS in its SOP did nothing to show this approach would involve an undue hardship.

Of course, MCPS did not make this showing because it cannot. The Supreme Court in *Groff* also spoke to this point. It held that just pointing to some potential inconvenience or expense due to accommodating a religious employee is insufficient: "Faced with an accommodation request like Groff's, it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options, such as voluntary shift swapping, would also be necessary." *Id.* at 473. The obvious analogue to shift swapping in the context of MCPS's business is placing Ms. Polk in a classroom environment in which the potential for the problem that MCPS forsees is minimal to nonexistent, or addressing it quickly by other employees if it does eventuate. After all, Ms. Polk worked the full 2021-2022 school year without any such problem arising, and her substituting in any particular class is day-to-day, so that any situation that arose could quickly and easily be remedied. (Polk Decl. ¶ 19 & Attach. 2.)

      3.   MCPS Has Not Carried Its Burden to
            Show Other Accommodations Are Infeasible

The Supreme Court in *Groff* also stressed that the employer's burden to canvass for accommodations that do not involve an undue hardship is not satisfied simply by considering what the religious employee might suggest. Instead, "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations. This distinction matters." *Id.* at 473 (citations omitted).

As its SOP discloses, MCPS has made no effort whatsoever to search for accommodations for Ms. Polk. The Supreme Court further instructs that it is required to do so

6

"in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 470-71 (citation and internal quotation marks omitted). In this case, that means, among other things, recognizing that MCPS has over 130 elementary schools, each with a multiplicity of classrooms in which Ms. Polk could teach, and that it has almost 25,000 employees and an over-three-billion-dollar annual budget. Moreover, substitute teachers utilize a web-based portal to find classes in need of a substitute. This portal, maintained by MCPS, could be used to ensure that Ms. Polk was not assigned to a classroom with a child presenting with gender issues, as the school system identifies children with gender issues and tracks them. (V.C. ¶¶ 13, 15; Polk Decl. ¶¶ 16, 19 & Attach. 2.)

MCPS's failure to look for any accommodation—and, indeed, its demonstrated antipathy to doing so—violates Title VII. For this additional reason, Ms. Polk should prevail in her complaint.

## B. MCPS Also Violated Ms. Polk's Constitutional Rights

It is way too late in the day to claim that MCPS may put whatever conditions it wishes on Ms. Polk's working as a substitute. The government

> may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser* v. *Randall,* 357 U. S. 513, 526. Such interference with constitutional rights is impermissible.
> . . . .
>
> Thus, the respondent's lack of a contractual or tenure 'right' to re-employment for the 1969-1970 academic year is immaterial to his free speech claim. Indeed, . . . the non-renewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights.

*Perry* v. *Sindermann,* 408 U. S. 593, 597-98 (1972) (citing *Shelton* v. *Tucker,* 364 U.S. 479

(1958); *Keyishian* v. *Bd. of Regents,* 385 U.S. 589 (1967)).  The Supreme Court confirmed in

*Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 412-14 (1979), that this rule

applies to a teacher who expresses her opposition to a school's practices privately.  And it noted

in *Connick v. Myers*, 461 US 138, 144 (1983), quoting from *Sherbert* v. *Verner,* 374 U. S. 398,

404 (1963), that the rule applies not only to an employee's constitutional right to free speech, but

to free exercise as well, both of which are at issue here: "the liberties of religion and expression

may be infringed by the denial of or placing of conditions upon a benefit or privilege."

        1.   Ms. Polk's Free Speech Rights Are
                  <u>Violated by MCPS's Gender Identity Policy</u>

          a.   <u>The MCPS Gender Identity Policy Compels Speech</u>

That compelled speech is at the heart of this case is obvious.  MCPS as a condition of

employment requires Ms. Polk to mouth its preferred message on trangenderism, including by

using pronouns that do not correspond with the child's biological sex and by misleading parents

about how their children are being treated in school.  The compelled speech doctrine applies to

ideological speech such as is involved here.  *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,

487 U.S. 781, 797-98 (1988); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

In punishing Ms. Polk for refusing to articulate its message, MCPS runs directly counter

to the Supreme Court's decisions recognizing that governments violate the Free Speech Clause

when they force someone to support a message with which she disagrees. *Janus v. American

Federation of State, County, and Municipal Employees*, 585 U.S. 878, 892 (2018), teaches that

doing so inflicts a "demeaning" injury that violates a "cardinal constitutional command"; *Hurley

v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, Inc.,* 515 U.S. 557, 573 (1995),

instructs that it runs roughshod over "the fundamental rule of protection under the First

Amendment"; and *Turner Broadcasting, Inc. v. FCC*, 512 U.S. 622, 641 (1994), observes that it undercuts the principle that lies "[a]t the heart of the First Amendment," one that grounds our very "political system and cultural life." *Wooley* instructs, "The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable." 430 U.S. at 715. And in *National Institute of Family & Life Advocates v. Becerra*, 585 U.S 755 (2018), the Court found intolerable under the Free Speech Clause a requirement that a pregnancy center post in its waiting room a pro-abortion message with which it disagreed; Justice Kennedy wrote, "Governments must not be allowed to force persons to express a message contrary to their deepest convictions." *Id.* at 780 (Kennedy, J., concurring); *see also Greater Balto. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balto.*, 879 F. 3d 101 (4th Cir. 2018). Here, Ms. Polk could cave to MCPS's instruction "only at the price of evident hypocrisy." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 219 (2013).

In *Janus*, the objecting employee had to pay prorated dues to the union designated to negotiate exclusively with his employer even though he disagreed with many of the union's public policy positions. 585 U.S. at 887. The employee did not express any speech of his own, but, still, the Court held that forcing him to subsidize messages with which he disapproved violated his free speech rights. The Court warned, "Compelling individuals to mouth support for views they find objectionable" on "controversial public issues" should be "universally condemned." *Id.* at 892. These teachings articulated in *Janus* apply with full force here. If subsidization of the speech of others qualifies as compelled speech, then forcing Ms. Polk to articulate speech with which she has a moral objection certainly does. *See Wooley*, 430 U.S. at

714-15 (striking down government attempt to make drivers "instrument[s] for fostering . . . an ideological point of view" they find "morally objectionable").

Of course, MCPS in its Gender Identity Guidelines also compels its teachers to articulate a *particular* point of view.  As such, it also runs afoul of the Free Speech Clause's prohibition of government regulation that is content-based or viewpoint discriminatory.  Such regulation is accorded strict scrutiny review.  *See 303 Creative, LLC v. Elenis*, 600 U.S. 570, 586 (2023) ("Generally, the government may not compel a person to speak its own preferred messages."); *see generally Rosenberger v. Rector and Visitors of Univ. of Va*., 515 U.S. 819, 829 (1995) (ruling that the government may not regulate speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction").

> b.  Ms. Polk Retains Her Free Speech Rights in Her Teaching Role

The Defendants, presumably, will not contest that, in a normal situation, they could not compel Ms. Polk to speak a message to which she objects.  Nor could they reasonably argue that, as soon as a teacher enters the school, her free speech rights vanish.  In the Supreme Court's well-known phraseology, teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969).  Instead, MCPS likely will seek refuge in the fact that some limitations may be placed on the free speech rights of public school teachers in certain circumstances.

Those limitations are of no avail to MCPS here.  The "government speech" exception of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and the balancing test of *Pickering v. Board of Education of Township High School District*, 391 U.S. 563, 568 (1968), do not apply.  Even if they did, Ms. Polk is articulating her own views on a matter of public interest in a non-curricular manner.

i.  Garcetti's "Government Speech" Exception
    Does Not Apply in an Academic Setting

In *Garcetti*, the Supreme Court ruled that a government employee, in that case a prosecutor, has no free speech rights when his communication is a function of his official responsibilities, making it basically government, rather than private, speech.  547 U.S. at 420-24. The Court expressly stated, however, that it was refraining from considering the situation of teachers, which, as Justice Souter pointed out in his opinion, implicates broader constitutional concerns of academic freedom and a reality that teachers are often expected to voice their own views in class even while serving as government employees.  *Id.* at 425; *id.* at 438-39 (Souter, J., dissenting).

The Courts of Appeals, including the Fourth Circuit, have resolved this issue by holding that *Garcetti*'s "official duties" rule does *not* apply to public school teachers.  *See Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011) (university teacher); *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007) (high school teacher); *see also Meriwether v. Hartop*, 992 F.3d 492, 504-06 (6th Cir. 2021); *Buchanan v. Alexander,* 919 F.3d 847, 852-53 (5th Cir. 2019); *Demers v. Austin,* 746 F.3d 402, 411 (9th Cir. 2014).  *But cf. Renken v. Gregory*, 541 F.3d 769 (7th Cir. 2008) (applying "official duties" rule to university professor's non-classroom speech).  In any event, it would be pushing *Garcetti* yet another, improper step to apply it in a *compelled* speech setting.  Compelled speech does not involve any of the type of considerations found relevant in cases like *Garcetti* and *Connick,* in which employees actively criticized their employers.  Thus, *Garcetti's* "official duties" exception does not apply here.

ii.  The Supreme Court Has Expressed Serious
     Reservations About the Applicability of the
     *Pickering* Balancing Test in Situations Such as This

Many cases involving whether a government employer may clamp down on an employee's speech, or punish the employee for it, are resolved by application of the balancing test the Supreme Court set out in *Pickering*.  The Court there held that a public employee's interest in exercising her freedom of speech must be weighed against the government's need to "promot[e] the efficiency of the public services it performs through its employees."  391 U.S. at 568.  The *Pickering* test is inapplicable here, however.

In *Janus*, the Supreme Court cast serious doubt on whether the *Pickering* test applied in that case for two reasons, both of which are relevant here.  First, the Court noted that *Pickering* is designed to deal with a particular employee's speech; it is ill suited to a "blanket requirement" that all employees support "speech with which they may not agree":

> While we have sometimes looked to *Pickering* in considering general rules that affect broad categories of employees, we have acknowledged that the standard *Pickering* analysis requires modification in that situation.  A speech-restrictive law with "widespread impact," we have said, "gives rise to far more serious concerns than could any single supervisory decision."  Therefore, when such a law is at issue, the government must shoulder a correspondingly "heav[ier]" burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights.  The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis.

585 U.S. at 907 (citing and quoting *United States v. Treas. Employees,* 513 U.S. 454, 466-68 & n.11, 475-76 n.21, 482-83 (O'Connor, J., concurring) (1995)).  Those parts of the Gender Identity Guidelines to which Ms. Polk objects apply to all teachers.  Thus, the standard *Pickering* analysis does not apply for that reason.

Second, the Supreme Court in *Janus* held that "the *Pickering* framework fits much less well" when the government compels speech:

> When a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf, the calculus is very different.  Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message.  Otherwise, however,

> it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case.
>
> . . . . If *Pickering* applies at all to compelled speech—a question that we do not decide—it would certainly require adjustment in that context.

*Id.* at 2473 (citing *Garcetti*, 547 U.S. at 421-22, 425-26).[2]

Notably, Ms. Polk objects to deceiving parents about how their kids are treated at school, which is not a "lawful," but an unlawful, purpose. MCPS enlists teachers to conspire with it via compelled speech to deprive parents of their constitutional rights. The only way to remedy that inappropriate action is to enforce the teacher's constitutional right not to be compelled to do so. Of course, the parents' rights in this regard are fundamental and also protected via the Fourteenth Amendment. *See Troxel v. Granville*, 530 U.S. 57 (2000); *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 529 (2007) ("it is not a novel proposition to say that parents have a recognized legal interest in the education and upbringing of their child"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Parham v. J.R.*, 442 U.S. 584, 604 (1979).

c.  MCPS Can Satisfy Neither Strict nor
Exacting Scrutiny nor *Pickering* Balancing

For the reasons addressed above, MCPS's requirements that Ms. Polk use pronouns that do not correspond to the sex of the student and that she withhold information from parents about their children do not qualify under *Garcetti*'s "official duties" exception. Granted, the Supreme

---

[2] Also providing a close analogy here is the series of cases in which the Supreme Court struck down government attempts, often by school districts, to compel workers to mouth loyalty oaths and disclose their associations with groups the school districts considered "suspect." The Court repeatedly noted that such conditions unconstitutionally compelled speech and infringed on the First Amendment right of association. *See, e.g.*, *Keyishian*, 385 U.S. at 602-09; *Cramp* v. *Bd. of Pub. Instruction,* 368 U.S. 278 (1961); *Torcaso* v. *Watkins,* 367 U.S. 488 (1961); *Shelton,* 364 U.S. at 490 (1960).

Court left unanswered whether *Pickering* should apply at all in a compelled speech context and, if so, how it would need to be adjusted.  It is clear, though, that the adjustment to any balancing test applied would have to be significantly in favor of the employee.

  The better conclusion for this situation is that the *Pickering* balancing test does not apply at all and that Ms. Polk's free speech rights may not be restricted unless strict, or at least exacting, scrutiny is satisfied. As discussed further below, the school can meet neither test here, and neither can it satisfy *Pickering*'s balancing test.

       i. <u>MCPS Cannot Satisfy Either Prong of Strict Scrutiny</u>

  Government regulations "that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those "that suppress, disadvantage, or impose differential burdens upon speech because of its content" and are presumptively invalid.  *See Turner Broad.*, 512 U.S. at 642.  Thus, MCPS has to justify its compelled speech requirement by showing a compelling governmental interest advanced by the least restrictive manner possible.  *See Reed v. Town of Gilbert*, 576 U.S. 155 (2015) (applying strict scrutiny to content restriction).

  MCPS does not have a compelling interest to force the use of pronouns that do not correspond to a student's sex or to hide information from parents about how the school is treating their children.  Moreover, even if these were "critical" components for affirming students who desire to exhibit as transgender, both the solution that Ms. Polk proposed and other alternatives provide adequate tailoring to permit satisfaction of any school interest while preserving Ms. Polk's free speech rights.

      (a) MCPS Has No Legitimate Interest in the
           <u>Parts of the Policy Offensive to Ms. Polk</u>

With regard to the compelling interest prong, the interest that motivates the pronoun prong of the policy—i.e., to shield students from what they might perceive as offensive or hurtful speech—is not a legitimate, much less a compelling, one. As the Supreme Court has made clear repeatedly, the First Amendment protects from exactly such regulation. *See, e.g.*, *Masterpiece Cakeshop*, 584 U.S. 617, 638 (2018) ("[I]t is not … the role of the State or its officials to prescribe what shall be offensive."); *Matal v. Tam*, 582 U.S. 218. 244 (2017) (citing cases); *Snyder v. Phelps,* 562 U.S. 443, 448–49, 460-61 (2011); *Tex. v. Johnson*, 491 U.S. 397, 414 (1989); *Nat'l Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43 (1977).

MCPS's pronoun policy cannot be saved by rephrasing the interest as an anodyne support for youth who have transgender desires. That is simply a repackaging of the desire to shield them from speech they find offensive. Even accepting the rephrasing, it is questionable that shielding students from those who do not believe that transitioning is in their best interests can qualify as a compelling interest. If they are old enough to make a decision in this regard, they are old enough to hear, at least by implication, that not everyone agrees that transitioning is wise. *See Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 541 (2022) (referring to our "long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society'" (quoting *Lee v. Weisman*, 505 U.S. 577, 590 (1992))). Moreover, affirming transgenderism certainly lacks the historical pedigree normally required for fundamental interests. *See Wash. v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (noting that fundamental rights are those "deeply rooted in this Nation's history and tradition") (quoting *Moore v. E. Cleveland*, 431 U.S. 494, 503 (1977) (plurality op.))); *Meyer v. Neb.*, 262 U.S. 390, 399 (1923) (finding parental control of children's education to be fundamental under common law and the Constitution).

15

The definition of a state interest must not be crafted overly broadly, for fear that it will unduly sweep all before it with vague generalities about what are concededly important interests in the abstract. The Supreme Court explained in *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682 (2014), when applying RFRA's strict scrutiny requirement, that defining interests in "very broad terms, such as promoting 'public health' and 'gender equality'" is inadequate and that the focus must be how the interests would be affected by accommodating the particular persons involved. *Id.* at 726 (citing and quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 430-31 (2006)). More recently, the Supreme Court in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), in a strict scrutiny analysis rejected a university's proffered interests in "better educating its students through diversity" and "producing new knowledge stemming from diverse outlooks" as too amorphous to be afforded any weight. *Id*. at 214. Here, the interest involved is not a generalized affirmation of students who may wish to exhibit as transgender. Instead, it is whether there is a state interest in forcing a teacher to use pronouns that mismatch the student's sex when the teacher, like Ms. Polk, is willing to use no pronouns at all, i.e., to be neutral on the topic. (Polk Decl. ¶ 23.) Obviously, any such purported interest fades into obscurity and is certainly not compelling.

With respect to hiding information from parents, the Gender Identity Guidelines support that policy by hailing a child's supposed "privacy" interest, even citing FERPA in support. This misstates FERPA, which strikes the balance in exactly the opposite way, giving parents access to *all* school information about their children. *See Mirabelli v. Olson*, 2023 WL 5976992 (S.D. Cal. Sept. 14, 2023); *Ricard v. USD 475 Geary County, KS School Board*, 2022 WL 1471372 at *7 (D. Kan., May 9, 2022). It also runs headlong into the rights of parents to control their minor

children's decisions about matters such as this.  The *Ricard* court expressed amazement over a similar policy:  "It is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children[] information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns."  *Id.* at *8 (footnote omitted).[3]

Whether a child should socially transition as transgender is a difficult and critically important decision that will have repercussions for the rest of the child's life.  It is well established that *parents* get to make such decisions for their minor children.  As the Supreme Court explained in *Parham*, children lack the "maturity, experience, and capacity for judgment required for making life's difficult decisions."  442 U.S. at 602.  And in *Troxel,* the Court repeated that parents have a "fundamental right to make decisions concerning the care" of their minor children.  530 U.S. at 72.

It naturally follows from this principle that the perceived interests of the child in safety and privacy do not, as a matter of law, trump the parents' right to make decisions for the child.  The Court elucidated in *Parham* that the fact that the decision of the parents "is not agreeable to a child or . . . involves risks . . . does not diminish the parents' authority to decide what is best for the child" or "automatically transfer the power to make that decision from the parents to some

---

[3] *Mirabelli* also speaks to this:

> The teachers could also make out a freedom of speech claim if the policy compels them to violate the law or deliberately convey an illegal message.  Here, the plaintiffs' come closest to making out a successful freedom of speech claim on the merits. This is because the policy . . ., as presented to faculty, and EUSD's response to the plaintiffs' request for accommodations, appears to demand that these teachers communicate misrepresentations to parents about the names and pronouns adopted by their students.  As discussed above, that would likely be unlawful and in derogation of the constitutional rights of parents.

2023 WL 5976992 at *12.

agency or officer of the state." 442 U.S. at 603-04. MCPS's purported "interests" are illegitimate because they are simply attempted justifications for wanting to displace parents as the ones primarily responsible for the care and nurturing of the parents' children. But it is parents, not schools, whom the law assumes act in their children's best interests. *Id.* at 602; *see also Troxel*, 530 U.S. at 68-69.

At its base, the "interests" asserted by MCPS are nothing more than a statement that the school might not agree with what the parents decide for their children. Thus, this situation is directly analogous to a governmental entity justifying a restriction on speech by arguing that it does not like the substance of what is being said. That, of course, is not a legitimate interest, but a repudiation of a fundamental right. *See Matal,* 582 U.S. at 244 (plurality op.). Similarly, a school may not subvert parental rights merely because the school prognosticates that it may disagree with how parents will exercise their fundamental rights with their minor children. Paraphrasing *Hurley*, a public school "is not free to interfere with [parental rights] for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." 515 U.S. at 579. Indeed, Justice Thomas in his *Troxel* concurrence noted that second-guessing a fit parent's decision about socialization of her child is not a legitimate governmental interest. 530 U.S. at 80.

The district court in *Ricard* applied this teaching in the context of a school policy very similar to that here:

> Presumably, the [school] District may be concerned that some parents are unsupportive of their child's desire to be referred to by a name other than their legal name. Or the District may be concerned that some parents will be unsupportive, if not contest, the use of pronouns for their child that the parent views as discordant with a child's biological sex. But this merely proves the point that the District's claimed interest is an impermissible one because it is intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit. And whether the District likes it or not, that

constitutional right includes the right of a parent to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred.

2022 WL 1471372 at *8 (footnote omitted).

Circuit courts have applied the principle that the state may not preempt parental rights due to perceived countervailing interests of the child in related contexts. In *Wyatt v. Fletcher*, 718 F.3d 496 (5th Cir. 2013), the Fifth Circuit noted that it "has never held that a person has a constitutionally-protected privacy interest in her sexual orientation, and it certainly has never suggested that such a privacy interest precludes school authorities from discussing with parents matters that relate to the interests of their children." *Id.* at 505. The same applies to gender identity. Similarly, in *Doe v. Heck,* 327 F.3d 492 (7th Cir. 2003), the Seventh Circuit found a violation of parents' rights when State actors "not only failed to presume that the plaintiff parents would act in the best interest of their children, they assumed the exact opposite." *Id.* at 521. And the Third Circuit in *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123 (3d Cir. 1997), underscored that "a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* at 1126; *accord Brokaw v. Mercer Cnty.,* 235 F.3d 1000, 1019 (7th Cir. 2000). Simply put, absent "'some definite and articulable evidence'" of a child being abused, "neither the state nor its officials have any interest whatsoever 'in protecting children from their parents,' and no further inquiry (i.e., balancing of interests) is necessary." *Heck,* 327 F.3d at 521 (citing *Brokaw,* 235 F.3d at 1019; *Croft,* 103 F.3d at 1126).

(b) MCPS Cannot Meet the Least
<u>Restrictive Means Requirement</u>

19

With regard to the least restrictive prong of strict scrutiny, the school's restrictions on Ms. Polk's free speech rights are not narrowly tailored.  At the outset, she suggests an accommodation that would avoid any substantial interaction with transgender students and need to apply the offending policies.  MCPS per the Gender Identity Guidelines knows the identity of transitioning students, and there are multiple classrooms where Ms. Polk could substitute without them being in attendance.  (V.C. ¶¶ 8, 13, 16, 20.)  Moreover, with respect to the pronoun policy, Ms. Polk has proposed a tailored approach of her using the student's preferred name, if and when she encounters a transgender student.  (Polk Decl. ¶ 23.)  That satisfies any interest MCPS may have.  Indeed, the Sixth Circuit described such a solution as a "win-win," as the teacher would not have to violate his principles and the student would not have to hear objectionable pronouns. *Meriwether*, 992 F.3d at 510-11.

### ii.  MCPS Cannot Satisfy Exacting Scrutiny

MCPS fares no better if exacting scrutiny is applied.  That test is only slightly less rigorous then that of strict scrutiny, and it has been applied principally in the context of commercial, not academic, speech.  *See Janus*, 585 U.S. at 894.  To satisfy exacting scrutiny, the school's speech restriction must "serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms."  *Id.* (quoting *Knox v. Serv. Employees Int'l,* 567 U.S. 298, 310 (2012) (internal quotation marks and alterations omitted)).  For the same reasons as stated for strict scrutiny, MCPS cannot satisfy exacting scrutiny.  There is no compelling interest.  Further, Ms. Polk has herself offered less restrictive means to satisfy any interests MCPS may have, and MCPS must demonstrate that all other means of satisfying them are not viable, which it cannot do.

### iii.  MCPS Cannot Prevail Under the Pickering Balancing Test

20

Finally, the school cannot prevail under the *Pickering* balancing test, even if it were to be applied.[4]  As recounted above, the Supreme Court in *Janus* has already questioned whether balancing is needed at all in a situation involving a broad rule restricting speech or a compelled speech situation and has noted that, if it does, the test needs to be substantially modified in the employee's favor.  *See* 585 U.S. at 907-08.

*Pickering* itself noted that a school is unlikely to be able to carry its burden when the teacher's speech has not "in any way either impeded the teacher's proper performance of his daily duties in the classroom or . . . interfered with the regular operation of the schools generally."  391 U.S. at 572-73.  Such is the case here.  Ms. Polk by referring to the student only by name and declining to use any pronouns would not impede her teaching of the curriculum assigned to her.  Nor would such a practice interfere with the regular operation of the school generally.  As the Sixth Circuit held in *Meriwether*, pronoun usage is "not a matter of classroom management," but of "academic freedom."  992 F.3d at 507.  *Pickering* balancing, especially in this context, strongly favors Ms. Polk.  *See id.* at 509-11.

## 2.   MCPS's Policy Also Violates Ms. Polk's Free Exercise Rights

The Free Exercise Clause provides another check on MCPS conditioning Ms. Polk's continued employment on her violating parental rights and misgendering students, because she sincerely believes that any such action is contrary to her religious beliefs.  Loss of employment is

---

[4] An initial requirement for the test is for the employee to show that the speech involves a matter of "public concern."  *See Pickering*, 391 U.S. at 568-74; *see also Connick*, 461 U.S. at 143.  This requirement is met in spades by Ms. Polk.  Whether to affirm or resist transgender actions by adolescents is currently roiling our nation.  *See Meriwether*, 992 F.3d at 508 (listing examples). This issue is certainly not "settled" in favor of affirmation, and many professionals and academic studies support the traditional view that transgender behavior is not normative and should be discouraged.  Indeed, the *Janus* Court described gender identity as a "controversial" and "sensitive" topic of "profound 'value and concern to the public.'"  585 U.S. at 913-14 (quoting *Snyder*, 562 U.S. at 453).

obviously a substantial burden on her free exercise.  Thus, MCPS must have a compelling

interest and effectuate it by a narrowly tailored means.  *See Kennedy,* 597 U.S. at 524-25.

That MCPS cannot meet this exacting burden is demonstrated by the discussion above

and by *Mirabelli*.  In that case, like here, teachers complained on free exercise grounds of a

school policy that required them to deceive parents about the school assisting their child to

transition at school.  The district court, in granting their requested preliminary injunction, found

them likely to succeed on their free exercise claims:

> In the end, [the teachers] face an unlawful choice along the lines of: "lose
> your faith and keep your job, or keep your faith and lose your job."  *Cf. Keene v. City &
> Cnty. of San Francisco*, U.S. App. LEXIS 11807, *6 (9th Cir. May 15, 2023).  Yet,
> "[r]espect for religious expressions is indispensable to life in a free and diverse
> Republic."  *Kennedy*, 142 S. Ct. at 2432-33.  The only meaningful justification the
> District offers for its insistence that the plaintiffs not reveal to parents gender information
> about their own children rests on a mistaken view that the District bears a duty to place a
> child's right to privacy above, and in derogation of, the rights of a child's parents.  The
> Constitution neither mandates nor tolerates that kind of discrimination.  The plaintiffs
> have demonstrated a strong likelihood of success on the merits for their free exercise
> claim against [the school district].

2023 WL 5976992 at *15.  Ms. Polk has similarly shown a likelihood of success on the merits.

Nor does the exception for neutral laws of general applicability articulated in

*Employment Division v. Smith*, 494 U.S. 872 (1990), save the Defendants here.  Leaving to one

side the shaky ground on which that precedent currently rests,[5] the Defendants' actions here are

neither neutral nor generally applicable.

---

[5] The last occasion on which the Court discussed *Smith* in detail was in *Fulton v. Philadelphia*,
593 U.S. 522 (2021).  Five justices wrote that *Smith* should be reconsidered and likely
overruled.  *Id.* at 553 (Alito, Thomas, and Gorsuch, JJ., concurring) (writing that *Smith* should
be overruled); *id.* at 543 (Barrett and Kavanaugh, JJ., concurring) (declining to overrule *Smith*
but espousing the view that "the textual and structural arguments against *Smith* are more
compelling").  While Ms. Polk can distinguish *Smith*, she also advances that *Smith* should be
overruled.

The "government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533 (*citing Masterpiece Cakeshop,* 584 U.S. at 636-38; *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)). MCPS and MCBE fail the neutrality test. It is obvious from the face of the Gender Identity Guidelines that at least one primary target was those teachers and parents who disagree with the idea that students should be free to transition from their God-give sex, and it is obvious that a main category of those individuals are those who hold to traditional religious teachings on transgenderism.

That religious individuals are targeted by the guidelines is also made apparent by MCPS's SOP filed with the EEOC. MCPS claimed that it could not tolerate even a single person in its teaching ranks who holds a traditional religious view of transgenderism and parental authority over minor children. This clearly manifests an anti-religious bias similar to that found unconstitutional in *Masterpiece Cakeshop,* which held that a plaintiff proves a free exercise violation by showing that "official expressions of hostility" to religion undergird a particular policy that burdens religious exercise. 584 U.S. at 639. In such cases, the Court has "set aside" the policy "without further inquiry." *Kennedy*, 597 U.S. at 525 n.1.

MCPS and MCBE also fail the "general applicability" part of the test. A "law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (quoting *Smith*). They fail this part of the *Smith* test for at least four reasons.

First, MCPS did not require Ms. Polk to certify adherence to the offending portions of the Gender Identity Guidelines when she was first hired as a substitute teacher in 2021. (Polk Decl. ¶ 14.) While it did so in 2022, the fact that it did not do so the year before when the same

policy was in effect demonstrates that MCPS has exercised discretion on when to make it a requirement.  And the fact that Ms. Polk did not encounter any transgender students when she substituted in 2021 and 2022 demonstrates that full adherence does not have to be a qualification for the job.

Second, MCPS has unbridled discretion with respect to how to apply the policy to parents, as MCPS decides whether it believes parents will be "supportive" enough to be told that the school is assisting their child transition genders.  If it makes such a decision, teachers like Ms. Polk must then hide from parents what is happening with their child at school, lying to them if need be.  But whether it applies this part of the policy is in MCPS's unbridled discretion.

Third, as Ms. Polk has demonstrated in this memorandum, the parts of the policy to which she has religious objection need not be applied uniformly.  Title VII provides that a religious accommodation must be made for those who object on religious grounds, as that can be done, including in her case, without any burden on the school or its students.

Fourth, MCPS Regulation GEF-RA, "Substitute Teachers" (Polk Decl., Attach. 1, found at https://ww2.montgomeryschoolsmd.org/departments/policy/pdf/gefra.pdf), requires an orientation for substitute teachers, but mandates only one part of that orientation, i.e., "compliance training on recognizing and reporting child abuse and neglect."  With respect to discipline and punishment, the regulation is replete with unbridled discretion, using "may" throughout and noting that "cases are reviewed on an individual basis."  As *Fulton* teaches, such discretionary processes make the *Smith* safe harbor to burdening the free exercise of religion by individuals unavailable.

As a result, the Defendants' challenged conduct here is subject to strict scrutiny.  That is a burden they cannot surmount, as the very fact that reasonable accommodations are available

24

demonstrates that they cannot show they have acted via the least restrictive means. *See, e.g.*, *Burwell*, 573 U.S. at 728-33.

II.    Ms. Polk Will Suffer Irreparable Harm Without the Requested Injunctive
       <u>Relief, MCPS Will Not Be Harmed by It, and the Public Interest Supports It</u>

Both Title VII and § 1983 provide for equitable relief, and this case calls out for it. Without an injunction allowing Ms. Polk to substitute teach at MCPS schools, her constitutional rights will continue to be infringed and her financial condition diminished. Of course, it is axiomatic that the deprivation or infringement of a constitutional liberty is an irreparable harm that supports an injunction. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (per curiam); *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Concomitantly, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted).

Here, the tailored nature of the injunction requested also prevents any harm to MCPS or its transgender students. Ms. Polk is only asking to be allowed to substitute in preschool, kindergarten, and elementary classrooms in which there are no transgender students; if she encounters any such transitioning students, she will treat them with respect and civility, and, if she must interact with them in a way that would cause her to violate her religious beliefs, she will seek assistance from other MCPS personnel to take over.

The public interest also strongly favors this solution. In addition to not violating Ms. Polk's statutory and constitutional rights, it prevents Ms. Polk from being required to cooperate in a school policy that itself unlawfully deprives parents of their constitutional rights to be

informed of how their children are being treated at school and to make decisions about their health, care, and welfare.  "[U]pholding constitutional rights surely serves the public interest." *Id.; accord Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.,* 354 F.3d 249, 261 (4th Cir. 2003).

Conclusion

Ms. Polk is more than likely to prevail on the merits, and the injunctive relief she requests is not only in the public interest but tailored to avoid any harm to MCPS and students while preventing irreparable injury to her.  The Court should grant the preliminary injunction.

Respectfully submitted,

/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr., Bar No. 21604
  (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(301) 622-0360
Rick@claybrooklaw.com

Of Counsel

Robert Flores
Gammon & Grange, P.C.
1945 Old Gallows Rd., Ste. 650
Vienna, Va. 22181
jrf@gg-law.com

Steven W. Fitschen, Bar. No. 31117
James A. Davids, Bar. No. 31107
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Attorneys for Plaintiff

May 29, 2024

26

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2024, a copy of the above Memorandum in support of the Motion for Preliminary Injunction, which was electronically file this day, was served by email and first-class mail, postage pre-paid as follows:

Stephanie P. Williams,
     General Counsel
Montgomery County Public Schools
Room 156
850 Hungerford Dr.
Rockville, Md. 20850
Stephanie_Williams@mcpsmd.org

 

/s/ Steven W. Fitschen
Steven W. Fitschen, Bar No. 31117
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

27