## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| KIMBERLY ANN POLK, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MONTGOMERY COUNTY PUBLIC | ) | Case No. 8:24-cv-01487-DLB |
| SCHOOLS, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Bruce M. Berman (*pro hac vice*)
bruce.berman@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037
Tel: (202) 663-6173
Fax: (202) 663-6363

Thomas K. Bredar (MD No. 21635)
thomas.bredar@wilmerhale.com
Cassandra A. Mitchell (*pro hac vice*)
cassie.mitchell@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888

*Counsel for Defendants*

# TABLE OF CONTENTS

Page

BACKGROUND ..................................................................................................................2

    A.    Montgomery County Public Schools Serves A Diverse Community.....................2

    B.    The Guidelines For Student Gender Identity ...........................................................3

    C.    Substitute Teachers At MCPS .................................................................................5

    D.    After Working As A Part-Time Substitute For One School Year, Ms. Polk
        Refuses To Complete Mandatory Gender Identity Training ...................................8

    E.    Ms. Polk Challenges MCPS's Denial Of Her Requested Accommodation............9

LEGAL STANDARD.......................................................................................................10

ARGUMENT ...................................................................................................................11

I.      Ms. Polk Has Delayed Too Long To Be Entitled To A Preliminary Injunction .............11

II.     Ms. Polk Is Not Entitled to Injunctive Relief On Her Section 1983 Claims ....................12

    A.    Ms. Polk Has Not Clearly Established Entitlement To An Injunction On
        Her Section 1983 Claims ......................................................................................12

        1.    Ms. Polk fails to state a free speech claim. ..............................................13

            a)    The challenged speech is part of Ms. Polk's job and thus
                not protected under Garcetti.........................................................13

            b)    Even if Garcetti did not apply, Ms. Polk's claim would fail
                under Pickering. ...........................................................................17

            c)    Even if Ms. Polk's speech were entitled to First
                Amendment protections, the Guidelines would survive no
                matter the level of scrutiny. .........................................................22

        2.    Ms. Polk is unlikely to succeed on the merits of her free exercise
            claim..........................................................................................................27

            a)    The Guidelines do not infringe Ms. Polk's free exercise
                rights. ...........................................................................................28

            b)    Even if the Guidelines incidentally burden Ms. Polk's
                religious practice, they are generally applicable and neutral,
                and subject to rational-basis review.............................................30

            c)    Ms. Polk's free exercise claim fails under any standard of
                 review...........................................................................................32

    B.    Ms. Polk Does Not Satisfy The Remaining Preliminary Injunction Factors
        As To Her Section 1983 Claims ...........................................................................32

III.    Ms. Polk Is Not Entitled To Injunctive Relief On Her Title VII Claim ..........................33

    A.    Ms. Polk Has Failed To Show Irreparable Harm...................................................34

i

  B. Ms. Polk Fails To Demonstrate Likelihood Of Success On The Merits Of Her Title VII Claim.................................................................................35

IV. Ms. Polk's Complaint Should Be Dismissed ...........................................................38

  A. Ms. Polk's Claims Against the Individual Defendants Should Be Dismissed................................................................................................38

  B. "Montgomery County Public Schools" Is Not Subject To Suit.............................39

  C. Ms. Polk Has Failed To State A Claim For Relief On All Claims ......................39

# TABLE OF AUTHORITIES

## CASES

Page(s)

*ACA Financial Guaranty Corp. v. City of Buena Vista, Virginia*, 917 F.3d 206
(4th Cir. 2019)...................................................................................................11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................11

*Association of American Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379 (D. Md.
2022) ............................................................................................................33

*Aziz v. Alcolac, Inc.*, 658 F.3d 388 (4th Cir. 2011).......................................................11

*Baltgalvis v. Newport News Shipbuilding Inc.*, 132 F. Supp. 2d 414 (E.D. Va.
2001) ..............................................................................................................36

*Barr v. Tucker*, 662 F. Supp. 3d 1353 (S.D. Ga. 2023) .................................................30

*Bethel Ministries, Inc. v. Salmon*, 2020 WL 292055 (D. Md. Jan. 21, 2020)...............30

*Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548
(4th Cir. 2013)...................................................................................................32

*Brown v. Board of Education*, 347 U.S. 483 (1954)..................................................1, 22

*Brown v. Chicago Board of Education*, 824 F.3d 713 (7th Cir. 2016)...........................15

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019) ................................................16

*Canaan Christian Church v. Montgomery County*, 29 F.4th 182 (4th Cir. 2022).........27

*Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134 (4th Cir. 2001)...........11, 12

*Carson ex rel. O. C. v. Makin*, 596 U.S. 767 (2022) ....................................................27

*Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012 (4th Cir. 1996)......................35, 41

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)...............30

*Clay v. Greendale School District*, 602 F. Supp. 3d 1110 (E.D. Wis. 2022),
*appeal dismissed*, No. 22-1998, 2022 WL 17403217 (7th Cir. Nov. 21,
2022) ..............................................................................................................24

*Connick v. Myers*, 461 U.S. 138 (1983)...............................................................18, 19

*Coomes v. Edmonds School District No. 15*, 816 F.3d 1255 (9th Cir. 2016) ...............15

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) .........................................................16

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017)..............................................10, 11

*Doe ex rel. Doe v. Boyertown Area School District*, 897 F.3d 518 (3d Cir. 2018) ...............22, 24

*Downing v. Lee*, 2017 WL 11489270 (E.D. Va. Feb. 13, 2017) ....................................34

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ...........................................................23

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999).......................................11

*Employment Division v. Smith*, 494 U.S. 872 (1990) ..................................................31

*Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, 624 F.3d 332 (6th Cir. 2010) ...........................................15, 16

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).............................................27, 31

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ........................................................ *passim*

*Groff v. DeJoy*, 600 U.S. 447 (2023) ..............................................................35, 36

*Henderson ex rel. NLRB v. Bluefield Hospital Co.*, 902 F.3d 432 (4th Cir. 2018) ...................32

*Hines v. South Carolina Department of Corrections*, 148 F.3d 353 (4th Cir. 1998) ..................30

*Janus v. AFSCME*, 585 U.S. 878 (2018) ........................................................17, 18, 19, 21

*John & Jane Parents 1 v. Montgomery County Board of Education*, 622 F. Supp. 3d 118 (D. Md. 2022), *vacated and remanded on other grounds*, 78 F.4th 622 (4th Cir. 2023)..................................................................21

*John & Jane Parents 1 v. Montgomery County Board of Education*, 78 F.4th 622 (4th Cir. 2023), *cert. denied sub nom. Parents 1 v. Montgomery Cnty. Bd.*, No. 23-601, 2024 WL 2262333 (U.S. May 20, 2024) ......................................21

*Kennedy v. Bremerton School District*, 597 U.S. 507 (2022)....................................22, 32

*Kim v. Board of Education of Howard County*, 641 F. Supp. 3d 223 (D. Md. 2022) ............................................................................27, 40

*Kluge v. Brownsburg Community School Corp.*, 2024 WL 1885848 (S.D. Ind. Apr. 30, 2024), *appeal filed*, No. 24-1942 (7th Cir. May. 31, 2024)....................26, 36, 37

*LaVine v. Blaine School District*, 257 F.3d 981 (9th Cir. 2001)....................................25

*Lee v. Weisman*, 505 U.S. 577 (1992)................................................................23

*Lee v. York County School Division*, 484 F.3d 687 (4th Cir. 2007) ...........................16, 18, 19

*Lissau v. Southern Food Service, Inc.*, 159 F.3d 177 (4th Cir. 1998) ..........................39

*Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016)....................................18

*Loftus v. Bobzien*, 848 F.3d 278 (4th Cir. 2017)...........................................................19

*Love-Lane v. Martin*, 355 F.3d 766 (4th Cir. 2004) ...............................................18, 19

*Mahmoud v. McKnight*, 688 F. Supp. 3d 265 (D. Md. 2023), *aff'd*, 102 F.4th 191
    (4th Cir. 2024)......................................................................................................28

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617
    (2018)...................................................................................................................30

*Maye v. City of Kannapolis*, 872 F. Supp. 246 (M.D.N.C. 1994).................................34

*Mayer v. Monroe County Community School Corp.*, 474 F.3d 477 (7th Cir. 2007) ....................15

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) .............................................16, 26

*Miller v. Montgomery County Public Schools*, 2020 WL 2097686 (D. Md. May 1,
    2020) ....................................................................................................................39

*New York v. Ferber*, 458 U.S. 747 (1982) ....................................................................25

*Parham v. J. R.*, 442 U.S. 584 (1979)...........................................................................25

*Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004) .................................35

*Pickering v. Board of Education of Township High School District 205*, 391 U.S.
    563 (1968)..................................................................................................... *passim*

*Piggee v. Carl Sandburg College*, 464 F.3d 667 (7th Cir. 2006) ..................................24

*Porter v. Board of Trustees of North Carolina State University*, 72 F.4th 573 (4th
    Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024)............................................16, 39

*Price v. Howard County Public School System*, 2022 WL 21769772 (D. Md. June
    17, 2022) ..............................................................................................................34

*Price v. Howard County Public School System*, 2023 WL 170425 (D. Md. Jan. 11,
    2023), *reconsideration denied sub nom. Price v. Board of Education of
    Howard County*, 2023 WL 4532808 (D. Md. July 13, 2023).......................17, 39

*Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75 (4th Cir. 1989).............11

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .............................................................22

*Roswell v. Mayor & City Council of Baltimore*, 671 F. Supp. 3d 607 (D. Md. 2023) ..............................................................................................................27, 28

*School District of Abington Township v. Schempp*, 374 U.S. 203 (Goldberg, J., concurring) ......................................................................................................23

*Seemuller v. Fairfax County School Board*, 878 F.2d 1578 (4th Cir. 1989) .................................19

*Showell v. Board of Education of Wicomico County*, 2011 WL 5877220 (D. Md. Nov. 22, 2011) ...............................................................................................39

*Singleton v. Wulff*, 428 U.S. 106 (1976) .............................................................................21

*Smith-Hosch v. Bramble*, 2019 WL 4060017 (D. Md. Aug. 28, 2019) ..........................................38

*Stroman v. Colleton County School District,* 981 F.2d 152 (4th Cir. 1992)...................................19

*Taylor v. Freeman*, 34 F.3d 266 (4th Cir. 1994)..........................................................................10

*Together Employees v. Mass General Brigham Inc.*, 19 F.4th 1 (1st Cir. 2021)............................34

*Troxel v. Granville*, 530 U.S. 57 (2000) ..................................................................................25

*Weintraub v. Board of Education of City School District of City of New York*, 593 F.3d 196 (2d Cir. 2010)............................................................................15

*Widmar v. Vincent*, 454 U.S. 263 (1981) .................................................................................23

*Willey v. Board of Education of St. Mary's County*, 557 F. Supp. 3d 645 (D. Md. 2021) .......................................................................................................38

*Willey v. Sweetwater County School District No. 1 Board of Trustees*, 680 F. Supp. 3d 1250 (D. Wyo. 2023) ..............................................................20

*Winkelman ex rel. Winkelman v. Parma City School District*, 550 U.S. 516 (2007) ...................25

*Woodbury v. Victory Van Lines*, 286 F. Supp. 3d 685 (D. Md. 2017)..........................................39

*WV Ass'n of Club Owners & Fraternal Services, Inc. v. Musgrave*, 553 F.3d 292 (4th Cir. 2009)................................................................................................33

*Yeager v. FirstEnergy Generation Corp.*, 777 F.3d 362 (6th Cir. 2015).......................................36

## CONSTITUTIONAL PROVISION

U.S. Const. amend. I ........................................................................................... *passim*

## STATUTES, RULES, AND REGULATIONS

20 U.S.C. § 1681(a) ................................................................................................23

42 U.S.C. § 1983 ....................................................................................12, 32, 38

42 U.S.C. § 2000e-2(a) ...........................................................................................35

Title VII of the Civil Rights Act of 1964 ........................................................... *passim*

Family Educational Rights and Privacy Act ...........................................................23

Individuals with Disabilities Education Act .........................................................25

Md. Code, Educ. §§ 3-104(a) & (b)(2) ...................................................................39

Fed. R. Civ. Pr. 8 .....................................................................................................11

## OTHER AUTHORITIES

Montgomery County Public Schools, *2022-2023 Employee Code of Conduct in Montgomery County Public Schools* (Jan. 2023), https://www.montgomeryschoolsmd.org/siteassets/district/compliance/0439.23_employeecodeofconduct_booklet_eng.pdf ................................................1

Montgomery County Public Schools, *2023-2024 Guidelines for Respecting Religious Diversity in Montgomery County Public Schools* (July 2023), https://www.montgomeryschoolsmd.org/contentassets/2bcd99470c9f44f891cc5be276c25d19/religiousdiversityguidelines_final.pdf ..............................31

Montgomery County Public Schools, *About Us*, https://www.montgomeryschoolsmd.org/about/ (last visited July 2, 2024) .................3, 36

As the Supreme Court has long recognized, "education is perhaps the most important function of state and local governments," and the opportunity for an education "must be made available to all on equal terms." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). Montgomery County Public Schools ("MCPS") believes that providing this equal opportunity requires maintaining "safe and healthy learning environments for all of [its] students."[1] MCPS therefore has adopted guidelines for its staff's relationship with students and their parents and requires all staff to agree to comply with these guidelines. The Guidelines for Student Gender Identity address a range of best practices for supporting students in expressing their gender identity while participating in school life (the "Guidelines"). Among other things, the Guidelines ask staff to respect a student's chosen gender identity by addressing students by their identified name and pronoun, permitting students to use the bathroom aligning with their gender identity, and making efforts to maintain the confidentiality of a student's transgender status.

Plaintiff Kimberly Ann Polk is a former substitute teacher at MCPS who refused to agree to comply with the Guidelines. At the start of the 2022-2023 school year, like all MCPS staff, she was required to review training materials relating to the Guidelines and check a box attesting that she had reviewed the training materials and understood her obligation to comply with them. Ms. Polk declined to do so, stating that the Guidelines' requirements were at odds with her religious beliefs. Nearly two years later, Ms. Polk now asks this Court for an injunction "allowing her to continue to substitute teach in classrooms in which students who are transitioning genders are not enrolled." Compl. at p.17. Ms. Polk—who has not taught in the Montgomery County Public Schools since 2022—has not shown any irreparable harm justifying

---

[1] Montgomery County Public Schools, *2022-2023 Employee Code of Conduct in Montgomery County Public Schools*, at 1 (Jan. 2023),
https://www.montgomeryschoolsmd.org/siteassets/district/compliance/0439.23_employeecodeofconduct_booklet_eng.pdf ("Employee Code of Conduct").

the extraordinary relief of a preliminary injunction.  Nor can she state a claim for relief:  Ms. Polk has no First Amendment or statutory right to refuse to teach transgender and gender nonconforming students.  And just as MCPS cannot be required to accommodate a teacher who refuses to teach students based on their race or religion, MCPS should not be required to accommodate this discriminatory request.  Ms. Polk's motion for a preliminary injunction should be denied and her Complaint dismissed.

## BACKGROUND

### A.    Montgomery County Public Schools Serves A Diverse Community

MCPS serves over 160,000 students across 212 schools, making it the largest school system in Maryland and 14th largest in the United States.  Decl. of Greg Edmundson in Opp. to Plf.'s Mot. for Prelim. Inj. ¶ 2 ("Decl.").  MCPS takes great pride in serving its diverse student population.  The Montgomery County Board of Education, MCPS's official policy-making body, oversees the adoption and implementation of policies supporting MCPS's diverse student population.  *Id.* ¶ 4.  Shebra Evans, Lynne Harris, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, and Julie Yang are members of the Board of Education; and Dr. Monique Felder is the former Interim Superintendent (the "Individual Defendants").[2]

MCPS serves its student population with approximately 25,000 employees, including over 13,000 teachers.  Decl. ¶ 3.  On any given day, MCPS students are also served by approximately 800 substitute teachers.  *Id.* ¶ 16.  All of MCPS's employees are critical to fulfilling its "Mission," to ensure that "*[e]very student* will have the academic, creative problem

---

[2] Dr. Thomas Taylor assumed the role of superintendent on June 25, 2024, replacing Dr. Felder. This brief refers to the Board, its members, and the school system as "MCPS."

solving and social-emotional skills to be successful in college and career."[3] (emphasis added).
MCPS's stated "Vision" is to "inspire learning by providing the greatest public education *to each and every student*," *id.* (emphasis added), and its stated "Core Purpose" is to "[p]repare *all students* to thrive in their futures," *id.* (emphasis added).

### B.    The Guidelines For Student Gender Identity

In 2015, the Maryland State Department of Education published a document titled "Providing Safe Spaces for Transgender and Gender Nonconforming Youth: Guidelines for Gender Identity Non-Discrimination." *See* Ex. 3 (Providing Safe Spaces). In that document, the State Department of Education explains that "Maryland schools have a history of commitment to educating all students to reach their highest potential," and notes that "[s]chool safety is a vital component of that commitment." *Id.* But many transgender and gender nonconforming students do not feel safe at school. The document cites research showing that significant proportions of transgender and gender nonconforming students reported being called names and excluded by peers; had declined to participate in activities "out of fear of discrimination"; and felt "unsafe at school because of who they are." *Id.* The document also cites research showing that transgender children have an increased probability of suffering from depression or anxiety, attempting suicide, and otherwise engaging in self-harm. *Id.* To address these harms, the State Board of Education "provide[d] technical guidance and assistance as each Maryland school system works to support the rights of all students, including those who are transgender and gender nonconforming"—specifically in the form of "guidelines [] designed to serve as suggestions for consideration for schools systems and administrators who may want to develop their own

---

[3] Montgomery County Public Schools, *About Us*, https://www.montgomeryschoolsmd.org/about/ (last visited July 2, 2024).

transgender policy, procedures, and/or guidelines." *Id.* at 1. Among other things, the State

Board of Education wrote that "[e]qual education in a non-discriminatory environment may be

supported" when staff "[a]ddress every student by a name and pronoun that corresponds to the

student's gender identity," *id.* at 5, when schools "[p]rovide access to the restroom that

corresponds to the student's gender identity," *id.* at 7, and when students have "the right to keep

private one's transgender status or gender nonconforming presentation at school," *id.* at 6.

Consistent with this State guidance, MCPS has memorialized its policies relating to

transgender and gender nonconforming students in the Guidelines for Student Gender Identity in

Montgomery County Public Schools (the "Guidelines"). *See* Ex. 2. The Guidelines were

developed in close consultation with MCPS students, parents, and staff groups. Decl. ¶ 9. The

goals of the Guidelines include:

- Reduc[ing] stigmatization and marginalization of transgender and gender nonconforming students.
- Foster[ing] social integration and cultural inclusiveness of transgender and gender nonconforming students.
- Respect[ing] the right of students to keep their gender identity or transgender status private and confidential.
- Provid[ing] support for MCPS staff members to enable them to appropriately and consistently address matters of student gender identity and expression.

Guidelines at 1.

In furtherance of these goals, in line with the recommendations of the State Board of

Education, and as relevant to Ms. Polk's claims, the Guidelines provide that "[a]ll students have

the right to be referred to by their identified name and/or pronoun. School staff members should

address students by the name and pronoun corresponding to the gender identity that is

consistently asserted at school." Guidelines at 3. The Guidelines also provide that "[w]here

facilities are designated by gender, students *must* be provided access to gender-specific facilities

(e.g., bathrooms, locker rooms, and changing rooms) in alignment with their gender identity

consistently asserted at school." *Id.* at 4.  And in a section titled "Proactively Working with Transgender and Gender Nonconforming Students," the Guidelines provide that "[t]he principal (or designee), in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school." *Id.* at 2.  While the Guidelines encourage principals to develop these Gender Support Plans for transgender and gender nonconforming students, the Guidelines do not require them; and not all transgender and gender nonconforming students have formal Gender Support Plans.  Decl. ¶¶ 13-14.  Recognizing that "[a]ll students have a right to privacy," the Guidelines also contemplate circumstances in which a student's "transgender status or gender nonconforming presentation at school" should not be disclosed to "other students, their parents/guardians, or third parties."  Guidelines at 2-3.

### C.    Substitute Teachers At MCPS

MCPS considers "[s]ubstitute teachers [to be] vital to the continuity of the instructional program and [] essential to a high-quality education for each student."  *See* Ex. 4 (Substitute Teacher Handbook).  Substitute teachers fill staffing gaps throughout the schools, covering both teacher absences that are planned long in advance, and those that, due to illness or other emergency, occur at the last minute.  Decl. ¶ 15.  There are currently approximately 3,000 active substitute teachers qualified to teach in MCPS schools, and on an average day, 800 substitute teachers are assigned to classrooms.  *Id.* ¶ 16.

The MCPS Department of Human Capital Management is responsible for maintaining the list of eligible substitute teachers, and only individuals on this list may receive assignments to serve as substitutes in MCPS schools.  Decl. ¶ 17.  To be added to the list, an applicant must show that they meet the minimum educational requirements, provide references, complete an

interview, and undergo a background check. *Id.* ¶ 18. Once the candidate's application is complete, they must complete the same district-wide compliance training required of all MCPS staff. *Id.* ¶ 19. Substitute teachers must review the district-wide compliance training materials each year before they can receive assignments. *Id.* Since the 2017-2018 school year, the required training has included materials relating to the Guidelines. *Id.* ¶ 20. And since the 2022-2023 school year, all staff members have been required to affirm that they understand the contents of the Guidelines and that they are obligated to comply with them. *Id.* ¶ 21.

Substitute teachers also are required to adhere to the Substitute Teacher Handbook, which is provided as part of their yearly training. *See* Ex. 4 (Substitute Teacher Handbook). Among other things, the Substitute Teacher Handbook explains that MCPS prohibits illegal discrimination, including on the basis of sex, gender, gender identity, gender expression, and sexual orientation, and directs substitutes to the Board Policy ACA, Nondiscrimination, Equity, and Cultural Proficiency. *See* Ex. 1 (Policy ACA). The Substitute Teacher Handbook also has a section titled Guidelines for Student Gender Identity, which explains MCPS's commitment to being "a safe, welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued," provides an overview of some requirements of the Guidelines, and directs teachers to the full document for further information. *See* Ex. 4 at 2. And the Substitute Teacher Handbook provides that "[a]ll substitutes are expected to maintain the confidentiality of information that they obtain through their work, including employee and student records." *See id.*

Once a substitute teacher has completed their compliance training, they can complete a preference form listing the subject areas or grade levels they are interested in teaching, and the schools in which they are interested in being placed. Decl. ¶ 23. Substitute teachers may list up

to 30 schools, and they will only be placed at schools they have listed. *Id.* Teachers and principals register requests for substitutes within the automated Substitute Employee Management System (SEMS). *Id.* ¶ 24. Once a request for coverage has been created in SEMS, the system automatically begins making calls to teachers whose preferences match the particular job. *Id.* ¶ 25. For example, if a substitute teaching job opens for an art teacher at Thurgood Marshall Elementary School, the system will begin making calls to substitutes who had indicated that they were willing both to teach art and to teach at Thurgood Marshall Elementary School. *Id.* ¶ 25. Once a substitute teacher receives a call with a particular job offer, they can choose to accept or decline that job. *Id.* Substitute teachers can also log on to the SEMS web portal to see available jobs in their preferred schools and subject areas or grade levels. *Id.* ¶ 26.

SEMS does not have a mechanism to prevent jobs in particular classrooms from being sent out to particular substitute teachers when those classrooms match the preferences indicated on the form. Decl. ¶ 27. In general, unless a specific substitute has been requested, the system will automatically send a job posting to all substitutes with matching preferences. The only way a substitute teacher can be blocked from being assigned to a particular classroom is if they are blocked from being assigned to an entire school. *Id.* ¶ 28. MCPS uses this process—the substitute removal process—if a school has concerns with a substitute or feels that they are not a good fit. *Id.* If a substitute removal process is initiated, an MCPS staff member manually removes the school in question from the substitute's preference list, and that substitute is no longer able to be matched at that school. *Id.*

While some substitutes are assigned to one particular classroom of students, others are not. For example, a substitute filling in for an elementary school art or music teacher may be tasked with teaching art or music to a number of different elementary school classrooms,

depending on the day.  Decl. ¶ 29.  Substitutes for middle and high school teachers typically

cover five different classes each day.  *Id.*  Substitute teachers may also face shifting class rosters

throughout the academic year, as students move in and out of classes and schools.  *Id.*

> **D.** **After Working As A Part-Time Substitute For One School Year, Ms. Polk**
> **Refuses To Complete Mandatory Gender Identity Training**

Kimberly Ann Polk was a substitute teacher for MCPS during the 2021-2022 school year.

Compl. ¶ 24.  As part of her onboarding process, Ms. Polk was required to review training

materials relating to the Guidelines.  Decl. ¶ 30.  During that school year, Ms. Polk served as a

substitute teacher ten times, in eight different elementary schools.  Compl. ¶ 24.  As a substitute

teacher, Ms. Polk covered preschool special education, kindergarten, second grade and fourth

grade classes.  *Id.* ¶ 25.

To continue serving as a substitute teacher for the 2022-2023 school year, Ms. Polk was

once again required to complete training relating to the Guidelines.  That year, MCPS also began

requiring staff members to attest that they understood their obligations to comply with the

Guidelines.  *Id.* ¶¶ 29-30.  Faced with this requirement, Ms. Polk determined that, based on her

"sincerely held religious beliefs, she was not able to affirm that she would adhere to the"

Guidelines.  *Id.* ¶ 31.  Specifically, Ms. Polk says that "based on her understanding of her

Christian religion and the Holy Bible," she believes that:

> a. God created individuals as either male or female and she would act unethically if she
> affirmatively assisted children to present as other than their God-given sex.  This
> would include lying to children by using pronouns for them that do not match their
> God-given, biological sex.
> b. God gave parents the primary responsibility for the care and upbringing of their
> minor children and it would be unethical for her to hide from parents that their child
> is transitioning genders at school.
> c. God requires modesty to be exercised between the sexes and it would be unethical for
> her to assist a child of one sex to use the restroom of the opposite sex while others of
> the opposite sex were present.

*Id.*

On November 21, 2022, Ms. Polk submitted a request for a religious accommodation, asking that she not be required to comply with the three parts of the Guidelines she identified. Compl. ¶ 32; *see also* ECF No. 4-9 at 2 (requesting "to work as a substitute teacher without committing to adhere to the full gender identity guidelines and training provided by the Montgomery County School Board"). On December 2, 2022, Ms. Polk met with an MCPS human resources professional to discuss whether an accommodation could be reached, although the parties disagree on what was said in that meeting. *Compare* Compl. ¶ 33 (alleging proposed accommodations offered by MCPS) *with* ECF No. 4-11 at 2 n.3 (noting that "contrary to Complainant's allegation, at no time during the interactive process did [MCPS] state that Complainant should be provided a religious accommodation"). On December 13, 2022, the human resources professional responded to Ms. Polk and explained that "MCPS is unable to accommodate your request." ECF No. 4-10. He explained, "[y]ou are required to complete the training and adhere to the Guidelines for Student Gender Identity. Completing the training and adhering to the guidelines are a condition of employment and the training provides information on how to perform the job, how to comply with equal employment opportunity obligations, and information on workplace policies, procedures, or applicable legal requirements." *Id.*

### E.    Ms. Polk Challenges MCPS's Denial Of Her Requested Accommodation

On August 10, 2023, Ms. Polk filed a charge of employment discrimination with the U.S. Equal Employment Opportunity Commission (EEOC). Compl. ¶ 37. On February 5, 2024, MCPS filed its statement of position with the EEOC, and on March 9, 2024, Ms. Polk filed a response. *Id.* ¶¶ 38, 40. On April 11, 2024, Ms. Polk requested the EEOC issue a "right to sue" notice, as it had been more than 180 days since she filed her charge, and the EEOC did so on April 12, 2024. *Id.* ¶¶ 41-42.

On May 21, 2024, more than a month after receiving the EEOC's right to sue notice, Ms. Polk filed her Complaint, raising claims under Title VII of the Civil Rights Act of 1964 and for violation of her First Amendment rights to free speech and free exercise.  ECF No. 1.  She seeks declaratory relief, "[m]ake whole relief," and "[a] preliminary injunction allowing her to continue to substitute teach in classrooms in which students who are transitioning genders are not enrolled."  *Id.* at p.17.  Over a week later, on May 29, 2024, Ms. Polk filed a motion for preliminary injunction.  ECF No. 4.  She asks the Court to issue an order enjoining Defendants "from refusing to continue to use Plaintiff as a substitute in MCPS's elementary school classes because she has not affirmed MCPS's gender identity training unless those classes currently have attending a student with a 'gender support plan' as specified in the MCPS Guidelines for Student Gender Identity and MCPS Form 560-80, provided that Plaintiff will obtain assistance from other MCPS personnel promptly if she is confronted with a situation in which she must engage a transitioning student in a way that would violate her religious beliefs."  ECF No. 4-13.

## LEGAL STANDARD

In this brief, Defendants ask the Court to do two things: deny Ms. Polk's Motion for Preliminary Injunction, and dismiss Ms. Polk's Complaint in its entirety.

A preliminary injunction is an "extraordinary remedy" and "shall be granted only if the moving party clearly establishes entitlement to the relief sought."  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citations omitted).  "Mandatory injunctive relief"—such as the injunction Ms. Polk seeks here to alter the status quo and compel MCPS to create a first-time exception to the Guidelines—"in any circumstance is disfavored, and warranted only in the most extraordinary circumstances."  *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994).  Even if Ms. Polk were seeking prohibitory injunctive relief—which aims "to maintain the status quo"— she would still be required to put forth sufficient evidence to "demonstrate that [s]he is likely to

10

succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Di Biase*, 872 F.3d at 230-31 (citations omitted).

A complaint survives a motion to dismiss only if it "states a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "While a court must accept the material facts alleged in the complaint as true, statements of bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); then quoting *Iqbal*, 556 U.S. at 679)). The plaintiff must allege "'more than an unadorned, the-defendant-unlawfully-harmed-me accusation' … [l]abels, conclusions, recitation of a claim's elements, and naked assertions devoid of further factual enhancement will not suffice to meet the Rule 8 pleading standard." *ACA Fin. Guar. Corp. v. City of Buena Vista, Virginia*, 917 F.3d 206, 211 (4th Cir. 2019) (citing *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### I.   Ms. Polk Has Delayed Too Long To Be Entitled To A Preliminary Injunction

As shown below, Ms. Polk's claims fail on the merits and for lack of irreparable harm. But her motion for a preliminary injunction can and should be denied for the simple reason that she has waited too long to seek the extraordinary relief of a preliminary injunction. The Fourth Circuit has "recognized that an inordinate delay in initiating a preliminary injunction proceeding may 'indicate an absence of the kind of irreparable harm required to support a preliminary injunction.'" *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 137 (4th Cir. 2001) (quoting *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989)). Therefore, "any delay attributable to plaintiffs in initiating a preliminary injunction request, coupled with prejudicial impact from the delay, should be considered when the question of

irreparable harm to plaintiffs is balanced against harm to defendants." *Candle Factory*, 23 F. App'x at 138.

The harm Ms. Polk complains of first accrued, if at all, when she first became aware of the Guidelines' requirements "in the summer of 2022." Pl. Br. 1. Ms. Polk says she requested an accommodation in November 2022, Compl. ¶ 32, which was denied in December 2022, *id.* ¶ 34. Ms. Polk then waited eight more months before filing a charge with the EEOC in August 2023, *id.* ¶ 37, and then nine more months before filing this action in May 2024. While Title VII does have an exhaustion requirement, if Ms. Polk had filed her charge with the EEOC when her proposed accommodation was first declined, she could have brought this suit over a year ago. *See id.* ¶ 41 (noting that she could request an EEOC "'right to sue' notice, as it had been more than 180 days from the filing of her charge with EEOC."). And nothing stopped her from seeking an injunction based on her First Amendment claims, which have no exhaustion requirement. Having now delayed for many months, and having already spent two entire school years *not* teaching at MCPS, Ms. Polk claims that she needs a preliminary injunction immediately so that she can start teaching again in the fall. But this is not how preliminary injunctive relief works. *See Candle Factory*, 23 F. App'x at 137. She can pursue her claims in the ordinary course and obtain whatever relief she might be entitled to if final judgment enters in her favor. For this reason alone, Ms. Polk's Motion for Preliminary Injunction should be denied.

## II.    **Ms. Polk Is Not Entitled to Injunctive Relief On Her Section 1983 Claims**

### A.    **Ms. Polk Has Not Clearly Established Entitlement To An Injunction On Her Section 1983 Claims**

Ms. Polk brings two claims pursuant to 42 U.S.C. § 1983, seeking relief for purported violations of her First Amendment rights to free speech (Count II) and free exercise (Count III).

12

Because Ms. Polk's constitutional claims fail as a matter of law, she has not shown a likelihood of success on the merits supporting the issuance of a preliminary injunction.

### 1.    Ms. Polk fails to state a free speech claim.

Ms. Polk's free speech claim fails. *First*, government employees are not entitled to constitutional protections for speech that is part of their "official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). Here, Ms. Polk challenges the Guidelines' application to her communications with students in the classroom and with parents about how children are faring in school, both of which fall squarely within the official duties of a substitute teacher. Ms. Polk argues that *Garcetti* does not apply because public school teachers and compelled speech are not covered by that rule, but the law is to the contrary. *Second*, even if the speech fell outside Ms. Polk's official duties, her claim would still fail because speech government employees make as citizens that is unrelated to matters of public concern does not receive any constitutional protection under *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). *Third*, regardless, MCPS's policy would survive strict scrutiny because it is narrowly tailored to serve the compelling interests of preventing discrimination against transgender students and promoting an equitable learning environment.

### a)    The challenged speech is part of Ms. Polk's job and thus not protected under *Garcetti*.

The First Amendment does not protect speech by public employees that is made pursuant to their employment responsibilities. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. That is because "[g]overnment employers, like private employers,

need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* at 418.

Ms. Polk's claim concerns speech made pursuant to her official duties as a substitute teacher—as she does not appear to dispute—and therefore fails under *Garcetti*. Ms. Polk first challenges the requirement that she "address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school." But as the Substitute Teacher Handbook makes clear, that speech is part of her responsibility as a substitute teacher to foster "a safe, welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued." Ex. 4. MCPS has determined, in line with guidance from the State Board of Education, that the best way to create a welcoming school environment for transgender and gender nonconforming students is to address them by their "name and pronoun corresponding to the gender identity that is consistently asserted at school." Guidelines at 3. The second requirement Ms. Polk challenges—that, in certain circumstances, she hypothetically be required to keep Gender Support Plans confidential from parents, *see* Compl. ¶ 66—fares no better. Again, Ms. Polk would only be informed of and asked to comply with a student's Gender Support Plan because of her responsibilities as a substitute teacher, and she would only ever be required to communicate with parents (if at all) in order to further classroom goals. Indeed, the Substitute Teacher Handbook specifically states that "[a]ll substitutes are expected to maintain the confidentiality of information that they obtain through their work, including employee and student records." Ex. 4 at 2. That Ms. Polk may disagree with a student's or school administrator's decisions does not give her license to disclose information that the Board has determined "may constitute confidential medical information." Guidelines at 2-3.

14

Courts have repeatedly applied *Garcetti* in exactly these circumstances.  For example, in *Brown v. Chicago Board of Education*, 824 F.3d 713 (7th Cir. 2016), the Seventh Circuit held that a teacher's use of a racial epithet in class was not protected speech because it was "pursuant to his official duties," whether the use was curricular or part of an attempt to maintain classroom order.  *Id.* at 715-16.  Because the plaintiff "made his comments as a teacher," his First Amendment claim "fail[ed] right out of the gate."  *Id.*  Communications with parents about how students are faring at school are likewise "part and parcel" of a teacher's job and therefore unprotected under *Garcetti*.  *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1264 (9th Cir. 2016).  As the Sixth Circuit has explained, a contrary approach would not work.  "Placing the First Amendment's stamp of approval" on debates over the appropriate way to manage classrooms "not only would 'demand permanent judicial intervention in the conduct of governmental operations,' but it also would transform run-of-the-mine" classroom management disputes "into constitutional stalemates."  *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341 (6th Cir. 2010) (quoting *Garcetti*, 547 U.S. at 423).

Ms. Polk's only argument under *Garcetti* is that it does not apply to public school teachers or to compelled speech.  She is wrong on both counts.  First, every federal appeals court that has directly addressed the question has agreed that *Garcetti*'s "official duties" framework applies to primary and secondary public school teachers.  *See, e.g.*, *Brown*, 824 F.3d at 715-16 (sixth grade teacher's use of racial epithet in classroom); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (elementary school teacher's antiwar remarks during classroom instruction); *Weintraub v. Bd. of Educ. of City Sch. Dist.*, 593 F.3d 196, 203 (2d Cir. 2010) (fifth grade teacher's criticism of school's disciplinary approach); *Evans-Marshall*, 624 F.3d at 340 (high school teacher's selection of unapproved books for classroom instruction).

15

Contrary to Ms. Polk's assertions, the Fourth Circuit has not held that that *Garcetti* does not apply to public school teachers. Rather, it has held that "the *Garcetti* rule does not extend to speech by *public university faculty members*, acting in their official capacity, that is related to scholarship or teaching." *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024) (emphasis added). But Ms. Polk is not a university faculty member, and the speech in question is not related to her academic scholarship. It is speech relating to the appropriate management of an elementary school classroom, and courts are unanimous that such speech is governed by *Garcetti*. The Sixth Circuit's decision in *Meriwether* is instructive. There, the court specifically contrasted a university professor, whose "rights to academic freedom and freedom of expression are paramount in the academic setting," with "the in-class curricular speech of teachers in primary and secondary schools," whose work does not implicate the same right to academic freedom. *Meriwether v. Hartop*, 992 F.3d 492, 505 & n.1 (6th Cir. 2021) (citation omitted); *see also Evans-Marshall*, 624 F.3d at 344 (noting that "universities occupy a special niche in our constitutional tradition").[4]

Nor did the Fourth Circuit hold in *Lee v. York County School Division*, 484 F.3d 687 (4th Cir. 2007), that *Garcetti* does not apply to public school teachers. To the contrary, the court expressly explained that it declined to "decide whether [the *Garcetti*] analysis would apply in the same manner to a case involving speech related to teaching" by a public high school teacher. *Id.* at 694 n.11. Indeed, at least one court in the District of Maryland recently applied *Garcetti* to bar a First Amendment claim brought by a public school teacher. In *Price v. Howard County Public School System*, the court held that a high school teacher's inflammatory comments during

---

[4] Ms. Polk's reliance on *Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019), and *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014), is misplaced for the same reason. In each of those cases, the plaintiff alleging a free speech violation was a university professor.

classroom instruction were made pursuant to his official duties under *Garcetti* and dismissed his First Amendment claim on that basis alone.  *See Price v. Howard Cnty. Pub. Sch. Sys.*, 2023 WL 170425, at *5 (D. Md. Jan. 11, 2023), *reconsideration denied sub nom. Price v. Bd. of Educ. of Howard Cnty.*, 2023 WL 4532808 (D. Md. July 13, 2023).

Ms. Polk's claim (Pl. Br. 12-13) that *Garcetti* does not apply to compelled speech is also meritless.  The Supreme Court's decision in *Janus v. AFSCME,* which held that public employees could not be forced to subsidize a union, and which Ms. Polk relies on at length, reiterates as much:  "Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message."  585 U.S. 878, 908 (2018) (citing *Garcetti*, 547 U.S. at 421-22, 425-26).  This is because "[w]hen an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer.  The employee is effectively the employer's spokesperson."  *Id.* at 910. In *Janus*, the Court noted that the speech in question—required dues paid to a union—was not made on behalf of an employer because unions speak on behalf of employees, not employers. Accordingly, the logic of *Garcetti* and *Pickering* could not apply to the plaintiffs' claims in *Janus*.  No such issue is presented here.

Because Ms. Polk's challenged speech would be made within the confines of her official duties as a public elementary school teacher, MCPS has the authority to regulate that speech. Accordingly, Ms. Polk has no First Amendment claim here.

> **b)**     **Even if *Garcetti* did not apply, Ms. Polk's claim would fail under *Pickering*.**

Ms. Polk's claim would fail even if *Garcetti* did not apply because it would be subject to, and fail, *Pickering*'s balancing test.  *Pickering* and its progeny hold that government employers may restrict their employees' private speech that is not on a matter of public concern, *see*

*Connick v. Myers*, 461 U.S. 138, 145 (1983), because "the speech of a public-sector employee may interfere with the effective operation of a government office," *Janus*, 585 U.S. at 908. Even if an employee's speech does touch on matters of public concern, restrictions may nonetheless be justified by "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150. Ms. Polk's claim fails under the *Pickering* balancing test because using particular students' proper pronouns within the classroom and keeping student information confidential in certain circumstances is outside the realm of public concern, and it would disrupt the functioning of schools if MCPS were not able to regulate such speech.

The first step in the *Pickering* balancing test is to examine "whether the speech at issue was that of a private citizen speaking on a matter of public concern." *Lee*, 484 F.3d at 694 (citation omitted). "If speech is purely personal, it is not protected and the inquiry is at an end." *Liverman v. City of Petersburg*, 844 F.3d 400, 406 (4th Cir. 2016). When evaluating whether speech is of public concern, "content and context are key." *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004). Here, both require concluding that the speech at issue does not address a matter of public concern. The content of the challenged speech concerns how Ms. Polk will address individual students within the classroom, and how she may hypothetically engage with individual parents when necessary to support those students. The name and pronoun by which one teacher addresses a particular student is not a subject of public concern. Indeed, an individual student's gender identity will often be an intensely private matter, as the Guidelines recognize by reiterating that students have "the right to keep private [their] transgender status or gender nonconforming presentation at school." Guidelines at 2. The topics that courts have found to raise issues of public concern stand in stark contrast. All involve broad policies, like

18

the need for additional school funding, *see Pickering*, 391 U.S. at 571-72, the schoolwide

mismanagement of teacher pay, *see Stroman v. Colleton Cnty. Sch. Dist.,* 981 F.2d 152, 159 (4th

Cir. 1992); and accusations of gender discrimination among staff, *see Seemuller v. Fairfax Cnty.

Sch. Bd.*, 878 F.2d 1578, 1582 (4th Cir. 1989).

        Likewise, the context of the speech at issue—classroom instruction—reflects that it is not

speech directed to a subject of public concern.  Speech in a classroom between a teacher and

individual students differs dramatically from scenarios in which a teacher has attempted to draw

public attention to issues, such as publishing a letter to the editor attacking a proposed

government tax hike, *see Pickering*, 391 U.S. at 566-67, or criticizing a school's discriminatory

disciplinary policies at a PTA or faculty meeting, *see Love-Lane*, 355 F.3d at 776; *see also

Janus*, 585 U.S. at 913-14 (recognizing protection afforded to "speak[ing] out *in collective

bargaining* on controversial subjects" like "gender identity") (emphasis added).[5]

        Even if Ms. Polk's use of preferred names and pronouns of individual students within the

four walls of the classroom could somehow be interpreted as addressing a matter of public

concern, MCPS's regulation of that speech still would be permissible under the second step of

the *Pickering* test.  The second step "consider[s] whether the employee's interest in First

Amendment expression outweighs the public employer's interest in what the employer has

determined to be the appropriate operation of the workplace."  *Lee*, 484 F.3d at 694 (citation

omitted).  MCPS need only show that "an adverse effect" could be "reasonably … apprehended"

from Ms. Polk's noncompliance.  *Loftus v. Bobzien*, 848 F.3d 278, 289 (4th Cir. 2017).

---

        [5] In *Connick*, the Supreme Court noted that a plaintiff's right to protest "a matter inherently of
public concern . . . is not forfeited by her choice of a private forum."  461 U.S. at 148 n.8.  But at the
same time, speech in a private setting that is "not otherwise of public concern does not attain that status
because its subject matter could, in different circumstances" have been a topic of public concern.  *See id.*
The circumstances here support a conclusion that Ms. Polk's speech would be limited to personal, private
interactions with students.

Permitting Ms. Polk to ignore the Guidelines would undermine MCPS's goals of providing "a safe and supportive space for [its] LGTQ+ students, free from discrimination, bullying, and harassment." Guidelines, Letter from Superintendent. By refusing to use a child's preferred pronouns and instead addressing students as she chooses, Ms. Polk could create an atmosphere in which LGBTQ+ students feel at minimum uncomfortable and at worst threatened, contravening MCPS's mandate to provide a safe and welcoming learning environment for all of its students. And by communicating information to a student's parents that is not contemplated by their Gender Support Plan, Ms. Polk threatens to undermine the gender identity support framework that MCPS has spent years implementing. MCPS adopted its Guidelines on Gender Support Plans in recognition of the fact that some transgender students "may not openly express their gender identity at home because of safety concerns or lack of acceptance," and may experience heightened "familial conflict." Guidelines at 2. MCPS's interest in maintaining a safe and supportive learning environment outweighs Ms. Polk's interest in asserting her own views inside the classroom regarding a student's individual gender identity.

Because Ms. Polk's claim fails under *Pickering*, she tries to sidestep that test. But her attempt to carve out an exception for compelled speech is no more successful for this straightforward *Pickering* analysis than it is for *Garcetti*. Courts have rejected similar lines of argument. *See Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1286 (D. Wyo. 2023) ("While *Janus* certainly left open the possibility that *Pickerin*g may not apply to cases where the government compelled the speech of its employees, the clear majority of courts to address the issue have concluded *Pickering* still applies to such claims.") (collecting cases). Indeed, in *Janus* itself, while the Court recognized that *Pickering* may have been "a poor fit" based on the particular facts at issue (compelled subsidization of a union), the Court still

conducted the *Pickering* balancing test in reaching its decision.  585 U.S. at 909, 914.  The facts in this dispute run much closer to *Pickering* than to *Janus*, and there is no basis for casting *Pickering* aside absent further guidance from the Supreme Court.

Ms. Polk's alternative effort to avoid *Pickering* is no better.  Latching on to *Janus*'s aside that an employer may insist that an employee "deliver any lawful message" that is part of their official duties, *Janus*, 585 U.S. at 908, Ms. Polk argues that the Guidelines require "deceiving parents about how their kids are treated at school," which is "an unlawful purpose" because it purportedly deprives "parents of their constitutional rights" to raise their children.  Pl. Br. 13. That aside in *Janus* did not purport to create a First Amendment cause of action for government employees who believe the policies they are required to carry out violate the rights of third parties.  Ms. Polk does not have standing to assert the rights of parents hypothetically harmed by the Guidelines, who are more than capable of asserting their own rights.  *See generally Singleton v. Wulff*, 428 U.S. 106, 116 (1976) (a party can only assert the rights of another if they have a "close relationship" and there is a "genuine obstacle" to the third party bringing suit).  Indeed, parents have done so, and the Fourth Circuit has rejected those parental challenges to the Guidelines as impermissibly "speculative."  *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 629 (4th Cir. 2023), *cert. denied sub nom. Parents 1 v. Montgomery Cnty. Bd.*, No. 23-601, 2024 WL 2262333 (U.S. May 20, 2024).  In any event, even if the Guidelines did infringe on parental rights, and even if Ms. Polk could rely on injuries to those third parties, the Guidelines easily satisfy rational basis review.  *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 139 (D. Md. 2022), *vacated and remanded on other grounds*, 78 F.4th 622 (4th Cir. 2023).

      **c)**      **Even if Ms. Polk's speech were entitled to First Amendment protections, the Guidelines would survive no matter the level of scrutiny.**

Even if the Court were to conclude that *Garcetti* and *Pickering* do not foreclose Ms. Polk's free speech claim, the parts of the Guidelines that Ms. Polk challenges survive strict scrutiny. If strict scrutiny were to apply (it does not), MCPS would have to demonstrate that its policy is narrowly tailored to serve a compelling government interest. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 532 (2022). It is.

*Compelling interests*. MCPS has a compelling interest in: (1) protecting student safety and preventing discrimination against students; (2) complying with its obligations under federal law, including Title IX, which prohibits discrimination based on gender identity; and (3) hiring staff who will nurture transgender and non-transgender students in equal measure.

The government has a compelling interest "of the highest order" in "eliminating discrimination." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). The interest in combatting discrimination in educational settings is especially strong because such discrimination "generates a feeling of inferiority as to status in the community that may affect [students'] hearts and minds in a way unlikely ever to be undone." *Brown v. Bd of Educ.*, 347 U.S. 483, 494 (1954). To that end, MCPS has a compelling interest in preventing discrimination against transgender students. *See Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018). Discrimination can lead to serious "negative educational outcomes" and even "precipitate self-injurious behavior." *Id.* As such, the risk of discrimination to students' well-being "cannot be overstated—indeed, it can be life threatening." *Id.* Schools accordingly have a compelling interest in implementing policies that "foster[] an environment of inclusivity, acceptance, and tolerance." *Id.*

MCPS must also comply with its obligations under federal law.  Under Title IX, "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  In *Grimm v. Gloucester County School Board*, the Fourth Circuit held that Title IX prohibits discrimination based on gender identity.  972 F.3d 586, 619 (4th Cir. 2020), *as amended* (Aug. 28, 2020).  Additionally, as the MCPS Guidelines recognize, disclosing a student's "transgender status or gender nonconforming presentation at school … to other students, their parents/guardians, or third parties may violate privacy laws, such as the federal Family Educational Rights and Privacy Act (FERPA)."  Guidelines at 2-3.  A school system's interest in complying with federal legal obligations is compelling.  *Widmar v. Vincent*, 454 U.S. 263, 271 (1981).

Finally, MCPS has a compelling interest in hiring teachers who will nurture and support transgender students just as they would any other student.  This interest is particularly crucial in the elementary school setting.  In the Establishment Clause context, the Supreme Court has stressed that the impressionable age of primary school pupils makes them uniquely sensitive to religious indoctrination from teachers and school curricula.  *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 592 (1992); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 307 (Goldberg, J., concurring); *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987).  The same principles apply here: elementary school students are highly susceptible to the influence of their teachers.  A teacher refusing to engage with a child at a young age because they are transgender, or struggling with gender identity, could have a long-lasting psychological toll.  MCPS has a compelling interest in ensuring that its teachers are willing and able to abide by policies that the school has adopted to ensure that teachers do not alienate or adversely affect students based on their gender identity.

23

Ms. Polk has no serious argument to the contrary, instead minimizing these interests as an effort to "shield students from what they might perceive as offensive or hurtful speech."  Pl. Br. 15.  To the contrary, the Guidelines govern authority figures' speech that is directly targeted at individual students and that involves a core aspect of their burgeoning self-identity—literally what names teachers may call their students.  Using proper pronouns promotes student safety; ensures the privacy of confidential information as to students' gender status, and prevents discrimination.  *See* Ex. 3 (Providing Safe Spaces) (noting that "[e]qual education in a non-discriminatory environment may be supported by" a guideline to "[a]ddress every student by a name and pronoun that corresponds to the student's gender identity"); *Doe*, 897 F.3d at 529.  At a minimum, MCPS may permissibly enact policies that minimize speech that is disruptive to the learning environment and unrelated to the curriculum.  For example, the Seventh Circuit found no First Amendment violation when a college chose not to retain a Christian cosmetology teacher who had given homophobic pamphlets to a gay student, explaining, "we see no reason why a college or university cannot direct its instructors to keep personal discussions about sexual orientation or religion out of a … class or clinic" when it has "a harassing effect" on a student. *Piggee v. Carl Sandburg Coll.*, 464 F.3d 667, 673-74 (7th Cir. 2006); *see also Clay v. Greendale Sch. Dist.*, 602 F. Supp. 3d 1110, 1115, 1119 (E.D. Wis. 2022) (teacher was lawfully terminated after sending unsolicited email to group of students stating, "if you were asking me to support LGBT marriage, that is an issue that I definitely oppose"), *appeal dismissed*, No. 22-1998, 2022 WL 17403217 (7th Cir. Nov. 21, 2022).

Ms. Polk also is wrong that MCPS has no compelling interest in requiring that teachers, in certain circumstances, not share students' Gender Support Plans with their parents.  As an initial matter, the cases on which Ms. Polk relies adjudicating due process claims brought by

parents are inapposite.  *See* Pl. Br. 20 (citing *Troxel v. Granville*, 530 U.S. 57 (2000) (parents

asserted due process challenge); *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550

U.S. 516, 529 (2007) (parents asserted Individuals with Disabilities Education Act challenge);

*Parham v. J. R.*, 442 U.S. 584 (1979) (parents asserted due process challenge)).  Ms. Polk is a

substitute teacher raising a First Amendment claim against her employer, not a parent raising a

due process claim based on an alleged interest in directing the upbringing of a child.

Even setting that aside, it is simply false that the Guidelines "repudiate" parents'

fundamental right to direct the care or education of their children.  Pl. Br. 18.  The Guidelines are

flexible, directing schools to assess students' needs on a case-by-case basis.  They specifically

invite parent participation whenever a child's family is supportive, and state that if a student

cannot openly express their gender identity at home because of safety concerns or lack of

acceptance, "staff will support the development of a student-led plan that *works toward inclusion*

*of the family*."  Guidelines at 2 (emphasis added).  The Guidelines thus balance concerns about

student safety and the interest of parents in the upbringing of their children, with a preference for

parental involvement where possible.  In the end, though, the Guidelines make clear that student

safety and well-being are paramount, and "[i]t is evident beyond the need for elaboration that a

State's interest in 'safeguarding the physical and psychological well-being of a minor' is

'compelling.'"  *New York v. Ferber*, 458 U.S. 747, 756-57 (1982); *LaVine v. Blaine Sch. Dist.*,

257 F.3d 981, 991-92 (9th Cir. 2001) (finding school's interest in safety of its students

compelling, and noting that "[w]e review … with deference schools' decisions in connection

with the safety of their students").

***Narrow tailoring.***  Current MCPS policy is narrowly tailored to serve those compelling

interests.  Ms. Polk claims that the Guidelines are overinclusive because MCPS can allow her to

"avoid any substantial interaction with transgender students" while still advancing its compelling

interests by placing her only in classrooms without such students. *See* Pl. Br. 20.[6]  But as

explained above, students are not required to have a Gender Support Plan, and there may well be

students within MCPS who need an accommodation under the Guidelines who do not have such

Plans.  Decl. ¶¶ 13-14.  So even if MCPS could ensure that Ms. Polk was not assigned to

classrooms with any students with Gender Support Plans, which the substitute teacher

assignment system described above does not enable it to do, *id.* ¶ 27, it could not ensure that no

transgender or gender nonconforming students would be present in any other classroom.

Even if MCPS had perfect knowledge of what classrooms all of its transgender and

gender nonconforming students were in, student rosters are not static throughout the year, or

even throughout the day for substitutes who teach multiple sections of students, like all of

MCPS's middle and high school teachers, as well as its elementary school music and art

teachers.  *Id.* ¶ 29.  Students themselves are also not static, and issues relating to gender may

come up in the classroom in real time, especially for substitutes who may be assigned to the

same class for an extended period.  Ms. Polk could, for example, be assigned as a long-term

substitute in a classroom where a student comes to realize, mid-school year, that they identify as

transgender.  Requiring MCPS administrators to track all these variables, while simultaneously

---

[6] Ms. Polk also cites dicta from *Meriwether*, 992 F.3d at 511, for the proposition that allowing her to address transgender students by name only and avoid using their pronouns entirely would be a "win-win solution."  ECF No. 4-1 at 20.  But that is, of course, not the relief she asks this Court to order.  She asks that she not be required to teach transgender or gender nonconforming students at all.  *See* Compl. at p.17. And in any event, experience in other courts has demonstrated that this awkward accommodation that repeatedly draws attention to the gender nonconforming student and the teacher's refusal to acknowledge their preferences is anything but "win-win."  *See, e.g., Kluge v. Brownsburg Cmty. Sch. Corp.*, 2024 WL 1885848, at *19 (S.D. Ind. Apr. 30, 2024) (finding that "Last Names Only Accommodation resulted in significant disruption to the learning development" and "produced substantial student harm"), *appeal filed*, No. 24-1942 (7th Cir. May. 31, 2024).  MCPS has a compelling interest in preventing its students from facing similar discriminatory conduct.

trying to place approximately 800 other substitute teachers on any given day, *id.* ¶ 16, is the definition of undue burden.  And even if the logistics were not insurmountable, MCPS should not be required to assign a substitute teacher who states at the outset that she will not follow MCPS's best practices for ensuring its transgender and gender nonconforming students are appropriately supported.  To require otherwise would undermine MCPS's compelling interests in combatting discrimination, adhering to federal law, and hiring staff who treat all students equally.  The policy thus is narrowly tailored.

> **2.    Ms. Polk is unlikely to succeed on the merits of her free exercise claim.**

Next, Ms. Polk argues that the Guidelines violate her First Amendment right to free exercise because they require her to act contrary to her religious beliefs, specifically with respect to their requirements to use proper pronouns and keep Gender Support Plans confidential in certain circumstances, as well as the requirement that students be allowed to use bathrooms in alignment with their gender identity.  But the Free Exercise Clause "only applies when the government burdens religious exercise" by penalizing or prohibiting it.  *Roswell v. Mayor & City Council of Balt.*, 671 F. Supp. 3d 607, 622 (D. Md. 2023) (citing *Carson ex rel. O. C. v. Makin*, 596 U.S. 767, 778-79 (2022)), *aff'd*, 2023 WL 8728503 (4th Cir. Dec. 19, 2023).  And even so, "a law that 'incidentally burden[s] religion' does not violate the Free Exercise Clause if it is neutral and generally applicable."  *Kim v. Bd. of Educ. of Howard Cnty.*, 641 F. Supp. 3d 223, 237 (D. Md. 2022) (quoting *Fulton v. City of Phila.*, 593 U.S. 522, 532 (2021)), *aff'd*, 93 F.4th 733 (4th Cir. 2024).  Such laws need only pass rational basis review.  *See Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 198 (4th Cir. 2022).  Because the Guidelines are neutral and generally applicable, and have a rational basis, their application to Ms. Polk does not violate her right to free exercise.  In any event, even if strict scrutiny applied, the court should

deny a preliminary injunction because the Guidelines are narrowly tailored and advance MCPS's compelling interests in complying with applicable nondiscrimination laws and fostering an inclusive learning environment.

        **a)**        **The Guidelines do not infringe Ms. Polk's free exercise rights.**

Ms. Polk's free exercise claim fails at the starting gate because MCPS's application of its Guidelines to Ms. Polk does not burden her religious practice. The Clause "only applies when the government burdens religious exercise" by penalizing or prohibiting it. *Roswell*, 671 F. Supp. 3d at 622; *see also Mahmoud v. McKnight*, 688 F. Supp. 3d 265, 288 (D. Md. 2023) ("'[I]t is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion.'"), *aff'd*, 102 F.4th 191 (4th Cir. 2024). The Guidelines do not impose any such coercive burden. They amount to straightforward, uniform requirements structuring interactions between students and teachers: addressing students by the name and pronoun consistently asserted at school, not violating student confidentiality principles in certain circumstances, and allowing students access to bathroom facilities aligned with their gender identity. And, in any event, the only thing required of Ms. Polk to date has been to review the training materials and attest to the following: "I have reviewed this resource and understand my obligation to comply with it." This attestation does not require her to shed her religious beliefs or endorse the policy; it only requires her to attest that she is aware of the expectation that she comply with the policy.

With respect to the Guidelines' requirement that "[w]here facilities are designated by gender, students must be provided access to gender-specific facilities," including restrooms, "in alignment with their gender identity consistently asserted at school," Ms. Polk has not plausibly shown any effect that policy has on her religious exercise. Ms. Polk is entitled to believe that "God requires modesty to be exercised between the sexes and it would be unethical for her to

assist a child of one sex to use the restroom of the opposite sex while others of the opposite sex are present," Polk Decl. ¶ 23, and nothing in the Guidelines infringes those beliefs.  The Guidelines simply state that children must be provided access to facilities in alignment with their gender identity; the Guidelines say nothing about Ms. Polk being required to assist children to use the restroom, or to do so while other students are present.  Because the Guidelines' provisions relating to gender-specific facilities are not actually at odds with Ms. Polk's religious exercise, her claim fails.

        With respect to the name and pronoun requirement, the Guidelines instruct that "School staff members should address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school."  Guidelines at 3.  That requirement does not coerce Ms. Polk to shed her beliefs about gender identity; it simply asks teachers to refer to students consistently and in accordance with student gender identity.  Nor does the Guidelines requirement regarding the need for confidentiality—*i.e.*, "[t]o the extent possible, and consistent with these guidelines, school personnel will make efforts to maintain the confidentiality of the student's transgender status."  *Id.*  That requirement doesn't affirmatively obligate Ms. Polk to do anything, much less "hide" information from parents or "l[ie] to the parents and hid[e] school files from them."  Polk Decl. ¶ 23.  To comply with that Guideline, Ms. Polk need only refrain from proactively alerting a student's parents as to *her perception* of that student's gender status. There is no basis for the assertion that a public teacher has a *religious right* to bypass a school administration and convey this kind of information to a student's parents, or that MCPS's decisions on how to handle confidential student information could conceivably infringe on Ms. Polk's religious exercise.  Courts regularly hold that a school does not infringe on religious exercise when it punishes employees for acting in a disruptive manner in the classroom, even if

that disruption is somehow rooted in the employee's religious exercise.  *See, e.g.*, *Barr v. Tucker*, 662 F. Supp. 3d 1353, 1370 (S.D. Ga. 2023) (rejecting injunction because "Defendants maintain they removed Plaintiff due to her inappropriately timed interactions with her children's teachers and concern about how she would support students or parents that identify as gay, not because of her beliefs about marriage and family formation").

> **b)** **Even if the Guidelines incidentally burden Ms. Polk's religious practice, they are generally applicable and neutral, and subject to rational-basis review.**

A policy is neutral when it "proscribes conduct without regard to whether that conduct is religiously motivated or not."  *Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 357 (4th Cir. 1998). In considering whether conduct is religiously motivated, courts may look to whether the object of the challenged policy is to "infringe upon or restrict practices because of their religious motivation," *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993), or whether the policy's enactment reveals any "'clear and impermissible hostility' toward religious beliefs," *Bethel Ministries, Inc. v. Salmon*, 2020 WL 292055, at *8 (D. Md. Jan. 21, 2020) (quoting *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 634 (2018)).

There is no evidence that, in enacting the Guidelines, MCPS intended to discriminate based on religion.  By their own terms, the Guidelines were promulgated because of MCPS's commitment to "providing a safe and supportive space for [its] LGBTQ+ students, free from discrimination, bullying, and harassment."  Guidelines, Letter from Superintendent.  The Guidelines are also just one of several policy documents designed to "celebrate the rich diversity of [the] community and ensure that every student has the opportunity to thrive and succeed."  *Id.* Another similar document, the Guidelines for Respecting Religious Diversity, provides analogous guidance for celebrating and supporting students from all manner of religious

30

backgrounds.[7]  Contrary to Ms. Polk's unsupported allegations (at 23) that the Guidelines were intended to target individuals who "hold to traditional religious teachings on transgenderism," taken together, MCPS's policy documents espouse a deep commitment to supporting all MCPS students, no matter their identity, and Ms. Polk has made no showing otherwise.

The Guidelines are also generally applicable.  Every staff member who works at MCPS is required to attest that they will comply with the Guidelines.  No exceptions to this policy have been made.  Decl. ¶ 32-33.  Any argument that "individualized exemptions" render the Guidelines "not generally applicable," *Fulton*, 593 U.S. at 533 (quoting *Employment Div. v. Smith*, 494 U.S. 872, 884 (1990)), therefore fails at the start.

Each of Ms. Polk's arguments to the contrary also fails.  First, she argues that she was not required to complete the attestation in 2021, meaning that MCPS exercised discretion in making it a requirement for later school years.  But this is not an example of an individualized exemption.  No employees were required to complete the attestation that year because it was not part of the training materials. And even if Ms. Polk previously was not required to check a box attesting that she would comply with the Guidelines, she was still required to complete a training on the Guidelines, and the Guidelines were in effect then just as they are now.  Second, Ms. Polk argues that "MCPS has unbridled discretion with respect to how to apply the policy to parents," apparently referring to the Guidelines' contemplation that some but not all Gender Support Plans could be kept confidential from parents.  Pl. Br. 24.  But even if that were true, it does not matter. The relevant question is whether MCPS exercises discretion with respect to how it applies the Guidelines to *staff*.  And as already explained, all staff are required to comply with the

---

[7] Montgomery County Public Schools, *2023-2024 Guidelines for Respecting Religious Diversity in Montgomery County Public Schools* (July 2023), https://www.montgomeryschoolsmd.org/contentassets/2bcd99470c9f44f891cc5be276c25d19/religiousdiversityguidelines_final.pdf.

Guidelines.  Third, Ms. Polk argues that MCPS cannot apply the Guidelines uniformly because it is required to provide religious accommodations under Title VII.  But while MCPS has provided staff with religious accommodations in other contexts, it has not offered an accommodation allowing staff to simply not comply with the Guidelines, Decl. ¶ 32-33—and for good reason, discussed below.  Fourth, Ms. Polk argues that MCPS's disciplinary processes for substitute teachers involve discretion, but disciplinary processes are not at issue here—the requirement that all staff members agree to comply with the Guidelines is, and MCPS exercises no discretion with respect to that requirement.

**c)    Ms. Polk's free exercise claim fails under any standard of review.**

Even if strict scrutiny somehow applied, MCPS's policy as applied to Ms. Polk is constitutional because the policy "serve[s] a compelling interest and [is] narrowly tailored to that end." *Kennedy*, 597 U.S. at 532 (2022).  As explained in Section II.A.1.c, the policy is narrowly tailored in a manner that serves compelling interests in protecting student safety and preventing discrimination, complying with Title IX and other federal legal obligations, and hiring staff who will nurture transgender and non-transgender students alike.  And as MCPS's policy satisfies strict scrutiny, it necessarily also satisfies rational basis review as well.  *See Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 561 (4th Cir. 2013) ("requir[ing] merely that the law at issue be 'rationally related to a legitimate governmental interest'").

**B.    Ms. Polk Does Not Satisfy The Remaining Preliminary Injunction Factors As To Her Section 1983 Claims**

The Court need not consider the remaining preliminary injunction factors because Ms. Polk has not clearly established that she is likely to succeed on her free speech or free exercise claims.  *See Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018).

32

In any case, Ms. Polk has not made a sufficient showing of irreparable harm or that the equities and public interest are in her favor. As discussed above, Ms. Polk's long delay in bringing her claims shows she has no irreparable harm. *See* Section I. Beyond that, the only potential irreparable harm she identifies with respect to her First Amendment claims is that "her constitutional rights will continue to be infringed." Pl. Br. 25. "[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (citation omitted). And as already discussed, Ms. Polk has not shown a likelihood of success on the merits on either claim. Nor do the balance of the equities or the public interest, two factors that merge when the government is the party opposing injunctive relief, favor an injunction. *Association of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 397 (D. Md. 2022). Here, "the public consequences in employing the extraordinary remedy of an injunction" are severe. *Id.* (citation omitted). Requiring MCPS to permit Ms. Polk to ignore the Guidelines would significantly disrupt classroom instruction, undermining MCPS's stated goals to foster an inclusive environment for all students. And Ms. Polk's proposed alternative—assigning her only to classrooms with no transgender and gender nonconforming students—at minimum would require fully re-engineering the substitute teacher assignment system, and in any event, would likely be impossible. The injunction should be denied.

## III.    Ms. Polk Is Not Entitled To Injunctive Relief On Her Title VII Claim

Ms. Polk claims that she also is entitled to injunctive relief because "MCPS violated Title VII by failing to provide her an accommodation to allow her to continue to work as a substitute teacher." Pl. Br. 2-3. Like her constitutional claims, Ms. Polk has failed to show that she is

likely to succeed on the merits.  But even more obviously, Ms. Polk has failed to make any showing of irreparable harm as necessary to obtain an injunction.

### A.    Ms. Polk Has Failed To Show Irreparable Harm

As to her Title VII claim, the only harm Ms. Polk claims is that "her financial condition" will continue to be "diminished."  Pl. Br. 25.  But "this Court has repeatedly rejected requests for preliminary injunctions sought by employees or former employees who argued that their loss of income would cause them irreparable harm."  *Price v. Howard Cnty. Pub. Sch. Sys.*, 2022 WL 21769772, at *2 (D. Md. June 17, 2022).  This is because Title VII contemplates damages sufficient to recompense any plaintiff at the end of a successful suit.  *See Downing v. Lee*, 2017 WL 11489270, at *2 (E.D. Va. Feb. 13, 2017) ("Indeed, if Plaintiff prevails at trial, the Court likely would be well within its power to award backpay and take other equitable steps to remedy the alleged Title VII allegations.  Put differently, because the alleged injury (loss of savings) is monetary, a monetary award at the end of trial would account for this injury in full.").

Nor has Ms. Polk alleged any set of facts to suggest that she faces an "impossible choice" between keeping her job and complying with the Guidelines against her religious beliefs; Ms. Polk made her choice almost two years ago, and she chose to stop teaching.  *See Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 8 (1st Cir. 2021) (finding no irreparable harm for medical professionals who were terminated when they refused to get COVID-19 vaccinations that they alleged violated their religious beliefs).  "[W]ithout a clear showing of actual and imminent irreparable harm, the inquiry need proceed no further."  *Maye v. City of Kannapolis*, 872 F. Supp. 246, 247 (M.D.N.C. 1994).

### B.    Ms. Polk Fails To Demonstrate Likelihood Of Success On The Merits Of Her Title VII Claim

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … religion[.]" 42 U.S.C. § 2000e-2(a)).  "To establish a prima facie religious accommodation claim, a plaintiff must establish that: '(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'" *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996). Defendants "must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023).

Assuming that Ms. Polk has alleged a bona fide religious belief that conflicts with the Guidelines, Ms. Polk's proposed accommodation—which, again, is that she be allowed "to substitute teach in classrooms in which students who are transitioning genders are not enrolled," Compl. at p.17—is unreasonable as a matter of law.  MCPS is required to provide an education to all of its students.  It is also required, under federal and state law, to provide all students an educational environment free from discrimination.  Just as MCPS could not reasonably be expected to accept teachers refusing to teach students based on their race or religion, MCPS cannot condone Ms. Polk's refusal to teach transgender or gender nonconforming students.  As the Fourth Circuit has recognized, some employee "conduct is not the type that an employer can possibly accommodate." *Chalmers*, 101 F.3d at 1021; *cf. Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607-08 (9th Cir. 2004) (employer "need not accept the burdens that would result from

allowing actions that demean or degrade, or are designed to demean or degrade").  This is such a case.[8]

Even if Ms. Polk's requested accommodation were not facially unreasonable, it would "result in substantial increased costs."  *Groff*, 600 U.S. at 470.  MCPS's mission is to ensure that "[e]very student will have the academic, creative problem solving and social-emotional skills to be successful in college and career."[9]  MCPS adopted the Guidelines in furtherance of these goals, "reinforc[ing] our long-standing dedication to fostering an inclusive, accepting, and equitable environment for all" and "recogniz[ing] the importance of providing a safe and supportive space for our LGBTQ+ students, free from discrimination, bullying, and harassment." Guidelines, Letter from Superintendent.  Ms. Polk's request to avoid teaching some of MCPS's most vulnerable students undermines these policy goals and is potentially at odds with MCPS's obligations under Title IX.  *See Yeager v. FirstEnergy Generation Corp.*, 777 F.3d 362, 363 (6th Cir. 2015) ("Title VII does not require an employer to reasonably accommodate an employee's religious beliefs if such accommodation would violate a federal statute.") (citing *Baltgalvis v. Newport News Shipbuilding Inc.*, 132 F. Supp. 2d 414, 418 (E.D. Va. 2001).

*Kluge v. Brownsburg Community School Corporation*, 2024 WL 1885848 (S.D. Ind. Apr. 30, 2024), *appeal filed*, No. 24-1942 (7th Cir. May 31, 2024), is instructive.  There, the court held that a teacher's proposed accommodation to refer to transgender students by only their last

---

[8] That Ms. Polk claims to have initially sought a different accommodation—not to be required to affirm compliance with the Guidelines, not to have to use preferred pronouns, and not to have to assist children in using restrooms that align with their gender identities, Compl. ¶ 33—makes no difference. For one, she has now made clear what accommodation she believes she is entitled to.  For another, the alternate framing of her accommodation would also be unduly burdensome to MCPS by imposing precisely the harms that the Guidelines are intended to protect against.  *See, e.g.*, *Kluge*, 2024 WL 1885848, at *19 (finding that "Last Names Only Accommodation resulted in significant disruption to the learning development" and "produced substantial student harm").

[9] Montgomery County Public Schools, *About Us*, https://www.montgomeryschoolsmd.org/about/ (last visited July 2, 2024).

names would have been an undue hardship on the schools.  *Id.* at *20.  The court noted that "a public school is not a typical business" and that the school system's "mission can legitimately extend to fostering a safe, inclusive learning environment for all students and evaluating whether that mission is threatened by substantial student harm and the potential for liability."  *Id.* at *17. The court then found that the plaintiff teacher's proposed accommodation "was insulting or offensive and made his classroom environment unwelcoming and uncomfortable," and that in turn "burdened [the school district's] ability to provide an education to all students and conflicted with its philosophy of creating a safe and supportive environment for all students."  *Id.* at *18. MCPS has the same interest in this case, to educate its students in a safe and inclusive learning environment.  Ms. Polk's proposed accommodations threaten to undermine that interest, either through refusing to teach transgender and gender nonconforming students altogether, or by refusing to follow the Guidelines specifically designed to aid those students.  Neither is required by Title VII.

If the potential dignitary harms to MCPS students and the weakening of MCPS's mission to educate all of its students were not enough to reject Ms. Polk's request for an accommodation on its face—and they surely are—Ms. Polk's proposed accommodation also is unworkable. While Ms. Polk says that MCPS can simply place her in classrooms that contain no students with Gender Support Plans, the Guidelines do not require that all students who are transgender or are exploring their gender identity have a formal Gender Support Plan in place, and, indeed, the Gender Support Plans currently on file do not necessarily reflect all of the students at MCPS who may identify or present as transgender or gender nonconforming and thus may require support under the Guidelines.  Decl. ¶¶ 13-14.  Accordingly, MCPS does not have full visibility into which classrooms have, as Ms. Polk describes them, "children [who] present as other than their

God-given sex."  Compl. ¶ 31(a).  And even if MCPS were able to know with certainty which classrooms have transgender and gender nonconforming students on any given day, there is no practical way to incorporate that information into the substitute assignment system to block teachers from being assigned to individual classrooms while maintaining student confidentiality. Decl. ¶¶ 27-28.  No matter how it is framed, Ms. Polk's proposed accommodation is overly burdensome and unworkable.  Her motion should be denied.

## IV.    Ms. Polk's Complaint Should Be Dismissed

This Court should also dismiss Ms. Polk's Complaint in full because she fails to state a claim for which relief can be granted.

### A.    Ms. Polk's Claims Against the Individual Defendants Should Be Dismissed

In her Complaint, Ms. Polk has failed to state a claim against any of the individual members of the Montgomery County Board of Education or the former Interim Superintendent under Section 1983 or Title VII.

As this Court has recognized, "no *individual* board member or board employee may be held liable for the actions of a board as a whole."  *Smith-Hosch v. Bramble*, 2019 WL 4060017, at *4 (D. Md. Aug. 28, 2019).  In order to state a claim against individual board members, "the plaintiff must do more than make conclusory claims of individual member conduct; specific allegations of individual conduct are required."  *Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 664 (D. Md. 2021).  Here, while Ms. Polk may claim that the Board acted improperly as a corporate whole, she has not alleged any specific wrongdoing by any specific member of the Board or by the interim superintendent.  As such, any "such allegations that refer generally to the group, without identifying specific individuals or conduct, are insufficient to state a claim against any individual board member." *Id.*

In addition, the Fourth Circuit "has held that Title VII creates a cause of action against employers, not individual supervisors." *Woodbury v. Victory Van Lines*, 286 F. Supp. 3d 685, 693 (D. Md. 2017) (citing *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180–81 (4th Cir. 1998)); *see Showell v. Bd. of Educ. of Wicomico Cnty.*, 2011 WL 5877220, at *9 (D. Md. Nov. 22, 2011) (dismissing Title VII claims against school board members in their official capacity). Ms. Polk's employer for Title VII purposes is the Board as a whole, not the former interim superintendent or any individual Board members. Ms. Polk's Title VII claims against the Individual Defendants should be dismissed for that reason.

### B.     **"Montgomery County Public Schools" Is Not Subject To Suit**

Ms. Polk's claims against "Montgomery County Public Schools" should be dismissed because "MCPS is not a distinct legal entity empowered to sue or be sued. Under Maryland law, the board of education for each county school system and the City of Baltimore is the entity which is empowered to sue and be sued." *Miller v. Montgomery Cnty. Pub. Sch.*, 2020 WL 2097686, at *1 (D. Md. May 1, 2020) (citing Md. Code, Educ. §§ 3-104(a) & (b)(2)). Accordingly, any claims brought against MCPS should be dismissed, leaving only the Board as the appropriate defendant.

### C.     **Ms. Polk Has Failed To State A Claim For Relief On All Claims**

Ms. Polk's claims under both the First Amendment and Title VII are insufficient as a matter of law and should be dismissed for the same reasons she has failed to show a likelihood of success on the merits as necessary to be entitled to a preliminary injunction. *See* Sections II-III, *supra*. Courts regularly apply *Garcetti* and *Pickering* to dismiss at the pleading stage cases involving speech of government employees. *See, e.g.*, *Porter*, 72 F.4th at 582, 584 (affirming dismissal of Section 1983 action because university professor was "speaking as a public employee" but not "related to 'scholarship or teaching'"); *Price*, 2023 WL 170425, at *5

(dismissing First Amendment claim because teacher made statements "pursuant to [his] official duties" and he was thus "not speaking as a citizen"). It is clear from the face of Ms. Polk's Complaint that the speech she challenges is inextricably tied to classroom management and so part of her official duties. *See Garcetti*, 547 U.S. at 419. Nor would the circumstances change if analyzed under *Pickering*, as the challenged speech would not be made on a matter of public concern. To the contrary, the speech would concern one-on-one interactions within a classroom that are inherently private. No amendments or discovery will change this analysis.

The same is true of Ms. Polk's free exercise claim. Most obviously, any requirement that Ms. Polk permit students to use restrooms in line with their gender identity does not burden her religious exercise because nothing in the Guidelines requires her to assist or participate in that activity. And even if some aspects of the Guidelines incidentally burden Ms. Polk's free exercise, she has identified no facts suggesting that the Guidelines are not neutral and generally applicable—no evidence to support her claims that the Guidelines were designed to target "those who hold to traditional religious teachings on transgenderism" or were otherwise promulgated with animus, Pl. Br. at 23, and no evidence to suggest that MCPS is exercising discretion with respect to who is required to affirm compliance with the Guidelines and who is not, *id.* at 23-24. Without any such allegations, Ms. Polk's claim is necessarily subject to rational basis review, and ample justification for MCPS's use of the Guidelines is evident on their face, and on the face of the Maryland State Board of Education document on which they were based. Ms. Polk's free exercise claim is also thus subject to dismissal. *See Kim*, 641 F. Supp. 3d at 237 (dismissing free exercise claim where there was no burden on religious exercise and law was neutral and generally appliable).

Finally, this Court should also dismiss Ms. Polk's Title VII claim as involving "conduct [that] is not the type that an employer can possibly accommodate." *Chalmers*, 101 F.3d at 1021. Because it is facially unreasonable to require MCPS to accommodate teachers who refuse to teach transgender and gender nonconforming children, Ms. Polk can state no claim for relief for MCPS's failure to so accommodate her. Ms. Polk's Complaint should thus be dismissed in its entirety.

Dated:  July 3, 2024                        Respectfully submitted,


                                            /s/      Thomas K. Bredar
                                            Bruce M. Berman (*pro hac vice*)
                                            bruce.berman@wilmerhale.com
                                            WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
                                            2100 Pennsylvania Ave. NW
                                            Washington, DC 20037
                                            Tel: (202) 663-6173
                                            Fax: (202) 663-6363

                                            Cassandra A. Mitchell (*pro hac vice*)
                                            cassie.mitchell@wilmerhale.com
                                            Thomas K. Bredar (MD No. 21635)
                                            thomas.bredar@wilmerhale.com
                                            WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
                                            7 World Trade Center
                                            250 Greenwich St.
                                            New York, NY 10007
                                            Tel: (212) 230-8800
                                            Fax: (212) 230-8888

                                            *Counsel for Defendants*

42

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 3, 2024, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

counsel of record.

 /s/ Thomas K. Bredar
Thomas K. Bredar