IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

KIMBERLY ANN POLK,                          )
                                            )
      Plaintiff,                            )      No. 8:24-cv-1487-DLB
                                            )
      v.                                    )
                                            )
MONTGOMERY COUNTY PUBLIC SCHOOLS, *et al.,*  )
                                            )
      Defendants.                           )
_____  )


**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AND**
<u>**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**</u>

Frederick W. Claybrook, Jr., Bar No. 21604
     Counsel of Record
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(301) 622-0360
Rick@claybrooklaw.com

Steven W. Fitschen, Bar No. 31117
James A. Davids, Bar No. 31107
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Robert Flores (*pro hac vice*)
Gammon & Grange, P.C.
1945 Old Gallows Rd., Ste. 650
Vienna, Va. 22181
jrf@gg-law.com

July 17, 2024

<u>Table of Contents</u>

Table of Authorities ............................................................................................................... ii

   I.   Ms. Polk Is Entitled to Relief Under Title VII .................................................... 1

   II.   MCPS Has No Legitimate Justification for Compelling Ms. Polk's Speech ..................... 8

     A.   What MCPS Is Compelling Ms. Polk to Speak Is Not Government Speech ................. 8

     B.   At Least Exacting Scrutiny Applies Here, Rather Than Normal
         *Pickering* Balancing ................................................................................. 12

     C.   MCPS Lacks Any Legitimate Interests and Fails Any Test ......................... 16

   III.   MCPS Violates Ms. Polk's Free Exercise Rights ............................................. 19

     A.   MCPS Infringes Ms. Polk's Free Exercise of Religion ................................ 19

     B.   MCPS May Not Avail Itself of the *Smith* Safe Harbor ................................ 20

   IV.   Ms. Polk's Request for Injunctive Relief Is Not Untimely ......................................... 22

   V.   The Court Should Hold MCPS's Motion to Dismiss Parties in Abeyance ...................... 23

Conclusion ........................................................................................................................ 24

Table of Authorities

Cases

*Bowen* v. *Roy,* 476 U.S. 693 (1986) ...................................................................20

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)....................................16, 19

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) ...........................20

*Connick v. Myers*, 461 U.S. 138 (1983) ............................................................11, 14

*Donlan v. Montgomery Cnty. Pub. Schs.*, 460 Md. 62, 188 A.3d 949 (2018) .............................23

*Fulton v. Phila.*, 593 U.S. 522 (2021) ...............................................................21-22

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................................ 8-10

*Gillette* v. *United States,* 401 U. S. 437 (1971) .......................................................20-21

*Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979) ...........................................11

*Groff v. DeJoy*, 600 U.S. 447 (2023)....................................................................2-3,5,7-8

*Gwinnett v. Sw. Fla. Reg'l Planning Coun.*,
   407 F. Supp. 3d 1273 (M.D. Fla. 2019)p...........................................................14

*Harris v. Quinn*, 573 U.S. 616 (2014)....................................................................14

*Janus v. AFSCME*, 585 U.S. 878 (2018) ............................................................... 8-15

*John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
   78 F.4th 622 (4th Cir. 2023).........................................................................9, 24

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) .............................................. 9-10,12-15

*L.W. v. Skrmetti,* 83 F.4th 460 (6th Cir. 2023),
   *cert. granted*, No. 23-477 (June 24, 2024) ..........................................................7

*Lane v. Franks,* 573 U.S. 228 (2014) ..................................................................14

*Lee v. York Cnty. Sch. Div.*, 484 F.3d 687 (4th Cir. 2007) ..........................................10

*Little Sisters of the Poor v. Pa.*, 591 U.S. 657 (2020)...............................................19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................24

*Meriweather v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ...............................................9, 14-17, 24

*Mirabelli v. Olson*, 691 F. Supp. 3d 1197 (S.D. Cal. 2023) ..................................................17, 19

*Perry v. Sindermann*, 408 U.S. 593 (1972) .............................................................................11

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)................................................................10, 12-14

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015).............................................................................12

*Ricard v. USD 475 Geary Cnty. KS Sch. Bd.*,
    2022 WL 1471372 (D. Kan., May 9, 2022).......................................................................9, 17

*Snyder v Phelps*, 562 U.S. 443 (2011) ........................................................................................15

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)...............................................................................................................16

*Thomas v. Review Bd.*, 450 U.S. 707 (1981) ...............................................................................2

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ...........................................9

*United States v. Skrmetti*, No. 23-477, petition for cert. granted (June 24, 2024) ......................15

*United States v. Treas. Employees*, 513 U.S. 454 (1995) ...........................................................12

*United States v. Varner*, 948 F.3d 250 (5th Cir. 2020)................................................................15

*Walz* v. *Tax Comm'n of N.Y.C.,* 397 U. S. 664 (1970)................................................................21

*Willey v. Sweetwater Cnty. Sch. Dist.*,
    680 F. Supp. 3d 1250 (D. Wyo. 2023)............................................................................14, 20

Statutes and Rules

Code of Md. Regs.

    ch. 13a.08.02.........................................................................................................................17

§ 13a.08.02.03 ............................................................................................................17

§ 13a.08.02.13 ............................................................................................................17

§ 13a.08.02.29 ............................................................................................................17

42 U.S.C.

§ 2000e(b) ...........................................................................................................23

§ 2000e-2(a)(1) ....................................................................................................23

<u>Other Authorities</u>

E. Abbruzzese, Stephen B. Levine & Julia W. Mason, "The Myth of 'Reliable Research' in
    Pediatric Gender Medicine: A critical evaluation of the Dutch Studies—and research
    that has followed" (Jan. 2, 2023), *available at* https://www.tandfonline.com/doi/full/
    10.1080/0092623X.2022.2150346 ............................................................................3

The Cass Review: Independent Review of Gender Identity Services for Young People,
    *available at* https://cass.independent-review.uk/home/publications/final-report/.....................3

Elliott Davis, Jr., *States That Have Restricted Gender-Affirming Care for Trans Youth*,
    U.S. News, *available at* https://www.usnews.com/news/best-states/articles/
    2023-03-30/what-is-gender-affirming-care-and-which-states-have-restricted-it-in-2023 .........3

https://ww2.montgomeryschoolsmd.org/departments/policy/pdf/gefra.pdf ...............................21

Sami-Matti Ruuska *et al.*, "All-cause and suicide mortalities among adolescents and
    young adults who contacted specialised gender identity services in Finland in
    1996–2019: a register study," 27 BJM Mental Health J., available at
    https://mentalhealth.bmj.com/content/27/1/ .............................................................3

The Defendants (collectively and individually "MCPS") would like the law to be, "Whatever the school district decides, even to compelling speech on a highly controversial issue that rejects religious and traditional learning, that resolves the issue." But that is not the law. Instead, a teacher's religious objections to parts of a school policy must be accommodated if the district can do so without undue hardship, and a school district cannot coerce spoken and religious conformance on non-curricular matters as a condition of employment. Ms. Polk's constitutional objections to MCPS forcing her to use inaccurate pronouns for children, to take children to the wrong-sex restroom (which MCPS now concedes that she need not do), and to hide information from parents are well taken and provide irreparable injury supporting her request for injunctive relief.

I.     Ms. Polk Is Entitled to Relief Under Title VII

MCPS does not challenge that it must accommodate Ms. Polk's religious beliefs if it can do so without incurring an undue hardship. Technically, MCPS is in default for failure to answer, because its argument that it should win this fact-driven issue does not support a motion to dismiss. Nevertheless, MCPS via the Edmundson Declaration does assert some practical difficulties in instituting the accommodation suggested by Ms. Polk, and Ms. Polk will respond to those points here. Ultimately, however, such professed "difficulties" fall far short of carrying MCPS's burden of demonstrating an undue hardship, and, if need be, that can be more fully demonstrated after discovery and at trial.[1]

---

[1] MCPS bases its motion to dismiss the Title VII count on the assertion that Ms. Polk "refuse[s] to teach transgender and gender nonconforming children." ECF No. 28-1 at 41. This is a blatant misreading of the Verified Complaint and is directly contradicted by Ms. Polk in her first declaration. ECF No. 4-2 ¶¶ 23, 30, 31. Ms. Polk reconfirms that she is willing to teach transgender and gender nonconforming children in her second declaration attached to this pleading. Polk 2d Decl. ¶ 7.

For present purposes, Ms. Polk has suggested an injunction that allows her to continue her employment while the undue hardship issue is fully aired. Her proffered accommodation allows the entire issue to be avoided, as she would work in elementary school classes without any known transgender students. MCPS's objections to this eminently reasonable solution are to no avail, both legally and factually.

Three overarching points at the outset. One, MCPS basically repeats its defense made in its EEOC SOP that it disagrees—even strongly disagrees—with Ms. Polk's religious beliefs about how best to deal with students suffering from gender confusion or dysphoria. But a disagreement with the employee's religious beliefs and practices is insufficient as a matter of law. When an employee's religious beliefs and practices conflict with the employer's, Title VII requires an accommodation if it can be achieved without an undue hardship. *See generally Groff v. DeJoy*, 600 U.S. 447 (2023)*; see also Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981) ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection").

Two, by suggesting this accommodation to avoid the conflict while allowing her to continue teaching, Ms. Polk is not "refusing" to teach transgender students, as MCPS phrases it ECF No. 28-1 at 35. Ms. Polk does not reject such students or believe they are inferior to other students, and she will treat them with dignity and respect and stop any belittling or harassment of them by others. ECF No. 4-2 (Polk Decl.) ¶ 23; Polk 2d Decl. ¶ 7. She simply does not agree that lying to them about their God-given sex and gender is the best way to promote their health and safety and, while she is willing to refer to them by their preferred name, she is not willing to lie to them by misgendering them with inaccurate pronouns. ECF No. 4-2 (Polk Decl.) ¶¶ 7, 23. Ms. Polk reaches her positions on these matters in major part based on her religious teachings

2

and convictions, and there are many others who reach the same result on social science grounds.[2]
It is MCPS that is bucking the current flow of how best to deal with minors dealing with gender
confusion.[3]  It is MCPS who shows lack of tolerance, not Ms. Polk.

Three, it is the *employer's* burden to show that an accommodation results in an undue
hardship, and that cannot be done simply by trying to flyspeck an accommodation suggested by
the employee, *see Groff*, 600 U.S. at 473, which is all MCPS does in its opposition.  But even the
flyspecking by MCPS falls fall short of showing her requested accommodation would be an
undue hardship to MCPS, a $3-billion-a-year enterprise.

MCPS, through the declaration of its Director of Student Welfare and Compliance,
asserts that the accommodation Ms. Polk suggests in her preliminary injunction would be
impractical for the following reasons, to each of which we respond below:

---

[2] *See, e.g.*, The Cass Review: Independent Review of Gender Identity Services for Young People, *available at* https://cass.independent-review.uk/home/publications/final-report/; Sami-Matti Ruuska *et al.*, "All-cause and suicide mortalities among adolescents and young adults who contacted specialised gender identity services in Finland in 1996–2019: a register study," 27 BJM Mental Health J., *available at* https://mentalhealth.bmj.com/content/27/1/e300940?mkt_tok=NzEwLVFSUi0yMDkkAAAGRh0XYVMHRAANHrnDyVou_Sxw-e7L8ros4DlMisLlvAHeeMEa77wVRZMIqe1ol2Lg27fPrkDvDIuKt0IanzSueQPDIV3hJ_CNNr0 EEJvJcYWA; E. Abbruzzese, Stephen B. Levine & Julia W. Mason, "The Myth of 'Reliable Research' in Pediatric Gender Medicine: A critical evaluation of the Dutch Studies—and research that has followed" (Jan. 2, 2023), *available at* https://www.tandfonline.com/doi/full/10.1080/0092623X.2022.2150346.

[3] Within the last few years, close to half of the state legislatures, based on medical finding, have adopted laws generally to stop giving minors puberty blockers and genital surgery.  *See generally* Elliott Davis, Jr., *States That Have Restricted Gender-Affirming Care for Trans Youth*, U.S. News, *available at* https://www.usnews.com/news/best-states/articles/2023-03-30/what-is-gender-affirming-care-and-which-states-have-restricted-it-in-2023.  Moreover, "[a]broad, several European nations, including the ones who paved the way for early drug-related and surgical treatments, have since limited these medical interventions for minors.  At home, the FDA has not approved these relatively new uses for puberty blockers and hormones."  *L.W. v. Skrmetti,* 83 F.4th 460, 488 (6th Cir. 2023) (upholding Tennessee's law), *cert. granted*, No. 23-477 (June 24, 2024).

3

- Identification of students with Gender Support Plans (GSPs) is kept by school, rather than system-wide or on the substitution system (SEMS) that substitute teachers use to accept jobs.  ECF No. 28-2 (Edmundson Decl.) ¶¶ 12, 27, 34.a.

- Some students exhibiting as other than their biological gender may not have GSPs and school administrators (as opposed to teachers) do not track them.  ECF No. 28-2 (Edmundson Decl.) ¶¶ 13, 14, 34.b.

-  A substitute for an elementary art or music teacher might teach in several classes during a given day.  ECF No. 28-2 (Edmundson Decl.) ¶ 29.

- In the event Ms. Polk needed to call in assistance if she had an ethical problem interacting with a transgender student in a manner required by the Gender Identity Guidelines, it would be "unworkable" and "disruptive."  ECF No. 28-2 (Edmundson Decl.) ¶ 34.c.

- To allow "some teaching staff to refuse to instruct transgender or gender nonconforming students would expose those students to social stigma and isolation" and risk "putting MCPS out of compliance with its obligations under state and federal nondiscrimination laws."  ECF No. 28-2 (Edmundson Decl.) ¶ 35.

Assertion:  GSPs Are Kept by School, Not System-wide.  There are two main responses to this assertion:  (1) so what, and (2) it's not true.

(1) So what:  As explained by Mr. Edmundson, there are 30 or fewer schools that are selected by the substitute at any given time for possible assignments.  ECF No. 28-2 (Edmundson Decl.) ¶ 23.  It cannot seriously be contended that it would be an undue burden for MCPS (a) to collect the GSP information from the 30 or fewer schools that Ms. Polk puts on her list; (b) to determine which special education, kindergarten, and elementary classrooms have

4

students with GSPs, if any; and (c) inform Ms. Polk which classes she should not select for substitution.

(2)  It's not true:  As can be seen from the MCPS intake form for gender nonconforming students, Form 560-80, ECF No. 4-2 (Polk Decl.), Attach. 4, which becomes the GSP when filled out, its distribution is to *both* a "school confidential folder (in principal's office)" *and* to the "Student Welfare and Compliance Unit," of which Mr. Edmundson is the Director.  In any event, whether or not there is a central repository in Mr. Edmundson's office, it is a minimal administrative burden for the schools on Ms. Polk's list to identify classrooms that she should avoid.

Assertion:  Some transgender students may not have formal GSPs.  This general assertion that "some" qualifying students might not have formal GSPs certainly doesn't rise to the level of carrying MCPS's burden of proof.  *See Groff*, 600 U.S. at 469-70.  How many?  How many are in elementary school?  Beyond that, there are three possibilities:  (a) such students have not yet decided to exhibit as transgender at school, and so there is no potential conflict; (b) they have, but they have done so successfully, so that teachers and administrators do not know their actual sex, in which case Ms. Polk would not be in the know, either; and (c) they have done so and are known by their teachers, if not their administrators as well.  Only this last group raises any potential for a religious conflict, and, once again, it hardly can be considered an undue burden for a school administrator to ask each of his teachers if there are any students in that third group in the teacher's class and, if so, to add that class to the "do not take" or "off limits" list passed along to Ms. Polk.

Assertion:  Art and music teachers move among various elementary classes.  This need not be a worry.  As she relates in her Second Declaration filed in support of her motion, for

purposes of the preliminary injunction, Ms. Polk will forego substituting for teaching art or music.  Polk 2d Decl. ¶ 5.

    <u>Assertion:  Calling in assistance would be difficult.</u>  The first point to be made, of course, is that, by not substituting in classes that have transgender students, Ms. Polk will only very unlikely have to interact with a transgender student in a way that would violate her religious principles.  But, of course, spouting hyperbole about "disruption" does not carry MCPS's burden to show an undue hardship.  As Ms. Polk further explains, in the majority of classrooms in which she substituted (those for special education), single-toilet bathrooms were in the classroom itself and outside students did not come into the class to use them.  Polk 2d Decl. ¶ 8.  Moreover, special education classes had a principal teacher and an aide, such that any needed assistance would be readily at hand.  Polk 2d Decl. ¶ 8.  In the kindergarten and elementary grade classrooms in which she substituted, students needing to use the restroom were given a pass or simply permission to do so and went to a restroom of the student's own choosing.  Polk 2d Decl. ¶ 8. All this confirms what MCPS said in its opposition, No. 28-1 at 29, i.e., that Ms. Polk would not have to take students to the bathroom, which is the only potential time in which she would need assistance from others.  Thus, this is a non-issue.

    <u>Assertion:  A teacher's refusal to teach gender nonconforming students might put MCPS out of compliance with nondiscrimination laws.</u>  This also is a non-issue.  Ms. Polk is not refusing to teach transgender students, and she will always treat them with courtesy and respect, including defending them from any incidence of harassment or bullying that she encounters. ECF No. 4-2 (Polk Decl.) ¶ 23; Polk 2d Decl. ¶ 7.  But, for present purposes, she is requesting preliminary relief that obviates the potential of any regular interaction with transgender students, so there could not be any credible claim of student stigmatization or discrimination.

So much for Mr. Edmundson's attempts to flyspeck Ms. Polk's requested injunction. Now a word about the practicality of her suggestion that those classes in which there are transgender students simply be eliminated from the pool from which she will select. Ms. Polk attaches to her second declaration a chart complied by MCPS, entitled "MCPS Form 560-80 Data Breakdown," that accumulates information about students who have GSPs, by grade, as June of this year. Polk 2d Decl., Attach. 11. She also attaches to her second declaration MCPS's interrogatory response identifying how many elementary classrooms MCPS has had for the last two years and will have for 2024-25. For 2024-25, there will be 3,143 K-5 classrooms. Polk 2d Decl., Attach. 12. Using these materials, one can assess how many classrooms will have a transgender student.

The MCPS chart identifies a total of 81 K-5 students with GSPs. Polk 2d Decl., Attach. 11. Even assuming the "worst case" that no classroom has more than one transgender student, that means that only approximately 2.6 percent of the classrooms would have been unavailable to Ms. Polk for 2024-25 (81/3143 = 2.58%). The small number of transgender students in K-5 also confirms (1) Ms. Polk's experience of never substituting in a class with transgender students ECF No. 4-2 (Polk Decl.) ¶ 19, and (2) the minimal administrative burden it would be for MCPS to identify those classes which do have transgender students in the schools on her list. Assuming an even distribution of the approximately 80 elementary students with GSPs across the system, in the 30 schools on Ms. Polk's list, the number of "off limits" classes to be reported to her would be about 18 (30 schools/137 total elementary schools x 81 = 17.74). To identify these classrooms is not an undue hardship, by any stretch of the imagination.

In summary, MCPS has not carried its burden to show it cannot accommodate Ms. Polk's religious beliefs with minimal effort, especially when compared to its total operations, as *Groff*

requires.  *See* 600 U.S. at 469-70.  Instead, MCPS demonstrates a bias against those like Ms.

Polk with traditional religious beliefs (not limited to Christianity), but an employer's

disagreement with a religious belief does not excuse its refusal to accommodate it.  *Id.* at 472.

II.      MCPS Has No Legitimate Justification for Compelling Ms. Polk's Speech

The Supreme Court in *Janus v. AFSCME*, 585 U.S. 878, 893 (2018) (citations omitted),

stated as follows:

> Free speech serves many ends. It is essential to our democratic form of government, and
> it furthers the search for truth. Whenever the Federal Government or a State prevents
> individuals from saying what they think on important matters or compels them to voice
> ideas with which they disagree, it undermines these ends.
>
>      When speech is compelled, however, additional damage is done. In that situation,
> individuals are coerced into betraying their convictions.  Forcing free and independent
> individuals to endorse ideas they find objectionable is always demeaning . . . .

That is the situation in which MCPS has put Ms. Polk, and it cannot be justified.

A.      What MCPS Is Compelling Ms. Polk to Speak Is Not Government Speech

MCPS principally contends that forcing Ms. Polk to use improper pronouns and to lie to

parents is "government" speech.  ECF No. 28-1 at 13-17.  The supposed proof is that MCPS has

adopted policies about the subject.  That does not suffice.

The "official duties" exception of *Garcetti* recognizes that a government employer, like a

private one, may express its own message and that it may evaluate the work product it requires of

its employees; it "reflects the exercise of employer control over *what the employer itself* has

commissioned or created."  *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006) (emphasis added).

That is not what MCPS is requiring of Ms. Polk via its Gender Identity Guidelines.  MCPS is

requiring that Ms. Polk accept and emulate not speech that it has "commissioned or created," but

the pronoun preferences of MCPS *students* and the *students'* desire to keep what is happening at

school secret from their parents.  It is not MCPS that is transitioning genders, but a few students.

*Garcetti* is "inapposite" unless "the employee's words are really the words of the employer." *Janus*, 585 U.S. at 910. A student's preferred pronouns are no more MCPS's speech than is a student's preferred or given name. *See Ricard v. USD 475 Geary Cnty. KS Sch. Bd.*, 2022 WL 1471372 at *8 (D. Kan., May 9, 2022) (holding that schools may not properly interfere with names and pronouns selected by parents for their minor children).

MCPS argues that, because it has made a policy and put some statements in a handbook, whatever a teacher says on the subject is "official" employer speech. ECF No. 28-1 at 13-14. This argument, of course, would eradicate the Supreme Court's frequent admonitions that a teacher does not shed her First Amendment rights at the schoolhouse gate. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Ms. Polk does not shed her right not to be compelled to mouth the child's preferences, including keeping the child's actions at school secret from parents, when she walks onto the school grounds. The fact that MCPS in a "policy" or "guidelines" or "handbook" compels her to speak an unwanted message of the student does not make the message "government" speech. A child's name and pronouns are not curricular matters, and forcing teachers to keep things secret from parents certainly is not. *See John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 645 (4th Cir. 2023) (Niemeyer, J., dissenting); *see also Meriweather v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021) (holding that pronoun usage is "not a matter of classroom management").

Nor is it dispositive that Ms. Polk's speech will take place on school grounds, any more than the facts that Coach Kennedy prayed on the school field after a game and was a "role model" and "on duty" when he did allow the school district to punish him for his doing so. *Kennedy*, 597 U.S. at 530. The key in *Kennedy* was that he was not "seeking to convey a

government-created message" and his prayers did not "ow[e their] existence" to his responsibilities as a public employee.  *Id.* at 529-30  (quoting *Garcetti,* 547 U.S. at 421).  The same is true for Ms. Polk.  Using pronouns that accord with a student's actual sex is not seeking to convey an MCPS-created message (if anything, the opposite), and her position on these matters does not owe its existence to her serving as a teacher.

     *Garcetti* is also not a good fit in this academic setting.  Admittedly, the older the student, the more leeway teachers are allowed in instruction, with college instruction of young adults different from instruction of elementary school students.  However, here MCPS is trying to have it both ways.  It relies on the impressionable nature of young children when it suits its purposes to demand conformity and then pretends that those same, impressionable young children are as fully capable as adults to determine that they wish to exhibit as other than their natural, chromosomal gender and to hide that life-altering decision from their parents.  The Fourth Circuit in *Lee v. York County School Division*, 484 F.3d 687, 694 n.11 (4th Cir. 2007), left open for resolution in what circumstances to apply *Garcetti*, if at all, in a non-university academic setting, but its application is uncalled for here. The Supreme Court in *Kennedy* used "certain aspects" of the *Garcetti-Pickering* framework at the request of the parties, but the parties there conceded that the case did not raise issues of academic freedom that would restrict its application, 597 U.S. at 528, and the Court avoided the issue of whether the school district had a burden to justify its restriction by strict scrutiny or under a lesser standard of *Pickering* balancing by finding that the district could meet neither burden.  *Id.* at 532.

     MCPS's resort to *Garcetti*'s government speech exception fails for another reason.  The Supreme Court in *Janus v. AFSCME* did not simply use a throwaway line when it conditioned any right the government has to compel speech on it being a "lawful message."  585 U.S. 878,

908 (2018). This condition flows directly from the Court's foundational principle that the government cannot condition employment on an individual forfeiting her constitutional rights. *See Connick v. Myers*, 461 U.S. 138, 144 (1983); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 412-14 (1979); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (government "may not deny a benefit to a person on the basis that infringes his constitutionally protected interests— especially his interest in freedom of speech").

Assuming *arguendo* it were MCPS's own speech, rather than the student's, it is not lawful for MCPS to require teachers to conspire to hide information from parents, who have the constitutional right to such information and the primary responsibility for the care, nurture, naming, and education of their children. It does no good for MCPS to argue that Ms. Polk does not have standing to raise the rights of the parents. ECF No. 28-1 at 21. She is not doing that. She is directly involved: she is resisting being compelled to act in a way that, under her religious beliefs, is wrong, ECF No. 4-2 (Polk Decl.) ¶¶ 7, 23), and, because of that resistance, MCPS has not retained her as a teacher. It is plainly at issue before this Court whether MCPS compels a "lawful message" or an unlawful one by forcing Ms. Polk to hide information from, and dissemble to, parents—as MCPS admits she must do in appropriate circumstances. ECF No. 28-1 at 20. *See Janus*, 585 U.S. 908. If the message is unlawful or "otherwise inappropriate," *id.*, which it is here, even if it were considered government speech, Ms. Polk must prevail.

Finally, MCPS cites cases in which teachers were fired for using a racial epithet in class, voicing repeated criticisms of the school's administration of a program, and selecting controversial books to use as part of the class curriculum, all of the teachers' own initiative. ECF No. 28-1 at 15. None of these cases are apposite. Ms. Polk is not being fired because she has maligned students who are exhibiting as other than their biological gender. She is being fired

because she objects to being compelled to mimic the student's inaccurate and, in her view, harmful speech and to honor the student's request for hiding information from parents.  She will protect transgender students from bullying and harassment and will treat them with courtesy and respect and, to that end, she is willing to use students' preferred names.  She will not lie to them or their parents.  ECF No. 4-2 (Polk Decl.) ¶¶ 7, 23; Polk 2d Decl. ¶ 7.

       B.       At Least Exacting Scrutiny Applies Here,
                      Rather Than Normal *Pickering* Balancing

Typically, any regulation of speech by the government requires justification by strict scrutiny.  *See Kennedy*, 597 U.S. at 532; *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015).  When the government is also an employer, though, a more lenient, balancing test is sometimes used, and MCPS argues for its application here.

In *Pickering v. Board of Education*, 391 U.S. 563 (1968), the Supreme Court balanced the government's rights as employer against an employee's rights of free speech.  In that case, the Supreme Court restricted the government employer from disciplining an employee who voiced his own opinions about matters of public concern that also related to his employment, finding that the balance there favored the employee.  *Id.* at 568-75.  Consistent with the genesis of the *Pickering* balancing test, the Supreme Court in *Janus* observed that the *Pickering* analysis "requires modification" if it is to be applied to "general [speech-restrictive] rules that affect broad categories of employees," because such rules have "widespread impact" and involve much more than a "single supervisory decision."  585 U.S. 907 (citing and quoting *United States v. Treas. Employees*, 513 U.S. 454, 466-68 & n.11, 475-76 n.21, 482-83 (O'Connor, J., concurring) (1995)).  "The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis."  *Id.* at 907 .  MCPS ignores this holding of *Janus*.

Also to the point here, the Court in *Janus* observed that it is doubtful that *Pickering* should be applied at all to give weight to the government's purported interests when the speech does not initiate with the employee but, instead, when the government demands "that its employees recite words with which they disagree." *Id.* at 908 . The Court noted that it has never applied *Pickering* balancing in a compelled speech context. *Id.*

MCPS's principal response is that, despite these admonitions, the Supreme Court in *Janus* itself applied *Pickering*. ECF No. 28-1 at 20-21. That is only conditionally true. The Supreme Court in *Janus* applied *Pickering* only as a response to the respondent's and dissent's argument that *Pickering* applied to the facts involved there and justified the compelled subsidy of the speech to which the plaintiff objected. The *Janus* majority demonstrated that, even if *Pickering* did apply, it would not justify the free speech deprivation, especially if considered under exacting scrutiny as required because of the case involved a general governmental policy. *Id.* at 905-09. The bottom line, per *Janus*, is that, even if the *Pickering* analysis is applied to a broad policy compelling speech by its employees, the normal analysis has to be much more heavily weighted toward the employee and at least exacting, if not strict, scrutiny must be applied. MCPS's contention that it can meet its burden by its having only a "rational basis" of a generalized interest in "student safety" obviously fails. *See Kennedy*, 597 U.S. at 531-32 (government has burden of proving sufficient justification for infringement of free speech and free exercise).[4]

---

[4] MCPS also points out that some lower courts have continued to apply the *Pickering* balancing analysis in compelled speech situations post-*Janus*. ECF No. 28-1 at 20-21. All such cases acknowledge that the appropriateness of doing so has been questioned by the Supreme Court, and in some the issue was handled the same way that the Supreme Court did in *Janus*, holding it open but showing the government did not meet the *Pickering* test in any event. *See, e.g.*, *Meriweather*, 992 F.3d at 509-11 (citing *Janus* for proposition that the government compelling speech inflicts more damage than restricting a person's own speech).

MCPS argues that it should not have to carry even the burden of *Pickering* balancing because Ms. Polk's speech is not on a matter of public interest, but only of private concern. ECF No. 28-1 at 18-19. It bases this argument on the fact that, to apply the policy, Ms. Polk would have to interface with specific students and their parents. This argument tracks that of Justice Kagan in *Harris v. Quinn*, 573 U.S. 616 (2014), and in *Janus*, where she argued that the challenged policies were of no public concern because their application was in and about the workplace. *Id.* at 675-76 (Kagan, J., dissenting); *Janus*, 585 U.S. at 945-47 (Kagan, J., dissenting).

The problem with the argument, of course, is that Justice Kagan was writing in dissent and the majority in both cases rejected her cramped view of what matters were of public concern for purposes of *Pickering*. *Harris*, 573 U.S. at 652-55; *Janus*, 585 U.S. at 910-14. Speech is "of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Lane v. Franks,* 573 U.S. 228, 241 (2014) (internal quotation marks and citation omitted); *accord Connick*, 461 U.S. at 146. Thus, in *Janus* the Supreme Court considered an employee's objection to his having to pay for the speech of others. The Court did not treat this, as Justice Kagan urged, as something related solely to him and his workplace and, thus, on a topic of only private with no public concern, such as one employee objecting to telling the boss what another told her about a personal incident.[5] Instead, the *Janus* majority viewed his objection in the

---

[5] *See Gwinnett v. Sw. Fla. Reg'l Planning Coun.*, 407 F. Supp. 3d 1273, 1278 (M.D. Fla. 2019) ("*Janus* differs because the union agency fees there were a blanket requirement for compelled speech on matters of public concern."). *Willey v. Sweetwater County School District*, 680 F. Supp. 3d 1250 (D. Wyo. 2023), on which MCPS relies, misreads *Janus* and *Kennedy* on this point.

context of the state's budget problems, in that the challenged policy involved many others and, thus, was of "substantial public concern."  585 U.S. at 911-14.  Similarly, in *Kennedy* the parties conceded that the school district prohibiting the coach's private prayer at midfield while he was on duty at his workplace was a matter that not only concerned him individually, but was a matter of public concern.  597 U.S. at 528.

Applied here, the genesis of Ms. Polk's objection is not a situation unique to her, but one that applies wholesale to MCPS teachers as a matter of policy.  The topic involved is the advisability of minors transitioning genders, and that topic is certainly one of broad public concern, as the Supreme Court noted in *Janus*, where it described gender identity as a "controversial" and "sensitive" topic of "profound 'value and concern to the public.'"  585 U.S. at 913-14 (quoting *Snyder v Phelps*, 562 U.S. 443, 453 (2011)).  For example, the Fifth Circuit rejected a motion to use the appellant's preferred gender pronouns—over an "emphatic[] dissent."  *United States v. Varner,* 948 F.3d 250, 254, 261 (5th Cir. 2020).  And the Supreme Court has just granted review of Tennessee's statute that prohibits pharmaceutical or surgical transitioning of minors—one of 19 such state laws relying on recent studies that show the inadvisability of facilitating minors transitioning genders.  *See United States v. Skrmetti*, No. 23-477, petition for cert. granted (June 24, 2024); *id.*, petition for cert. at 3 (listing state statutes), *found at* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/23-477.html.  That the MCPS system-wide policy compels the speech in a classroom and, as applied, involves particular students and their parents does not somehow make the government regulation of that speech of strictly private concern.  "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern."  *Meriweather*, 992 F.3d at 508.  Ms. Polk's objection to using inaccurate pronouns and hiding information from parents

"transcend[s] personal interest or opinion" and relates to "our social and/or political lives." *Id.*
(describing that as the "linchpin" of the public concern issue). If Coach Kennedy's personal
prayers at midfield after a game raised matters of public concern, Ms. Polk's compelled
conformance with the Gender Identity Guidelines certainly does.

    C.  <u>MCPS Lacks Any Legitimate Interests and Fails Any Test</u>

      One prefatory point on this issue. The preliminary injunction requested by Ms. Polk
avoids her confronting students who are transitioning genders. Consistent with Title VII, Ms.
Polk does not seek to resolve a difference of opinion on religious matters, but to avoid a
confrontation on them. MCPS frames its entire "interests" argument as if Ms. Polk were
regularly going to be interacting with transitioning students and as if she were requesting more
expansive, permanent relief. That is an issue for another day. Nevertheless, Ms. Polk addresses
below the points made by MCPS.

      Keeping children safe is a worthy goal. But an interest stated in that level of generality is
insufficient to prove anything, a deficiency not cured by frequent repetition. The government
must articulate its interests with specificity in order to justify encroachment on a teacher's free
speech (or free exercise) rights. *See Students for Fair Admissions, Inc. v. President and Fellows
of Harvard Coll.*, 600 U.S. 181, 214 (2023); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682,
726-27 (2014). MCPS here must address these specific questions: What interest does MCPS
have in preventing a teacher from referring to a student only by name, avoiding use of pronouns?
And what interest does MCPS have in stopping a teacher from giving accurate information to a
student's parents? In fact, MCPS posits no interests that can be given weight legally.

      As to the naming question, MCPS asserts that, in addition to "protecting student safety,"
it is trying to avoid unlawful discrimination. ECF No. 28-1 at 22-23. But referring to a student

by name does not discriminate against the transgender student.  *See Meriweather*, 992 F.3d at

511 (finding that a teacher using accurate, rather than preferred, pronouns does not violate Title

IX).

As to keeping secrets from parents, there is no such legitimate interest.  MCPS repeats

what the Guidelines themselves claim, that such student privacy is required by FERPA.  ECF No.

28-1 at 23.  But, that is a misreading of FERPA, plain and simple.  As the courts in *Mirabelli* and

*Ricard* explained, FERPA requires giving parents access to *all* school information about their

children.[6]  *Mirabelli v. Olson*, 691 F. 3d 1197, 1211-12 (S.D. Cal. 2023); *Ricard*, 2022 WL

1471372 at *7.  Far from insulating MCPS, its reliance on FERPA  to shield information from

parents is "an erroneous understanding of the law" that strips the Guidelines of legitimacy.  *Id.*

("The District could not have a legitimate, compelling interest in withholding information based

on FERPA when FERPA in fact required the District to disclose the very information at issue—at

least to the extent the information was contained in an education record.").

To Ms. Polk's point that it is unconstitutional to withhold information from parents about

their children, MCPS again counters that she does not have standing to raise this issue.  ECF No.

28-1 at 24-25.  But she does not raise this point as a surrogate for parents; she objects to MCPS

forcing her, herself, to conspire with it to violate the constitutional rights of parents.  As Ms. Polk

established in her Opening Memorandum, MCPS has no legitimate interest in forcing her to do

so or in punishing her for refusing to do so.  ECF No. 4-1 at 16-19.  Indeed, the legitimate

interests, both public and private, support Ms. Polk's stance against hiding information from

parents.  MCPS's protestations, ECF No. 28-1 at 25, that, in its ideal world, parents are

---

[6] As do Maryland regulations promulgated to comply with FERPA.  *See* Code of Md. Regs.  Ch.
13a.08.02, and particularly the definitions found in §13a.08.02.03 and the provisions in §§
13a.08.02.04C, 13a.08.02.13, and 13a.08.02.29.

"supportive" of their children changing genders and, if they are, MCPS will involve them in the school process does not mitigate the fact that it is not for MCPS to determine what qualifies as "supportive" parenting and whether to withhold information from parents. The law provides that it is parents who are primarily entrusted to pursue and determine their children's best interests.

The purported interest that MCPS asserts in having teachers agree with and conform to its policy adds absolutely nothing to the mix. ECF No. 28-1 at 23-24. It is simply a repackaging of its oft-repeated theme that it likes its policy and would prefer that no one take exception to it. And, again, it hardly behooves MCPS to speak, ECF No. 28-1 at 23, about how "impressionable" primary school children are when its own policy rests on the following irrational assumptions:

- Minor children always know what is best for themselves, at least when sexual matters are concerned.

- Minor children always know when their parents will be "supportive" and when they will not be.

- School personnel will never unduly influence minor children when helping a child to determine whether parents will be "supportive."

- School personnel and minor children will always employ a uniform meaning of "supportive."

- Parents who may counsel their child against transgenderism are, by definition, not "supportive."

Finally, MCPS claims that the tailored, preliminary relief Ms. Polk requests is impractical. ECF No. 28-1 at 25-27. That is simply not true, for the reasons stated above in Section I of the memorandum. MCPS implies that, if it can postulate one possible interaction between Ms. Polk and a transgender student, it should win. That does not follow, and it is a far

cry from proving that no more narrowly tailored remedy than "no-exceptions-no-how" is feasible.

III.    MCPS Violates Ms. Polk's Free Exercise Rights

    A.    MCPS Infringes Ms. Polk's Free Exercise of Religion

The Gender Identity Guidelines obviously infringe Ms. Polk's free exercise of religion in the respects they would require her to take actions she finds religiously objectionable. MCPS defends in part by asserting that there is no infringement because all she has been required to do "to date" is to review the training materials about them and "attest that she is aware of the expectation that she comply with the policy." ECF No. 28-1 at 28. What MCPS intends to argue by this is hard to understand. Ms. Polk, by honestly refusing, due to her religious convictions, to attest that she would comply with the Gender Identity Guidelines, was locked out of the MCPS substitution system. ECF No. 28-2 (Edmundson Decl.) ¶ 21; ECF No. 4-2 (Polk Decl.) ¶¶ 25, 26. This penalizes her for her religious practice. *See Mirabelli*, 691 F. Supp. 3d at 1218.

MCPS also repeatedly asserts that, by taking required actions to facilitate and confirm children acting as other than their God-give sex, she would not violate her conscience because she would not have to shed her internal beliefs. ECF No. 28-1 at 28-30. This reflects a miscomprehension of what religious duties require. Facilitating others to do wrong or to harm themselves is itself wrong, and that impinges on the free exercise of religion. ECF No. 4-2 (Polk Decl.) ¶ 7. *See Little Sisters of the Poor v. Pa.*, 591 U.S. 657, 695-96 (2020) (Alito, J. concurring) (discussing religious objections to facilitating wrongdoing of others, "complicity-based objections"); *Burwell*, 573 U.S. at 691, 723-26 (same).

In trying to rebut the tension between the MCPS policies and Ms. Polk's religious beliefs, MCPS unwittingly confirms the feasibility of Ms. Polk's suggested injunctive relief. MCPS says

that "the Guidelines say nothing about Ms. Polk being required to assist children to use the

restroom, or to do so while other children are present."  ECF No. 28-1 at 29.  Good.  That takes

care of any concern about her violating the Guidelines in this respect.  MCPS also concedes that

the chance Ms. Polk would have to communicate with parents about their child transitioning at

school is remote, as she does not have to be proactive.  ECF No. 28-1 at 29.  Good again.[7]  And,

obviously, these risks are reduced to zero by her requested preliminary relief of allowing her to

substitute in classes without known transgender students in them.

       B.     <u>MCPS May Not Avail Itself of the *Smith* Safe Harbor</u>

       MCPS here has neither acted neutrally nor in a generally applicable way.  As to neutrality,

it is not sufficient for MCPS to recite the purposes stated in the Guidelines themselves.  ECF No.

28-1 at 30-31.  In the first place, MCPS's hostility to parents with traditional religious beliefs is

shown on the face of the document and its accompanying intake form, ECF No. 4-2 (Polk Decl.),

attach. 4, by its labeling them as "unsupportive" and refusing to inform them that their child is

transitioning.  In the second place, proof of motivation of religious intolerance is not restricted to

the face of the relevant document.  As the Supreme Court explained in *Church of Lukumi Babalu*

*Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 (1993),

> Facial neutrality is not determinative.  The Free Exercise Clause, like the Establishment
> Clause, extends beyond facial discrimination.  The Clause "forbids subtle departures from
> neutrality," *Gillette* v. *United States,* 401 U. S. 437, 452 (1971), and "covert suppression
> of particular religious beliefs," *Bowen* v. *Roy, supra,* [476 U.S. 693] at 703 [(1986)]
> (opinion of Burger, C. J.).  Official action that targets religious conduct for distinctive
> treatment cannot be shielded by mere compliance with the requirement of facial
> neutrality.  The Free Exercise Clause protects against governmental hostility which is
> masked as well as overt.  "The Court must survey meticulously the circumstances of

---

[7] *See Willey*, 680 F. Supp. 3d at 1283 (while not having to reach the issue because it found hiding requested information from a parent is a likely violation of parental rights, the court found it "problematic" on free exercise grounds that a teacher has to mislead parents when they request information about their minor child).

governmental categories to eliminate, as it were, religious gerrymanders." *Walz* v. *Tax Comm'n of New York City,* 397 U. S. 664, 696 (1970) (Harlan, J., concurring).

At a minimum, Ms. Polk is entitled to discovery on this issue, which also precludes granting of the motion to dismiss. *See id.*

MCPS also fails to show that it lacks discretion, but rather admits that it does have discretion in this area, which defeats the claim of "general applicability." *See Fulton v. Phila.*, 593 U.S. 522, 533-34 (2021). Mr. Edmundson, MCPS's Director of Student Welfare and Compliance, confirmed Ms. Polk's testimony that, in years prior to 2022-23, MCPS did *not* require affirmation of compliance with the Guidelines. ECF No. 28-2 (Edmundson Decl.) ¶¶ 20, 21; ECF No. 28-1 at 31. Moreover, MCPS's Substitute Teachers Regulation GEF-RA requires orientation about, and affirmation of, compliance with certain materials, but not with the Gender Identity Guidelines. It also vests complete discretion within MCPS how to discipline substitute teachers for violating procedures "on an individual basis." https://ww2.montgomery schoolsmd.org/departments/policy/pdf/gefra.pdf at 4. It doesn't assist MCPS to claim that it has or will require all substitutes to comply with the Guidelines when it has discretion not to do so. ECF No. 28-1 at31-32. *Fulton* teaches that simply having discretionary power is sufficient to defeat application of *Smith.* 593 U.S. at 534-37. And it doesn't assist MCPS to try to differentiate between failing to affirm compliance with the policy and failure to comply with the policy. That certainly seems to be a distinction without a difference. But if it's not, it's a convoluted way of MCPS admitting it has discretion in this area. In addition, MCPS admits that it has provided religious accommodations to other teachers, albeit not with regard to compliance with the Guidelines. ECF No. 28-1 at 32. Again, that demonstrates that MCPS has discretion to do so in Ms. Polk's situation as well (in addition to it also being a legal requirement under Title

VII).  Discretion alone defeats application of *Smith*.  Ms. Polk need not show it has been

exercised.  *See Fulton*, 593 U.S. at 534-37.

IV.    <u>Ms. Polk's Request for Injunctive Relief Is Not Untimely</u>

Ms. Polk is well aware that requests for financial relief, standing alone, ordinarily do not

qualify for injunctive relief.  She does not base her request for injunctive relief on financial

hardship alone; she also bases her request on constitutional violations, which, as MCPS admits

are irreparable injuries that, standing alone as well as combined with other hardships, *do* qualify

for injunctive relief.  ECF No. 28-1 at 33.

Ms. Polk's request is not untimely.  She brought her EEOC charge promptly after being

denied an accommodation by MCPS, and she brought this action promptly after the mandatory

exhaustion of her EEOC remedy, which she terminated when allowed by statute due to the length

of time the EEOC had already taken to investigate.  She is not asking for a TRO, and she brought

her motion for preliminary injunction in adequate time to allow the parties to brief the motion

and the Court to decide it before the upcoming school year.  Moreover, she has tailored her

request to avoid confrontation between her religious beliefs and the objectionable parts of the

MCPS gender policy; that will allow full discovery, trial, and decision on the merits before her

requests for permanent injunctive relief are determined.

Ms. Polk has acted timely, and MCPS has suffered no harm by any delay necessitated by

her first pursuing her EEOC remedy.  Just because she suffered delay at the EEOC does not

mean she must forego all preliminary relief while her claims are considered for the first time.

Nor can she be faulted for not wanting to incur the extra trouble and expense of overlapping

filings at the EEOC and this Court, a process that would undoubtedly have engendered a request

by MCPS for stay of the court proceedings while the EEOC proceedings were ongoing.

V.    <u>The Court Should Hold MCPS's Motion to Dismiss Parties in Abeyance</u>

MCPS asserts that only MCBE should be a named party.  ECF No. 28-1 at 38-39.  MCPS

first moves to dismiss MCPS, arguing that MCBE is the only entity that is a proper party to the

litigation.  We do not dispute that Maryland law specifies that MCBE may sue and be sued.

However, under Title VII, it is the "employer" as defined in the act who is the party to be sued.

42 U.S.C. §§ 2000e(b), 2000e-2(a)(1).  If MCPS is able to come forward with some proof that

Ms. Polk was hired and then not retained by MCBE, rather than MCPS, perhaps Ms. Polk would

not object to MCPS being dismissed as a party without prejudice to her taking more discovery on

the issue.  As of now, however, the record does not support that MCBE, rather than MCPS, was

her employer:  (1) Ms. Polk always understood her employer to be MCPS, Polk 2d Decl. ¶ 9; (2)

MCPS referred to itself as her employer, ECF No. 4-2 (Polk Decl.) Attachs. 6, 7; Polk 2d Decl. ¶

9; (3) the "Personnel Action Notice" just provided by MCPS in discovery notes that Ms. Polk

was "terminated for no earnings" in November 2023 by MCPS, not MCBE, Polk 2d Decl.,

Attach. 13; and (4) Ms. Polk filed the EEOC charge against MCPS, not MCBE, as her employer,

without objection by MCPS or MCBE, ECF No. 4-2 (Polk Decl.), Attach. 9.  Add to all this that

the Mayland Court of Appeals (as its highest court was until recently denominated) entertains

actions against MCPS as the named party.  *See, e.g.*, *Donlan v. Montgomery Cnty. Pub. Schs.*,

460 Md. 62, 188 A.3d 949 (2018).

MCPS also moves to dismiss the individual board members as parties.  Again, Ms. Polk

does not dispute that, to retain those individuals as parties, individual actions need be shown.

However, as noted above, at issue is whether the Gender Identity Guidelines were adopted and

retained due in part to anti-religious bias.  Discovery has not even begun on that issue.  If the

Court were inclined to act immediately on this motion, the dismissal should be without prejudice,

so that the dismissal could not be used as a ground to deny discovery on the issue or to deny injunctive relief if it is later determined that such relief must run to individuals rather than the governmental entity. *Cf. John and Jane Parents 1*, 78 F.4th 622, 622 (4th Cir. 2023) (naming school board members as parties without objection); *Meriweather*, 992 F.3d at 492 (same).

Ms. Polk does not believe that it is the best practice to rule on the motion to dismiss the parties immediately, while the facts have not yet been fully discovered or developed. Rather, Ms. Polk suggests that the best practice is for the Court to hold the motions in abeyance until the conclusion of discovery and trial, when all potential evidence will have been disclosed. Holding them in abeyance will be of no prejudice to MCPS and the MCBE members and will foster judicial efficiency and economy. However, if the Court decides to act on the motions now, any dismissal should be without prejudice.

Conclusion

Ms. Polk has well pled violations of Title VII and the Free Speech and Free Exercise Clauses. At the motion to dismiss stage, her pleadings must be accepted as accurate and the presumption given that she will be able to expand on those allegations through discovery and trial. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'") (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). Moreover, she has proven her entitlement to a tailored preliminary injunction while the case proceeds. That injunction would prevent additional irreparable injury and financial hardship to her and will not harm MCPS in the least. The motion to dismiss should be denied and the motion for preliminary injunction granted.

24

Respectfully submitted,

/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr., Bar No. 21604
       Counsel of Record
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(301) 622-0360
Rick@claybrooklaw.com

Steven W. Fitschen, Bar No. 31117
James A. Davids, Bar No. 31107
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Robert Flores (*pro hac vice*)
Gammon & Grange, P.C.
1945 Old Gallows Rd., Ste. 650
Vienna, Va. 22181
jrf@gg-law.com

July 17, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2024, I electronically filed the foregoing using the CM/ECF

system, which will send notification of such filing to all counsel of record.

<u>/s/ Frederick W. Claybrook, Jr.</u>
        Counsel of Record
Frederick W. Claybrook, Jr., Bar No. 21604
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(301) 622-0360
Rick@claybrooklaw.com