**IN THE UNITED STATES DISTRICT COURT**
<u>**FOR THE DISTRICT OF MARYLAND**</u>

| | | |
|---|---|---|
| **KIMBERLY ANN POLK,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-24-1487** |
| **MONTGOMERY COUNTY PUBLIC SCHOOLS,** *et al.*, | * | |
| | * | |
| **Defendants.** | | |

<u>**MEMORANDUM OPINION**</u>

Kimberly Ann Polk worked as a substitute teacher for Montgomery County Public Schools ("MCPS") during the 2021–2022 school year. In the summer of 2022, all MCPS teachers, including Polk, were required to review an online instructional video on MCPS's gender identity guidelines ("the Guidelines"). The Guidelines set forth MCPS policies on transgender and gender nonconforming students and provide for the creation of gender support plans for students. Under the Guidelines, teachers must refer to students by their preferred pronouns and may not discuss a student's gender identity with the student's parents without the student's consent. At the end of the video, teachers were required to affirm they understood the Guidelines and their obligation to follow them. Polk refused to affirm because, in her view, the Guidelines require her to act and speak in a manner that conflicts with her Christian beliefs. Because Polk refuses to abide by the Guidelines, she may not be a substitute teacher in MCPS.

Polk sued MCPS, the Montgomery County Board of Education ("the Board of Education" or "the Board"), the elected members of the Board of Education, and the interim Superintendent of the Board of Education. Polk claims that the defendants violated her First Amendment rights to free exercise of religion and free speech when MCPS ended their employment relationship because

Polk would not comply with the Guidelines. Polk also claims the defendants violated her rights under Title VII of the Civil Rights Act because her employer refused to accommodate her religious beliefs.

Polk moves for a preliminary injunction that requires MCPS to place her in a classroom that has "no transitioning students." ECF 4, at 1. The defendants oppose the preliminary injunction motion and move to dismiss Polk's complaint for failure to state a claim. Both motions are fully briefed. For the following reasons, the Court grants the motion to dismiss the free exercise and free speech claims, denies the motion to dismiss the Title VII claim, and denies the motion for a preliminary injunction.

## I.    Background[1]

### A.  MCPS and the Guidelines

MCPS is the public school district for Montgomery County, Maryland. ECF 1, ¶ 8. It is the largest school district in Maryland. *Id.* In 2023, it was the seventh largest employer in the state. *Id.*

Maryland law authorizes the Montgomery County Board of Education to adopt rules, regulations, and educational policies for MCPS, so long as those rules, regulations, and policies are consistent with state law. *Id.* ¶ 7; *see also* Md. Code Ann., Educ. § 4-108(3)–(4). Pursuant to that grant of authority, the Board of Education adopted gender identity guidelines for the 2019–2020 school year. ECF 1, ¶ 11. The Board has published substantively the same Guidelines for

---

[1] These facts, accepted as true, are from Polk's complaint, ECF 1, and the Guidelines, ECF 28-4, which are attached to the motion to dismiss, integral to the complaint, and authentic. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016) ("[I]t is well established that a document attached to a motion to dismiss may be considered when evaluating a motion to dismiss if the document was 'integral to the complaint and authentic.'" (quoting *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007))).

each school year thereafter. *Id.* The Guidelines apply to every student in the MCPS system. *Id.* ¶ 16.

The Guidelines permit schools to create "Gender Support Plans" for transgender and gender nonconforming students. *Id.* ¶ 13. The Guidelines provide that the principal or their designee, "in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school." *Id.*

The Guidelines instruct school staff members, including substitute teachers, to "address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school." *Id.* ¶ 14. The Guidelines also address a student's right to keep their gender identity private, even from their parents. *Id.* The Guidelines provide:

Privacy And Disclosure Of Information

All students have a right to privacy. This includes the right to keep private one's transgender status or gender nonconforming presentation at school.

Information about a student's transgender status, legal name, or sex assigned at birth may constitute confidential medical information. Disclosing this information to other students, their parents/guardians, or third parties may violate privacy laws, such as the federal Family Educational Rights and Privacy Act (FERPA).

Schools will ensure that all medical information, including that relating to transgender students, is kept confidential in accordance with applicable state, local, and federal privacy laws. . . .

Transgender and gender nonconforming students have the right to discuss and demonstrate their gender identity and expression openly and decide when, with whom, and how much to share private information. The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose students' status to others, including parents/guardians and other school staff members, unless legally required to do so or unless students have authorized such disclosure.

*Id.* When a staff member speaks to a parent of a transgender student, the Guidelines instruct staff members to "use the student's legal name and pronoun that correspond to the student's sex assigned at birth," "[u]nless the student or parent/guardian has specified otherwise." *Id.* The Guidelines do not tell staff members what they must say to parents if they inquire about their child's gender identity. *Id.* Rather, the Guidelines encourage staff members to keep such information confidential and authorize disclosure only if it is legally required or if the student consents to disclosure. *Id.*

### B. Kimberly Polk and Her Reaction to the Guidelines

Kimberly Polk worked as a substitute teacher for MCPS during the 2021–2022 school year. *Id.* ¶ 24. The Guidelines were in effect that year. *Id.* ¶ 11. Polk taught ten times at eight different MCPS elementary schools. *Id.* ¶ 24. She primarily taught in preschool special education classes, but she also taught kindergarten and second and fourth grade. *Id.* ¶ 25. She "received uniformly positive reviews and responses concerning her teaching." *Id.* ¶ 26. Polk was qualified to return to MCPS as a substitute teacher for the 2022–2023 school year without reapplying. *Id.* ¶ 24. She planned to substitute teach more frequently during the 2022–2023 school year. *Id.* ¶ 28.

"As part of the retention process for the 2022-23 school year," Polk was required to review online instructional videos about MCPS policies and procedures. *Id.* ¶ 29. One of those videos was about the Guidelines. *Id.*

Polk watched the Guidelines video. *Id.* At the end of the video, the screen instructed Polk to electronically sign an affirmation, by clicking a box, that she had watched and understood the instructional video and would "fully adhere to" the Guidelines. *Id.* ¶ 30.

Because of her "sincerely held religious beliefs," Polk "was not able to affirm that she would adhere to [the Guidelines]." *Id.* ¶ 31. Polk believes that "God created individuals as either

male or female and she would act unethically if she assisted children to present as other than their God-given sex." *Id.* This would "include lying to children by using pronouns for them that do not match their God-given, biological sex." *Id.* Polk also believes that "God gave parents the primary responsibility for the care and upbringing of their minor children and it would be unethical for her to hide from parents that their child is transitioning genders at school." *Id*. Polk's beliefs are "based on her understanding of her Christian religion and the Holy Bible."[2] *Id.*

In November 2022, Polk submitted a request for a religious accommodation to Khalid Walker, the MCPS compliance coordinator. *Id.* ¶ 32. Polk also submitted a request for an accommodation on the MCPS website. *Id.* Afterward, Polk and Walker spoke on the phone about a possible accommodation. *Id.* ¶ 33. Walker told Polk that any accommodation they discussed would be "subject to further MCPS approval." *Id.* Walker "informed [Polk] that she would not have to use preferred pronouns," "would not be required to sign the affirmation," and "would be permitted to teach in the elementary schools and preschool special education program but not in the middle or high schools." *Id.* Walker also "informed [Polk] that, in the event a child presented gender identity issues such that she could not adhere to [the Guidelines], the school would provide her with someone else, like a school administrator, who would be able to provide her with support and to interact instead with the student." *Id.*

In December 2022, Walker informed Polk that MCPS had rejected "any accommodation for her." *Id.* ¶ 34. Because she did not receive an accommodation, Polk did not teach in MCPS schools during the 2022–2023 or 2023–2024 school years. *Id.* ¶ 35. Her inability to substitute teach for MCPS has negatively impacted her family's finances. *Id.* ¶ 36.

---

[2] Polk also claims that the Guidelines violate her religious beliefs by requiring her "to assist a child of one sex to use the restroom of the opposite sex while others of the opposite sex were present." ECF 1, ¶ 31.

###### C.  Procedural History

Polk timely filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") in August 2023. *Id.* ¶ 37. She alleged that MCPS violated her rights under Title VII by denying her a religious accommodation. *Id.* In February 2024, MCPS filed a statement of position with the EEOC. *Id.* ¶ 38. MCPS said it was amenable to one accommodation: Polk would not have "to execute the affirmation in the training materials that she would abide by the policy in its entirety, but she would still be required to do so when working." *Id.* Polk does not believe this was a "true accommodation," because it "compels" her "to choose between losing her job and being untrue to her religious convictions." *Id.* In April 2024, Polk requested and received from the EEOC a right to sue notice. *Id.* ¶¶ 41–42.

In May 2024, Polk filed her complaint in this Court against MCPS, the Board of Education, and the elected Board members and the interim MCPS Superintendent in their individual and official capacities. *Id.* ¶¶ 7–10. Polk asserts three claims against all defendants: (1) a violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, for failing to provide her with a religious accommodation; (2) a violation of 42 U.S.C. § 1983 for violating her First Amendment right to free speech; and (3) a violation of 42 U.S.C. § 1983 for violating her First Amendment right to free exercise of religion. *Id.* ¶¶ 53–71. Polk seeks monetary damages and a declaration that the Guidelines violate her constitutional rights and her rights under Title VII. *Id.* at 17. She also seeks "[a] preliminary injunction allowing her to continue to substitute teach in classrooms in which students who are transitioning genders are not enrolled" and "[a] permanent injunction consistent with the declaratory relief." *Id.*

Polk moves for a preliminary injunction. ECF 4. Though Polk eventually wants a permanent injunction that would allow her not to comply with the Guidelines at all, she pledges,

for the duration of the preliminary injunction, to "limit her substitute services to elementary school classrooms with no transitioning students attending them" and to "obtain assistance from other MCPS personnel promptly if she must engage a transitioning student in a way that would violate her religious beliefs." *Id.* at 1. The defendants oppose the preliminary injunction and move to dismiss Polk's complaint. ECF 28. Both motions are fully briefed. ECF 4, 4-1, 28, 28-1, 30, 31. After briefing was complete, Polk filed three notices of supplemental authority. ECF 32, 37, 38. The Court held a motions hearing on October 17, 2024. ECF 36.

## II.    Motion to Dismiss

The defendants move to dismiss Polk's free exercise and free speech claims because she has not stated a cognizable constitutional claim. The defendants also move to dismiss Polk's Title VII failure-to-accommodate claim because accommodating her would pose an undue hardship on her employer. Polk's First Amendment claims are dismissed. Polk's Title VII claim survives.

### A.  Standard of Review

Rule 8 of the Federal Rules of Civil Procedure requires a party to state "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a party may seek dismissal of a claim because the pleader does not "state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Merely "reciting" a claim's elements and "supporting them by conclusory statements does not meet the required standard." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019).

When considering a Rule 12(b)(6) motion to dismiss, the Court must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023). The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)). Still, the court must "draw on its judicial experience and common sense" to determine whether the plaintiff has stated a claim that is plausible, not merely possible. *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

## B. Proper Employer Defendant

Before resolving the motion to dismiss, the Court first addresses the defendants' argument that MCPS is not Polk's employer and thus is not a proper a defendant. They argue that the proper employer defendant is the Board of Education. They are correct. MCPS is the name of a local school district. Under Maryland law, a "school district . . . does not exist as a separate entity for purposes of suit." *Adams v. Calvert Cnty. Pub. Schs.*, 201 F. Supp. 2d 516, 520 n.3 (D. Md. 2002). Instead, state law establishes "a county board of education for each county school system," Educ. § 3-103, which "[m]ay sue and be sued," *id.* § 3-104(b). The county board of education is the proper defendant in a civil lawsuit brought by an employee of a public school system in Maryland. *See Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 167 (D. Md. 2022) (noting the proper defendant in Maryland public school teacher's anti-discrimination lawsuit was county board of education); *Adams*, 201 F. Supp. 2d at 520 n.3 (treating janitor's anti-discrimination lawsuit as suit against county board of education); *cf. James v. Frederick Cnty. Pub. Schs.*, 441 F. Supp. 2d 755, 758 (D. Md. 2006) (holding county board of education was proper defendant in

excessive force suit brought by parent against school system). Thus, the Board of Education, not MCPS, is the proper employer defendant in this action. The claims against MCPS are dismissed.[3]

### C. Free Exercise

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. "Many matters fall under the ambit of the Free Exercise Clause, encompassing both direct and indirect coercion of religion." *Mahmoud v. McKnight*, 102 F.4th 191, 204 (4th Cir. 2024). To state a violation of the Free Exercise Clause, the plaintiff must allege facts showing that a government action has burdened her religious exercise. *Id.* at 205. The plaintiff need not show that the action imposes a "substantial burden" on her religious exercise—just that the law imposes "*a* burden." *Id.* at 207 & n.12; *see also Firewalker-Fields v. Lee*, 58 F.4th 104, 114 n.2 (4th Cir. 2023) (recognizing that the Supreme Court overruled prior cases requiring a "substantial burden" on religious practice). "[A] burden exists whenever government conduct either 'compel[s] a violation of conscience' or 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Mahmoud*, 102 F.4th at 208 (second and third alterations in original) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981)). If the plaintiff plausibly alleges that government action burdens her religious exercise, "then the analysis shifts to whether the government can justify the limitation or intrusion under the applicable level of scrutiny." *Id.* at 205 (emphasis omitted). If the government action is subject to rational basis review, "[t]he party challenging the law bears the burden of negating 'any reasonably conceivable state of facts that could provide a rational basis' for the law." *Kim v. Bd. of Educ.*, 93 F.4th 733, 749 (4th Cir. 2024) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).

---

[3] Throughout this opinion, the Court refers to MCPS and its policies and decisions. These references do not imply that MCPS is the proper defendant. The only legal entity that Polk may sue is the Board of Education.

### 1. Burden

Polk alleges the Guidelines burden her religious exercise by forcing her to act in violation of her Christian beliefs. Polk objects to the requirements that she address students by pronouns that do not correspond to the sex assigned to them at birth and that she "hide from parents that their child is transitioning genders at school." ECF 1, ¶ 31. Polk insists that if she agrees to these requirements, she would be forced to act contrary to her Christian beliefs that "God created individuals as either male or female" and that "God gave parents the primary responsibility for the care and upbringing of their minor children." *Id.* Polk says MCPS forced her to choose between violating her religious beliefs and losing her job. Indeed, because Polk refuses to abide by the Guidelines, she is not allowed to substitute teach. That suffices to allege a burden on her religious practice. *See Mahmoud*, 102 F.4th at 208.

The Board argues Polk has not alleged a religious burden because "the only thing required . . . to date has been to review the training materials" and attest that she has reviewed them and understands her obligation to comply with them. ECF 28-1, at 36. According to the Board, the "attestation does not require her to shed her religious beliefs or endorse the policy; it only requires her to attest that she is aware of the expectation that she comply with the policy." *Id.*

The Board's argument is too clever by half. There is no meaningful difference between Polk affirming that she will comply with the Guidelines and Polk actually complying with them. Polk has refused to do either. When Polk requested accommodations that would alleviate the burden on her religious exercise, MCPS rejected them. When MCPS suggested it could accommodate Polk by eliminating the affirmation requirement, it insisted that Polk "would still be required to [comply with the Guidelines] when working." ECF 1, ¶ 38. Polk has refused this "accommodation" because she believes it compels her "to choose between losing her job and being

untrue to her religious convictions." *Id.* Because Polk will not comply with the Guidelines, MCPS will not employ her as a substitute teacher. Their employment relationship remains severed. Polk has alleged a religious burden.

### 2. Neutrality and General Applicability

"The Court's free exercise analysis does not end with proving the existence of a burden on religious exercise . . . because '[n]ot all burdens on religion are unconstitutional.'" *Mahmoud*, 102 F.4th at 206 (alteration in original) (quoting *United States v. Lee*, 455 U.S. 252, 257 (1982)). For example, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Emp. Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *Lee*, 455 U.S. at 263 n.3 (Stevens, J., concurring)). Under *Smith*, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citing *Smith*, 494 U.S. at 878–82).[4] If the law is neutral and generally applicable, the government need show only that it survives rational basis review, which "requires merely that the law at issue be rationally related to a legitimate governmental interest." *Canaan Christian Church v. Montgomery County*, 29 F.4th 182, 199 (4th Cir. 2022) (internal quotation marks omitted) (quoting *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 561 (4th Cir. 2013)). If the law is not neutral or generally applicable, strict scrutiny applies. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). The plaintiff bears the burden of showing that the government action is not neutral or generally applicable. *Id.*

---

[4] Polk argues that *Smith* rests on "shaky ground" and "should be overruled." ECF 4-1, at 29 & n.5 (observing that in *Fulton*, five justices agreed that *Smith* "should be reconsidered and likely overruled"). As of today, *Smith* is the law of the land, and this Court must and will apply it. *Id.*

### i.   Neutrality

The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533; *see also Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 640 (2018). "Conversely, government action is neutral if it 'has no object that infringes upon or restricts practices *because* of their religious motivation.'" *Kim*, 93 F.4th at 748 (quoting *Alive Church of the Nazarene, Inc. v. Prince William County*, 59 F.4th 92, 108 (4th Cir. 2023)) (cleaned up in original).

To determine whether a law targets religion, a court "must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). The text of the Guidelines is facially neutral. It does not mention religion at all. The Guidelines do not discriminate on their face.

Polk disagrees. She proclaims that it is "obvious from the face of" the Guidelines that they target people like her who "hold to traditional religious teachings on transgenderism" and "disagree with the idea that students should be free to transition from their God-given sex." ECF 4-1, at 30. Yet Polk points to nothing in the text of the Guidelines that supports this sweeping proclamation. It is not, as Polk insists, "obvious from the face of" the Guidelines that they discriminate against people with her religious beliefs. The Guidelines are facially neutral.

Even so, "[f]acial neutrality is not determinative." *Lukumi*, 508 U.S. at 534. The Free Exercise Clause "'forbids subtle departures from neutrality' and 'covert suppression of particular religious beliefs.'" *Id.* (first quoting *Gillette v. United States*, 401 U.S. 437, 452 (1971); and then quoting *Bowen v. Roy*, 476 U.S. 693, 703 (1986) (plurality opinion)). So, "[w]hen presented with a law that affects religious practice, even if indirectly, a court must look behind the law's text to determine if it was enacted 'because of' and not 'in spite of' its effect on religion." *Alive Church*

*of the Nazarene*, 59 F.4th at 108 (quoting *Lukumi*, 508 U.S. at 540). "Such an inquiry compels the court to look at contemporaneous statements made by decisionmakers or community members surrounding the law's passage, and any deviations from standard decisionmaking procedures." *Id.*

In her complaint, Polk does not allege that the Board made any religiously hostile statements contemporaneous with the enactment of the Guidelines. Polk also does not allege that the Board deviated from standard procedures when it implemented the Guidelines. Indeed, the Guidelines largely follow the Maryland State Department of Education's gender identity guidelines. The state guidelines are not binding on local school systems, but they are "designed to serve as suggestions for consideration for school systems and administrators who may want to develop their own transgender policy, procedures, and/or guidelines." ECF 28-5, at 1.[5] Those guidelines indicate that staff should refer to students by their preferred pronouns and suggest that parents should not be told about their child's gender identity unless the child consents. *See id.* at 6, 7. The state guidelines explain that "no provision of state or federal law requires schools to affirmatively disclose this sensitive [gender identity] information to parents." *Id.* at 7. Instead, "while information in official student records must be disclosed upon the request of parents, sensitive information related to gender identity generally need not be disclosed without the student's consent." *Id.* The state policy encourages local school systems to create training and practices that "prevent accidental disclosure of information that may reveal a student's transgender status to others, *including parents* and other school staff unless the student and/or the student's

---

[5] The Court may take judicial notice of the state's gender identity guidelines, which are a matter of public record, without converting the motion to dismiss into a summary judgment motion. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (approving the consideration of "publicly available [statistics] on the official redistricting website of the Virginia Division of Legislative Services" at the motion to dismiss stage); *see also Corbitt v. Balt. City Police Dep't*, 675 F. Supp. 3d 578, 583 n.5 (D. Md. 2023) (taking judicial notice of a police department policy on a motion to dismiss).

parent has authorized school staff to make such disclosure or staff is legally required to do so." *Id.* (emphasis added). Following this guidance, the Board implemented its own policy on transgender and gender nonconforming students that largely mirrors the state's policy.

In her briefing, Polk points to statements that MCPS made in response to her employment discrimination charge with the EEOC. Polk maintains that, in its EEOC position statement, "MCPS claimed that it could not tolerate even a single person in its teaching ranks who holds a traditional religious view of transgenderism and parental authority over minor children." ECF 4-1, at 30. Polk asks the Court to infer from this position statement that the Board had covert religious hostility when it enacted the Guidelines. No such inference can be drawn.

Polk does not allege in her complaint that the position statement is evidence of discriminatory intent, and she cannot amend her complaint through her preliminary injunction briefing. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (explaining that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

Even if Polk had alleged that the position statement was evidence of discriminatory intent, it would not change the outcome. MCPS, through counsel, submitted its position to the EEOC in February 2024. Counsel's statements, written years after the Guidelines were enacted, were made in connection with an adversarial proceeding. They are not "contemporaneous statements made by decisionmakers or community members" that are relevant to whether the Board enacted the Guidelines "'because of' . . . [their] effect on religion." *See Alive Church of the Nazarene*, 59 F.4th at 108 (quoting *Lukumi*, 508 U.S. at 540).

Even so, Polk insists her case is like *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*. It is not. In *Lukumi*, the Supreme Court found that a city violated the free exercise rights of people

who practiced Santeria. 508 U.S. at 547. Members of the religion engaged in animal sacrifice as "one of the principal forms of devotion" of their faith. *Id*. at 524. In response, city lawmakers enacted three ordinances banning animal sacrifice. *Id.* at 527–28. The Supreme Court held that the ban violated the First Amendment because it was not religiously neutral. *Id.* at 545–46. Indeed, there was overwhelming evidence that the city enacted the ordinances with the intent of preventing the church members from engaging in the religious ritual. The ordinances prohibited only animal sacrifice (not other animal killings), legislators and community members made hostile comments about the church on the public record, and the city passed a resolution noting the concern of city residents about the practices of "certain religions." *Id.* at 535–42. No such allegations are found here. Polk makes only conclusory allegations about intent. She offers no facts from which the Court could plausibly infer that the Board created the Guidelines to target teachers who adhere to traditional religious teachings on gender identity or that the Board was hostile towards any religion when it enacted the Guidelines. The Guidelines apply to everyone. Anyone who disagrees with them—for religious, secular, or other reasons—must nevertheless abide by them.

Polk's attempt to analogize this case to *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission* fails for the same reasons. In *Masterpiece Cakeshop*, the Supreme Court found that the Colorado Civil Rights Commission's treatment of a cakeshop owner's religious discrimination claim reflected hostility towards his religious beliefs and violated his free exercise rights. 584 U.S. at 640. During the Commission's meetings, several of the Commission members made inappropriate and dismissive comments about the shop owner's faith. *Id.* at 634–35. One member even described his faith as "one of the most despicable pieces of rhetoric that people can use" and said his faith was used to justify slavery and the Holocaust. *Id.* at 635. The Court found that those "statements cast doubt on the fairness and impartiality of the Commission's adjudication

of [his] case." *Id.* at 636. The Commission violated the cake shop owner's free exercise rights by not adjudicating his civil rights complaint in a manner "neutral toward religion." *Id.* at 640. The factual allegations here could not be more different. There are no contemporaneous statements by members of the Board of Education that suggest religious animus motivated the Guidelines.

Polk does not plausibly allege that the Board enacted the Guidelines because of religious animus. Still, Polk argues that she is "[a]t a minimum . . . entitled to discovery on [neutrality]." ECF 30, at 26. Nothing entitles Polk to discovery on neutrality. She alleges no facts from which the Court could infer religious animus. Polk may not try to find those missing facts in discovery. *See Iqbal*, 556 U.S. at 678–79 (stating that Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions").

The Guidelines are neutral.

### ii. General Applicability

The Court next considers whether the Guidelines are generally applicable. A policy is not generally applicable "if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions'" or "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 533–34 (alteration in original) (quoting *Smith*, 494 U.S. at 884).

Polk argues that the Guidelines are not generally applicable for three reasons. None persuades. First, Polk argues that she was not required to affirm the Guidelines when she was hired as a substitute teacher in 2021 but she is required to affirm them now. MCPS's decision to require affirmation of the Guidelines does not make them generally inapplicable. All teachers have been treated the same. Before 2022, no one, including Polk, was required to affirm the Guidelines. Since

2022, everyone, including Polk, must affirm them. There are no allegations that MCPS has ever allowed, on an individual basis, teachers to be exempt from complying with the Guidelines. MCPS's decision to impose an affirmation requirement for the 2022–2023 school year and beyond does not render the Guidelines generally inapplicable.

Second, Polk claims that "MCPS has unbridled discretion with respect to how to apply the policy to parents" and how to discipline teachers who violate the Guidelines. ECF 4-1, at 31. That is beside the point. Even if MCPS has discretion over how to apply the policy to parents on a case-by-case basis and how to discipline teachers who violate the policy, MCPS does not have any discretion to exempt teachers from their obligation to comply with the Guidelines. Contrast these facts with those in *Fulton*. There, the city of Philadelphia refused to make referrals to a Catholic foster care agency because the agency refused to certify same-sex couples as foster parents. 593 U.S. at 531. The foster care agency sued the city, alleging that the referral freeze violated its First Amendment free exercise rights. *Id.* The city argued that the agency's practice violated the nondiscrimination provision in the city's standard foster care contract. *Id.* at 534. The Supreme Court held that the contract's nondiscrimination provision was not generally applicable because it "incorporate[d] a system of individual exemptions" from the provision that could be invoked in the contract administrator's "sole discretion." *Id.* at 535. The city would not exempt the Catholic foster care agency from the nondiscrimination provision. *Id.* That was a *Smith* problem. Under *Smith*, the city could not "refuse to extend [the exemption] system to cases of religious hardship without compelling reason." *Id.* (internal quotation marks omitted) (quoting *Smith*, 494 U.S. at 884). And even though the city had never granted an exemption, "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable . . . because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy

of solicitude, here, at the Commissioner's 'sole discretion.'" *Id.* at 537 (alteration in original) (internal citation omitted). Because the policy was not generally applicable, it triggered strict scrutiny. *Id.* at 541. The Court found that the policy did not survive strict scrutiny and violated the First Amendment. *Id.* at 542.

Here, no system of individual exemptions exists. The Board's requirement that teachers comply with the Guidelines applies to every teacher; there is no mechanism for granting exemptions to it. That the Board may exercise discretion in how it implements the Guidelines with parents and how it disciplines teachers who violate the Guidelines does not alter the fact that all teachers must abide by them. *See Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1284 (D. Wyo. 2023) (finding similar policy generally applicable when the complaint contained no allegation that the school ever granted an exception to a policy requiring teachers to use students' preferred names and pronouns).

Finally, Polk argues that exemptions from the Guidelines are available under Title VII. On Polk's account, because someone *could* get a religious accommodation under Title VII, compliance with the Guidelines is not uniformly required and thus not generally applicable. Assuming the premise of Polk's argument is true—that a religious accommodation is available under Title VII—Polk offers no authority to support the proposition that the possibility of an accommodation under a federal anti-discrimination employment statute turns an otherwise generally applicable policy into one that allows exemptions. Under *Fulton*, a court must determine whether the policy itself creates a mechanism for individual exemptions, not whether a federal anti-discrimination law may require individual accommodations.

The Guidelines are neutral and generally applicable.

### 3. Rational Basis

The neutral and generally applicable Guidelines are subject to rational basis review. *See Jesus Christ Is the Answer Ministries, Inc. v. Baltimore City*, 915 F.3d 256, 265 (4th Cir. 2019), *as amended* (Feb. 25, 2019). "Under rational basis review, a classification enjoys a strong presumption of validity and is constitutional as long as 'there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *United States v. Timms*, 664 F.3d 436, 447 (4th Cir. 2012) (quoting *Heller*, 509 U.S. at 320). The government's "policy decisions are 'not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). A court may not judge a policy's rationality "on the basis of its wisdom, fairness, or logic (or lack thereof)." *Id.* at 293–94.

On a motion to dismiss, the court considers the allegations in the complaint to determine whether the plaintiff has sufficiently negated a rational basis for the challenged policy. *See Kim*, 93 F.4th at 749 (affirming dismissal of free exercise claim when plaintiff made no effort in the complaint to show policy lacked a rational basis); *Alive Church of the Nazarene*, 59 F.4th at 110 (affirming dismissal of free exercise claim because plaintiff did not allege facts that would negate a rational basis).

Polk has not alleged any facts that would negate a rational basis for the Guidelines.

For its part, the Board identifies three purposes of the Guidelines: "(1) protecting student safety and preventing discrimination against students; (2) complying with its obligations under federal law, including Title IX [of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688.], which prohibits discrimination based on gender identity; and (3) hiring staff who will nurture

transgender and non-transgender students in equal measure." ECF 28-1, at 30. These are legitimate government purposes.

The Board's requirement that teachers address students by their preferred pronouns is rationally related to its obligations under Title IX, which prohibits discrimination against transgender students at school. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 (4th Cir. 2020) (finding school board's refusal to let transgender student use bathroom corresponding to his gender identity and update school records to reflect his gender identity violated Title IX). Likewise, the Board's requirement that teachers keep students' gender identities confidential, even from their parents, is rationally related to the Board's goal of supporting and protecting the safety of the students whose parents may object to their decision to transition. *See* ECF 28-4, at 13 (the Guidelines) ("In some cases, transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance. Matters of gender identity can be complex and may involve familial conflict."); *cf. Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 887 (4th Cir. 2023) (finding school admissions policy supported by rational basis and explaining that "'federal courts should not lightly interfere with the day-to-day operation of schools,' given that 'school officials are far more intimately involved with running schools' than are judges" (quoting *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 440 (4th Cir. 2013))). Finally, the requirement that all teachers must abide by the Guidelines is rationally related to the Board's goal of hiring staff who will treat and nurture every student equally. The Guidelines are rationally related to legitimate government purposes. Polk's allegations do not defeat the Guidelines' "strong presumption of validity." *Timms*, 664 F.3d at 447.

Polk has alleged the Guidelines burden her religious exercise. Under *Smith*, the Guidelines are subject to rational basis review because they are neutral and generally applicable to all staff.

The Guidelines easily pass that level of review. They are rationally related to legitimate government purposes, and Polk has not alleged facts that would defeat the presumption of their validity. In consequence, Polk has not alleged that the Board violated her free exercise rights when it terminated their employment relationship after Polk refused to abide by the Guidelines. Polk has failed to state a free exercise claim. The Board's motion to dismiss this claim is granted.

### D.  Free Speech

Polk also claims that the Board violated her First Amendment right to freedom of speech. Polk argues that the Board compelled her—as a condition of employment—to speak in a manner that conflicts with her religious beliefs in two respects. First, the Board compelled her to use children's preferred pronouns even if the pronouns do not correspond to the children's assigned sex at birth. Second, the Board compelled her not to discuss with parents their child's desire to transition genders. Because Polk refused to engage in this speech, the Board refused to allow her to substitute teach.

It has long been settled that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142 (1983). That bedrock principle applies to public school teachers. Teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy*, 597 U.S. at 527 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). However, "certain limitations are placed on the[ir] free speech rights . . . due to the nature of their employment by government-operated schools." *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 693 (4th Cir. 2007).

When public school teachers and other government employees assert free speech claims, courts "use a three-prong test to determine if the employee's rights under the First Amendment

were violated." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017). First, the court asks "whether the speech at issue was that of a private citizen speaking on a matter of public concern." *Lee*, 484 F.3d at 694 (quoting *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc)); *see Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). "This prong can in turn be divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties, and whether the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs.'" *Crouse*, 848 F.3d at 583 (internal citation omitted) (quoting *Connick*, 461 U.S. at 149). Second, if—and only if—the speech was made as a private citizen and addressed a matter of public concern, then the court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam) ("*Pickering* did not hold that any and all statements by a public employee are entitled to balancing. To require *Pickering* balancing in every case where speech by a public employee is at issue, no matter the content of the speech, could compromise the proper functioning of government offices."). Finally, the court must determine whether the employee's speech caused the disciplinary action. *See Crouse*, 848 F.3d at 583.

Polk's free speech claim fails at the first prong. Polk does not make the speech as a private citizen. She makes the speech pursuant to her official duties as a public school teacher.

The Supreme Court's decision in *Garcetti v. Ceballos* forecloses Polk's free speech claim. In *Garcetti*, a state prosecutor, Richard Ceballos, wrote a memorandum to his supervisors in which he identified misrepresentations in an affidavit in support of a search warrant and recommended dismissal of a pending criminal case. 547 U.S. at 414. His supervisors disagreed with the

recommendation and refused to dismiss the charges. *Id.* Later, Ceballos was called as a defense witness to testify at a motions hearing on the validity of the search warrant. *Id.* at 415. In the aftermath of these events, Ceballos's supervisors reassigned him, transferred him to another courthouse, and denied him a promotion. *Id.* Ceballos argued that his memorandum was protected speech and that his supervisors retaliated against him in violation of his First Amendment rights when they punished him because he wrote the memorandum. *Id.*

The Supreme Court disagreed. It held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. Ceballos, a public employee, did not dispute that he wrote the internal memorandum pursuant to his official duties as a prosecutor. *Id.* Still, the Court explained the reasons why it agreed the memo was written "pursuant to [his] official duties." *See id.* at 421–22. The "controlling factor" was that "Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." *Id.* at 421. He wrote the memo "because that is part of what he, as a calendar deputy, was employed to do." *Id.* The Court elaborated: When Ceballos "went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings," he "did not act as a citizen," and he did "not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case." *Id.* at 422. Because Ceballos was "simply performing [his] job duties" when he wrote the memorandum, it was not protected speech, and his supervisors did not violate his First Amendment rights when they disciplined him because of the memorandum. *Id.* at 423. The Court declined to apply the *Pickering* balancing test to Ceballos's speech because to do so "would be to demand

23

permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." *Id.*

Applying *Garcetti* to these facts, the Court finds that the speech Polk challenges is made pursuant to her official duties as a substitute teacher. Using pronouns when interacting with and communicating about students is intrinsic to teaching. *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019) ("[H]ow faculty members relate to students *is* part of their jobs."). And communicating with parents about their children's conduct in school is "part and parcel" of a teacher's responsibilities. *See Coomes v. Edmonds Sch. Dist. No. 15.*, 816 F.3d 1255, 1264 (9th Cir. 2016). The Guidelines enhance these traditional responsibilities of a teacher. These responsibilities now include referring to students by their preferred pronouns and not communicating with parents about their child's gender identity without the student's consent. Both categories of speech would occur only to fulfill Polk's responsibilities as a teacher. *See Garcetti*, 547 U.S. at 421. In the words of *Garcetti*, the speech "is part of what [Polk], as a [substitute teacher], was employed to do." *See id.*[6]

The speech required by the Guidelines is part of Polk's official duties as a teacher. When Polk uses pronouns to refer to students in the classroom setting, she is acting as a teacher, not as a citizen. When Polk speaks to parents about their child's behavior in school, she is acting as a teacher, not as a citizen. Such speech is not protected by the First Amendment. Under *Garcetti*, the Board may require Polk to use student-preferred pronouns and may restrict what Polk says to parents about their child's gender identity. Polk may object to the employer-mandated speech on

---

[6] Polk argues that referring to children by pronouns and keeping their confidences about the gender identity they express in school are "not curricular matters." ECF 30, at 14. True, the challenged speech does not concern a subject taught in school. Even so, the speech is part of Polk's job responsibilities as a substitute teacher.

religious grounds, but if she chooses to teach in public schools, she is a government employee and must perform "the tasks [she] was paid to perform." *See id.* at 422. Conditioning Polk's employment as a substitute teacher on her agreement to abide by the Guidelines does not violate her right to free speech.

Determined to avoid the outcome that *Garcetti* requires, Polk insists that *Garcetti* does not apply here for two reasons.

First, Polk argues *Garcetti* does not apply because this case involves speech related to teaching, which Polk claims is afforded more constitutional protection than *Garcetti* provides. Polk grounds her argument in the following dicta in *Garcetti*: "There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *See id.* at 425. The *Garcetti* Court did not resolve that argument. It declined to decide "whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* The Supreme Court still has not decided the issue.

The Fourth Circuit has—in the context of speech of public university faculty members. In this circuit, "the *Garcetti* rule does not extend to speech by public university faculty members, acting in their official capacity, that is 'related to scholarship or teaching.'" *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023) (quoting *Garcetti*, 547 U.S. at 425); *see Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011) (finding *Garcetti* did not apply "to the academic work of a public university faculty member" whose "speech . . . was intended for and directed at a national or international audience on issues of public importance unrelated to any of [the professor's] assigned teaching duties . . . or any other terms of his employment"). Other circuits have held similarly. *See Meriwether v. Hartop*, 992 F.3d 492, 507

(6th Cir. 2021) (holding *Garcetti* did not apply to university professor's refusal to use preferred pronouns because of the importance of "the free exchange of ideas in the college classroom"); *Heim v. Daniel*, 81 F.4th 212, 227 (2d Cir. 2023) (highlighting the Supreme Court's "deep[] commit[ment] to safeguarding academic freedom' as 'a special concern of the First Amendment' and holding *Garcetti* does not apply to a public university professor's academic writing and teaching (alteration in original) (quoting *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967))); *Demers v. Austin*, 746 F.3d 402, 411–12 (9th Cir. 2014) (holding that *Garcetti* did not apply to a public university's teaching and academic writing because "the Court . . . 'ha[s] long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition'" (quoting *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003))).

When it comes to the classroom speech of public elementary and secondary school teachers, the Fourth Circuit has not decided whether *Garcetti* applies. The court had the opportunity to answer that question in *Lee v. York County School Division*, but it declined to do so. *See Lee*, 484 F.3d at 694 n.11 (opting not to decide whether *Garcetti* applied to the posting of religious materials on a middle school Spanish teacher's blackboard and instead deciding the speech was not a matter of public concern under *Pickering*).

Several other circuits have found that *Garcetti* does apply to the in-class speech of public elementary and secondary school teachers. *See Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016) (noting *Garcetti* applies to school teachers because the "core of the teacher's job is to speak in the classroom on the subjects she is expected to teach" and finding teacher's "impromptu lesson on racial epithets" not protected because it was given "in the course of his regular grammar

lesson to a sixth grade class"); *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 & n.12 (9th Cir. 2011) (holding *Garcetti's* carve-out for "academic freedom" does not apply to "primary and secondary school teachers" and finding high school teacher spoke as a government employee when he displayed religious banners in his classroom because his speech "'owe[d] its existence' to his position as a teacher" (quoting *Garcetti*, 547 U.S. at 421–22)); *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 340 (6th Cir. 2010) (finding *Garcetti* applied to high school English teacher who was fired because she taught books and topics not in line with the approved curriculum); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) (holding *Garcetti* applied to speech of probationary elementary school teacher who was fired because she expressed her personal views on the Iraq War in a lesson that "was part of her assigned tasks in the classroom" despite the principal's order that teachers not take sides in political controversies).

These cases suggest two reasons why courts have found *Garcetti* applies to the classroom speech of elementary and secondary school teachers. First, public school teachers are paid to speak. "Expression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary." *Mayer*, 474 F.3d at 479. When "teachers hire out their own speech," they "must provide the service for which employers are willing to pay." *Id.* When a "school board . . . hires [a teacher's] speech, it can surely 'regulate the content of what is or is not expressed.'" *Evans-Marshall*, 624 F.3d at 340 (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995)).

Second, public education is compulsory, and elected school board officials, not teachers, decide the curriculum and how teachers present it in the classroom. *See Mayer*, 474 F.3d at 479. "This is an accountability measure, pure and simple, one that ensures the citizens of a community have a say over a matter of considerable importance to many of them—their children's education—

by giving them control over membership on the board." *Evans-Marshall*, 624 F.3d at 341. "The

First Amendment does not ban this policy choice or this accountability measure." *Id.* As the

Seventh Circuit has explained:

> Children who attend school because they must ought not be subject to teachers'
> idiosyncratic perspectives. Majority rule about what subjects and viewpoints will
> be expressed in the classroom has the potential to turn into indoctrination; elected
> school boards are tempted to support majority positions about religious or patriotic
> subjects especially. But if indoctrination is likely, the power should be reposed in
> someone the people can vote out of office, rather than tenured teachers. At least the
> board's views can be debated openly, and the people may choose to elect persons
> committed to neutrality on contentious issues.

*Mayer*, 474 F.3d at 479–80. The Constitution does not "entitle teachers to present personal views

to captive audiences against the instructions of elected officials." *Id.* at 480.

The Court finds the reasoning of these cases persuasive. When the Board hires Polk to be

a substitute teacher, it is paying her to speak on its behalf. She must provide the service for which

she is being paid. The Board has the responsibility and authority to determine the educational

policies for MCPS. *See* Educ. § 4-108(3). Pursuant to that authority, the Board implemented the

Guidelines. When Polk works for the Board, Polk must follow her employer's directives, including

the Guidelines. If the residents of Montgomery County disagree with the Guidelines, they have the

power to vote the members of the Board of Education out of office and make changes. But Polk,

in her capacity as a substitute teacher, cannot deviate from the Board's policies. She must provide

the service that the Board is paying her to provide, and that includes complying with the

Guidelines. The speech at issue here does not "implicate[] additional constitutional interests" that

are "not fully accounted for by . . . customary employee-speech jurisprudence." *See Garcetti*, 547

U.S. at 425. *Garcetti* applies to the speech Polk makes pursuant to her official duties as a public

school teacher.

Next, Polk argues that *Garcetti* does not apply to government-compelled speech. Unlike the government employee in *Garcetti*, Polk was not punished because of what she said; Polk was punished because of what she refused to say. On Polk's account, hers is a challenge to government-compelled speech. For that reason, Polk argues that compelled speech cases, such as *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781 (1988); *Wooley v. Maynard*, 430 U.S. 705 (1977); and *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018), apply to her case, and *Garcetti* does not.[7] The Court is unconvinced.

Polk is correct that *Garcetti* did not involve compelled speech. The prosecutor was not required to write the memorandum that resulted in his discipline. Even so, *Garcetti* did not turn on whether the employee's speech was compelled. *Garcetti* turned on whether the speech was part of the employee's official duties. If it is, then the employer may restrict the employee's speech without violating their right to freedom of speech. *See Garcetti*, 547 U.S. at 421–22. As the *Garcetti* Court explained, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* More recently, the Supreme Court in *Kennedy v. Bremerton School District* confirmed that "[i]f a public employee speaks 'pursuant to [his or her] official duties,' . . . the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the

---

[7] *Riley*, *Wooley*, and *Becerra* are not government employee speech cases. *See Riley*, 487 U.S. at 803 (restrictions on professional fundraisers violated the First Amendment); *Wooley*, 430 U.S. at 717 (motorist had free speech right not to display state motto on his license plate); *Becerra*, 585 U.S. at 779 (state requirement that crisis pregnancy centers provide certain notices to patients likely violated the First Amendment).

government's own speech." 597 U.S. at 527 (second alteration in original) (quoting *Garcetti*, 547 U.S. at 421).

The speech Polk objects to—even if it is compelled speech—"owes its existence to" Polk's professional responsibilities as a public school teacher. *See Garcetti*, 547 U.S. at 421–22. The Board "commissioned" the Guidelines, and it may "exercise control over" the speech of teachers who are bound by them. *See id.* at 422. For constitutional purposes, the speech Polk challenges is the Board's own speech.[8] The Board, like other government employers, "need[s] a significant degree of control over [its] employees' words and actions; without it, there would be little chance for the efficient provision of public services." *See id.* at 418–19 (citing *Connick*, 461 U.S. at 143 ("[G]overnment offices could not function if every employment decision became a constitutional matter.")). The Board may restrict Polk's speech by requiring her to use student-preferred pronouns and by limiting what she says to parents about their child's desire to transition genders. This speech falls within *Garcetti*'s reach.

If there ever was any doubt about whether *Garcetti* applies to government-compelled speech, the Supreme Court dispelled it in *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 585 U.S. 878 (2018). In *Janus*, the Court held unconstitutional an Illinois statute that authorized public-sector unions to assess fees from nonmember public employees. 585 U.S. at 885–86. The Court found that the arrangement "violate[d] the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern." *Id.* The union argued, unsuccessfully, that *Garcetti* allowed it to assess the fees

---

[8] Polk argues that a child's preferred pronouns are the child's speech, not the Board's speech. True, the child, not the Board, has chosen the pronouns they prefer to use in school, but the Board has chosen to require teachers to use the child's preferred pronouns. The use of preferred pronouns when referring to children in the classroom is the speech of the Board.

on nonmember public employees. *Id.* at 909. The *Janus* Court found *Garcetti* "totally inapposite" because "the union speaks for the *employees,* not the employer," and "if the union's speech is really the employer's speech, then the employer could dictate what the union says"—a result the Court assumed would not please the unions. *Id.* at 910. In reaching this conclusion, the *Janus* Court confirmed that *Garcetti* applies to employer-compelled speech: "Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Id.* at 908 (citing *Garcetti*, 547 U.S. at 421–22, 425–26).[9] So, under *Janus* and *Garcetti*, the Board may "dictate" or "insist" that Polk, as part of her official duties as a substitute teacher, speak in accordance with the Guidelines. *See id.* at 908, 910.

Polk does not dispute that the Board "may insist that [she] deliver any lawful message" as part of her official duties. *See Janus*, 585 U.S. at 908. Yet Polk argues that the message the Board insists she deliver is unlawful. According to Polk, the restrictions on her speech imposed by the Guidelines would require her to deceive (or be complicit in deceiving) parents about their child's desire to transition genders. This deception, in turn, would violate the parents' substantive due process rights to direct the care and upbringing of their children—rights that were recognized a century ago in *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), and *Pierce v. Society of the Sisters of the Holy Names*, 268 U.S. 510, 534–35 (1925). Polk claims the Board cannot force her to speak in a manner that would result in a violation of the substantive due process rights of the parents of the children she teaches.

Polk cites no authority for her novel argument. *Janus* does not recognize a First Amendment cause of action under these circumstances. And no court in the country has held that

---

[9] After this statement, the *Janus* Court observed that "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." 585 U.S. at 908. Polk's case may be that situation.

a school board violates a teacher's right to freedom of speech when it prohibits the teacher from

speaking to parents about their child's desire to transition genders without the child's consent. This

Court will not be the first to extend the reach of the First Amendment that far.[10]

        When Polk refers to students by pronouns in the classroom and when she speaks with

parents about their child's conduct at school, she speaks pursuant to her official duties as a teacher.

This speech is the speech of her employer, the Board. It is "unprotected" because "it is part of what

---

[10] Polk may believe the Guidelines violate parents' substantive due process rights, but her First Amendment free speech claim is not the proper vehicle to advance that argument. There is no authority to support her expansive view of the First Amendment. One district court has suggested a public school teacher might have a viable free speech claim if the school forces the teacher to lie to parents who ask about their child's preferred pronouns or their child's desire to transition genders. *See Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1215 (S.D. Cal. 2023) (observing teachers could have a free speech claim if school "policy compels them to violate the law or deliberately convey an illegal message"). Even if Polk had a First Amendment right not to lie to parents, she has not alleged that the Guidelines require her to lie. They require her to keep students' confidences. If the Guidelines violate parents' substantive due process rights, the Board is responsible, not Polk. Another judge in the District of Maryland recently found the Guidelines do not violate parents' substantive due process rights, but that decision was vacated by the Fourth Circuit on other grounds. *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 139 (D. Md. 2022), *vacated*, 78 F.4th 622, 626 (4th Cir. 2023). Other district courts have held that similar policies do not violate parents' due process rights. *See Doe v. Del. Valley Reg'l High Sch. Bd. of Educ.*, No. 24-00107, 2024 WL 706797, at *8 (D.N.J. Feb. 21, 2024) (finding no "'*constitutional* obligation on state actors to contact parents of a minor' who requests to be recognized by a different gender identity, regardless of the minor's preference as to parental notification" (quoting *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 262 (3d Cir. 2007)); *Regino v. Staley*, No. 23-00032, 2023 WL 4464845, at *4 (E.D. Cal. July 11, 2023) (holding parent had no substantive due process right to notice of her child's gender transition at school and no right to provide consent before school staff referred to child by their preferred name and pronouns); *cf. Littlejohn v. Sch. Bd.*, 647 F. Supp. 3d 1271, 1283 (N.D. Fla. 2022) (holding school's decision to let student use preferred name and pronouns without parents' consent and failure to include parents in creation of student's gender support plan did not violate parents' substantive due process rights). At least one district court has held that a similar policy likely would violate parents' due process rights. *See Willey*, 680 F. Supp. 3d at 1279–80 (holding parent was likely to succeed on claim that school policy preventing disclosure of student's gender identity to parents without student's consent violated parents' substantive due process rights). This Court need not decide this issue now. Under the Free Speech Clause, Polk has no right to disregard her employer's policy on what she may say to parents concerning their child's gender identity on the ground that Polk believes the policy violates the parents' due process rights.

[Polk] is paid to do." *See Janus*, 585 U.S. at 905; *see also id.* at 910 ("[I]n general when public employees are performing their job duties, their speech may be controlled by their employer."). When Polk decided to enter government service as a public school teacher, she "by necessity" had to "accept certain limitations on . . . her freedom." *See Garcetti*, 547 U.S. at 418 (citing *Waters v. Churchill,* 511 U.S. 661, 671 (1994) (plurality opinion) ("[T]he government as employer indeed has far broader powers than does the government as sovereign." (alteration in original))). Polk "retain[s] the prospect of constitutional protection for [her] contributions to the civic discourse" on transgender and gender nonconforming children, but the "prospect of protection . . . does not invest [her] with a right to perform [her job] however [she sees] fit." *See id.* at 422.

Because the speech that Polk challenges is part of her official duties as a teacher, it is unprotected by the First Amendment. The Board may require Polk to speak in accordance with the Guidelines. Polk does not state a cognizable free speech claim. The claim is dismissed.[11]

### E.  Title VII

Polk's final claim is a Title VII religious discrimination claim. Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). "Courts have recognized that employees may utilize two theories in asserting religious discrimination claims." *Chalmers v. Tulon Co.*, 101 F.3d

---

[11] Because Polk has no free speech claim under *Garcetti*, the Court need not engage in the *Pickering* balancing test. Polk does not speak as a private citizen when she speaks to students and parents, and even if she did, her speech does not involve a matter of public concern. An elementary school student's gender identity, preferred pronouns, and desire to transition genders cannot "be fairly considered as relating to any matter of political, social, or other concern to the community." *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick*, 461 U.S. at 146). Nor is the speech "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *See id.* (quoting *Roe*, 543 U.S. at 83–84). The speech at issue here—using a child's preferred pronouns in the classroom and speaking with parents about their child's gender identity—is very much a matter of private concern.

1012, 1017 (4th Cir. 1996). "These theories are denominated as the 'disparate treatment' and 'failure to accommodate' theories." *Id.* Polk alleges a failure to accommodate.

A Title VII failure-to-accommodate claim proceeds in two steps. First, the employee bears the burden of establishing a prime facie case of discrimination. *See id.* at 1019. To show a prima facie failure to accommodate, an employee must prove that (1) they have "a bona fide religious belief that conflicts with an employment requirement"; (2) they "informed the employer of this belief"; and (3) they were "disciplined for failure to comply with the conflicting employment requirement." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017). If the employee makes a prima facie case, the burden shifts to the employer to show "*either* (1) that it provided the [employee] with a reasonable accommodation for [their] religious observances *or* (2) that such accommodation was not provided because it would have caused an undue hardship[.]" *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008). To show undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023).

To survive a motion to dismiss, a plaintiff need not plead a prima facie case of discrimination under Title VII. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *see also Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). Instead, the plaintiff must "allege[] facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing*, 959 F.3d at 617 (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).

As the Board concedes, Polk has stated a failure-to-accommodate claim. She alleges that (1) she has a bona fide religious belief that conflicts with the Guidelines; (2) she informed MCPS

that she has a religious opposition to the Guidelines and will not comply with them; and (3) MCPS refused to hire her as a substitute teacher because she refuses to comply with the Guidelines.

The Board's defense to the Title VII claim is that Polk's proposed accommodation would cause it undue hardship. The Court does not consider an affirmative defense on a motion to dismiss unless it "clearly appears on the face of the complaint." *See Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)). An undue hardship defense to a failure-to-accommodate claim rarely appears on the face of the complaint. The defense usually arises at summary judgment. *See Niederberger v. Wegmans Food Mkts., Inc.*, No. JKB-23-2759, 2024 WL 2866609, at *4 (D. Md. June 6, 2024) (declining to decide reasonableness of religious accommodation and hardship on employer because they "are issues of fact more appropriately resolved on summary judgment"); *Dean v. Acts Ret. Life Cmtys.*, No. GLR-23-1221, 2024 WL 964218, at *6 (D. Md. Mar. 6, 2024) ("Whether an undue hardship exists is usually considered an issue of fact to be determined on summary judgment.").

The Board says there is precedent for granting a motion to dismiss a failure-to-accommodate claim on the ground that the accommodation would cause the employer undue hardship. It cites *Lowe v. Mills*, 68 F.4th 706 (1st Cir. 2023). There, the First Circuit affirmed the dismissal of a Title VII failure-to-accommodate claim brought by healthcare workers whose employers, healthcare providers, terminated them after they refused for religious reasons to get COVID-19 vaccinations. 68 F.4th at 709. In their complaint, the employees alleged that the only acceptable accommodation would be a waiver of the vaccination requirement. *Id.* at 719. That accommodation, however, would violate Maine law. *Id*. at 720. In consequence, the proposed accommodation would have caused a significant risk that the healthcare providers would lose their

licenses and be subject to monetary penalties. *Id.* The First Circuit had no trouble concluding that an undue hardship on the employers was apparent on the face of the complaint. *Id.* at 719–20 (noting that, even though "undue hardship is an affirmative defense," dismissal on a Rule 12(b)(6) motion is appropriate "if 'the facts establishing the defense [are] clear on the face of the plaintiff[s'] pleadings' and 'there is "no doubt" that the plaintiff[s'] claim[s] [are] barred" (alterations in original) (quoting *Zenon v. Guzman*, 924 F.3d 611, 616 (1st Cir. 2019))). The First Circuit affirmed dismissal of the complaint because the employees' only requested accommodation obviously would have caused the employer an undue hardship. *Id.* at 720.

This case is not remotely like *Lowe*. Polk does not allege, as the *Lowe* plaintiffs did, that she would accept only one accommodation that so obviously would violate the law and cause the Board an undue hardship. Polk does not demand, as the Board claims she does, that MCPS exempt her from teaching transgender and gender nonconforming students entirely or grant her permission to treat those students differently. Even though Polk does not have to plead a specific accommodation that would be acceptable to her, Polk suggests in her complaint and states her briefing that she might be amenable to an accommodation along the lines that she and the MCPS compliance coordinator discussed. *See* ECF 1, ¶ 33; ECF 4-1, at 12–13. That might include an exemption from using preferred pronouns and extra assistance from school administrators who would interact with the transgender students in her classroom. Such an accommodation may, as the Board argues, violate Title IX and thus cause an undue hardship, but at this stage, it is premature to say that *any* accommodation suitable to Polk would be unreasonable. *See Kluge v. Brownsburg Cmty. Sch. Corp.*, 732 F. Supp. 3d 943, 962–70 (S.D. Ind. 2024), *appeal filed*, No. 24-1942 (7th Cir. May 31, 2024) (evaluating similar religious accommodations for high school teacher at summary judgment stage).

Even if this case were like *Lowe*, the First Circuit decided *Lowe* before the Supreme Court decided *Groff v. DeJoy*. The *Groff* Court emphasized that undue hardship is a "fact-specific inquiry." 600 U.S. at 468. As *Groff* explained, Title VII requires an employer to consider all possible accommodations—"not merely [to] assess the reasonableness of a particular possible accommodation or accommodations." *Id.* at 473. The Board may prove, after discovery, that every possible accommodation would cause undue hardship, but the Court cannot evaluate that fact-intensive defense now. *See Dodson v. Lutheran Vill. at Millers Grant, Inc.*, No. EA-23-169, 2024 WL 3597201, at *5 (D. Md. July 30, 2024) ("As the *Groff* decision makes clear, however, undue hardship must be assessed on a case-by-case basis. And because it is a fact-bound question, it is better suited for resolution on summary judgment as opposed to a motion to dismiss."); *Phillips v. Rector & Visitors of the Univ. of Va.*, No. 3:22-cv-00075, 2024 WL 1201639, at *8 (W.D. Va. Mar. 20, 2024) ("If not clear before *Groff*, it is certainly clear now that an undue hardship analysis is premature at the motion to dismiss stage.").

Polk's Title VII claim may proceed, but only against the Board, not the Board members and the interim superintendent. As her employer, the Board is the only proper defendant for the Title VII claim. *See* 42 U.S.C. §§ 2000e-2(a), 2000e(b) (defining "employer"); *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015) (explaining that "[a]n entity can be held liable in a Title VII action . . . if it is an 'employer' of the complainant"). Polk does not assert any specific allegations about the individual defendants in their individual capacities. Even if the individual defendants could be considered Polk's supervisors—and Polk does not allege they were—supervisors are not liable under Title VII in their individual capacities. *See Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 181 (4th Cir. 1998). The claim against the individuals in their official capacities fares no better. A suit against an individual in their official capacity is a suit

against the entity they represent, and that entity here is the Board. *See Adams v. Ferguson*, 884 F.3d 219, 225 (4th Cir. 2018) (stating that suits against government officials in their official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent" (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978))). Polk's Title VII claim against the individual Board members and the interim superintendent is dismissed because it is duplicative of her claim against the Board. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (dismissing § 1983 claim against school superintendent in his official capacity as duplicative of same claim against school board); *see also Windsor v. Bd. of Educ.*, No. TDC-14-2287, 2016 WL 4939294, at *7 (D. Md. Sept. 13, 2016) (dismissing Title VII claims brought against Prince George's County Board of Education members in their individual and official capacities).

The motion to dismiss Polk's Title VII claim is denied as to the Board and granted as to the Board members and the interim superintendent.

### III.    Motion for a Preliminary Injunction

Finally, the Court considers whether Polk is entitled to a preliminary injunction on her sole remaining claim, the Title VII failure-to-accommodate claim. She is not.

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)). Polk seeks "a particularly aggressive form of preliminary injunction, one that is 'disfavored' in 'any circumstance.'" *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014)). She seeks a "mandatory injunction," because

she seeks "an order altering the status quo before the case even begins." *See id.* Such injunctions "are 'warranted only in the most extraordinary circumstances.'" *Id.* (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994)).

To obtain a preliminary injunction, Polk must establish four factors: (1) that she is likely to succeed on the merits of her claims; (2) that she is likely to suffer irreparable harm without preliminary relief; (3) that the balance of equities favors her; and (4) that an injunction is in the public interest. *See Frazier v. Prince George's County*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Polk must prove all four factors. *See id.*

Polk has not shown irreparable harm. The harm caused by the alleged Title VII violation is financial. Financial harm generally does not suffice to establish irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90, 92 n.68 (1974) (holding that "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury," nor does "insufficiency of savings or difficulties in immediately obtaining other employment"). Polk conceded as much. ECF 30, at 27 ("Ms. Polk is well aware that requests for financial relief, standing alone, ordinarily do not qualify for injunctive relief."). The irreparable harm that Polk relied on in support of her preliminary injunction motion was the alleged violation of her constitutional rights. Now that her constitutional claims have been dismissed, Polk cannot establish irreparable harm.

Polk is not entitled to a preliminary injunction on her Title VII claim. Her motion for a preliminary injunction is denied.

## IV.    Conclusion

The Board's motion to dismiss Polk's complaint is granted in part and denied in part. Polk's First Amendment claims are dismissed without prejudice. Her Title VII claim survives. The only

proper defendant for the Title VII claim is the Board. The claims against MCPS are dismissed with prejudice. The claims against the Board members and the interim superintendent are dismissed without prejudice. Polk's motion for a preliminary injunction is denied. A separate Order follows.


Date: <u>January 17, 2025</u>

Deborah L. Boardman
United States District Judge